**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| [UNDER SEAL], | Civil Action No. _____ |
| Plaintiffs, | **<u>COMPLAINT</u>** |
| v. | |
| [UNDER SEAL], | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| Defendants. | **JURY TRIAL DEMANDED** |

**DOCUMENT TO BE KEPT UNDER SEAL**

**DO NOT ENTER INTO PACER**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* TODD PATTISON,<br>213 Zinfandel Ln.<br>Annapolis, MD 21401<br><div align="right">Plaintiffs,</div><br>v.<br><br>PARAGON SYSTEMS, INC.,<br>13900 Lincoln Park Dr., Ste. 300<br>Herndon, VA 20171<br><br>PATRONUS SYSTEMS, INC.,<br>3000 N. Wickham Rd., Ste. 8<br>Melbourne, FL 32935<br><br>PATRONUS SYSTEMS PARTNERS, LLC,<br>3000 N. Wickham Rd., Ste. 8<br>Melbourne, FL 32935<br><br>ATHENA SERVICES INTERNATIONAL, LLC,<br>5015 Battery Ln., Ste. 703<br>Bethesda, MD 20814<br><br>and<br><br>ATHENA JOINT VENTURE SERVICES, LLC,<br>5015 Battery Ln., Ste. 703<br>Bethesda, MD 20814<br><div align="right">Defendants.</div> | Civil Action No. _____<br><br>**COMPLAINT**<br><br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**<br><br><br>**JURY TRIAL DEMANDED** |

*Qui tam* Plaintiff-Relator Todd Pattison ("Relator"), on behalf of the United States of America, for his Complaint against Paragon Systems, Inc.; Patronus Systems, Inc.; Patronus Systems Partners, LLC; Athena Services International, LLC; and Athena Joint Venture Services, LLC (collectively, "Defendants"), alleges, based on personal knowledge and relevant documents, as follows:

2

## I.    __INTRODUCTION__

1.    This is an action to recover damages and civil penalties on behalf of the United States of America and the States arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants and/or their agents, employees and co-conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729–33, as amended ("the FCA" or "the Act").

2.    Defendant Paragon Systems, Inc. ("Paragon Systems" or "Paragon") is one of the largest providers in the United States of specialized security, fire and emergency response, investigations, inspections, cybersecurity, and mission support services to the Federal Government and other critical infrastructure entities.  Paragon Systems has more than 14,000 security and fire personnel through the country.  Its parent company, Securitas Critical Infrastructure Services, Inc., is a subsidiary of Securitas AB (aka, "the Securitas Group" or, simply, "Securitas").

3.    Securitas AB is an $11.7 billion Stockholm-based multinational securities services provider with three primary business segments: Securities Services North America, Security Services Europe, and Securities Services Ibero-America (which includes Spain, Portugal and Latin America).   In addition, Securitas AB's AMEA division conducts security-related business operations in Africa, the Middle East, and Asia.  Securitas AB is thus one of the world's largest providers of security services, with 355,000 employees worldwide.

4.    Despite Paragon Systems' own substantial size (and the even greater size and resources of its related corporate entities), since at least 2010, Defendant Paragon Systems has successfully undertaken an unlawful scheme to capture security officer services contracts set aside by the Federal Government for award to _small_ businesses, including small businesses owned by veterans who became disabled while serving in the United States military, women, and other socially and economically disadvantaged groups.  In order to capture such set-aside contract awards, Defendant Paragon Systems has formed and entered into joint ventures with proxy companies—Defendants Patronus Systems, Inc. ("Patronus Systems") and Athena Services

International, LLC ("Athena Services")—to bid for and secure contracts set aside for small businesses.

5.      Although Patronus Systems and Athena Services are purportedly small businesses owned by women, one of whom is a veteran, in reality they are controlled by, managed by, affiliated with, and (Relator believes, based on the above-listed considerations) at least partially owned by Paragon Systems itself.  Through this ruse, Paragon Systems, Patronus Systems, Athena Services, and the joint ventures they have formed to advance their conspiracy and unlawful plan— Patronus Systems Partners, LLC and Athena Joint Venture Services, LLC—deprive the United States of the benefit of set-aside contracts, which are intended to foster the growth and development of small businesses, including those owned by veterans in the service of their country.

6.      In addition, Defendants bid for contracts at lower prices than they knew they would actually charge the Government once awarded such contracts, thereby depriving the Government of competitive pricing promised by Defendants.

## II.    **PARTIES**

7.      Plaintiff-Relator Todd Pattison is a resident of Annapolis, Maryland.  He is the CEO and President of CDA, Inc. d/b/a MaxSent, a company based in Annapolis, Maryland that provides professional security services in shopping centers; federal, state, and local government buildings; airports and transit centers; manufacturing sites; and other locations.

8.      Relator learned in or around October 2018 that Patronus Systems Partners, LLC, a joint venture between Paragon Systems, Inc. and Patronus Systems, Inc., had been awarded a contract to provide Protective Security Officer services at various locations in New Jersey by the Federal Protective Service.  Relator conducted an extensive investigation and determined that Paragon Systems, Inc., a large business, was using Patronus Systems, Inc., Patronus Systems Partners, LLC, Athena Services International, LLC, and Athena Joint Venture Services, LLC as proxy companies to obtain that contract and other small business set-aside contracts for which

4

Paragon Systems, Inc. was ineligible.  Through his counsel, Relator voluntarily disclosed to the Government the information on which his allegations are based prior to filing this Complaint.

9.      The real party in interest in this case is the United States (sometimes referred to herein as the "Government").  The Government, through the United States Department of Homeland Security, Federal Protective Service (sometimes referred to herein as "FPS"), solicited proposals for and awarded the contracts at issue in this action.  As described more fully below, the Government set those contracts aside for award to small businesses to foster and nurture the development of small businesses, including those owned by veterans who became disabled while serving in the United States military.  FPS provides security and law enforcement services at more than 9,500 federal facilities nationwide.

10.     Defendant Paragon Systems, Inc. ("Paragon") provides protective security officers ("PSOs") at various federal buildings under contracts and subcontracts with the Federal Protective Service, a component of the United States Department of Homeland Security ("DHS"), and holds significant market share in the FPS contract security market.  It is incorporated in New York, Alabama, and Minnesota.  Its headquarters are located at 13900 Lincoln Park Drive, Suite 300, Herndon, Virginia.  Paragon's revenues exceed $450 million per year.  It is a subsidiary of Securitas AB, a publicly traded multi-billion-dollar global security service provider based in Stockholm, Sweden.  Paragon is registered in the System for Award Management ("SAM"), a federal database, with DUNS number 175357672 and SAM number RG1VD6RNMXB5.

11.     Defendant Patronus Systems, Inc. ("PSI") is a privately held company incorporated in Florida.  PSI's filings with the Florida and Kentucky secretaries of state indicate that its address is 3000 N. Wickham Road, Suite 8, Melbourne, Florida.  It is registered as a Service Disabled Veteran- and Woman-Owned Small Business that employs PSOs at various federal buildings under FPS contracts and subcontracts.  On paper, PSI's President and sole owner is Mabel O'Quinn.  Her husband, Rick O'Quinn, is the Vice President of International Union, Security, Police, and Fire Professionals of America ("SPFPA"), a union that represents, among other

members, PSOs working under FPS contracts.  Andrea Kaciban (nee Dankanics) was a Director of PSI from 2010 through 2011.  Ms. Kaciban is married to Leslie ("Les") Kaciban, President of Paragon's Protective Services Division.  PSI is registered in SAM with DUNS number 961795031 and SAM number GU1JM7G4MHR7.

12.    Defendant Patronus Systems Partners, LLC ("PSP") was a Florida company formed in July 2018 and located at 3000 N. Wickham Road, Suite 8, Melbourne, Florida (the same address as PSI).  Mabel O'Quinn was the registered agent for PSP, and she filed articles of dissolution for the company with the Florida Secretary of State in November 2018.

13.    Defendant Athena Services International, LLC ("ASI") is a Maryland company that provides PSO services.  Its filings with the Maryland Secretary of State list its address as 4905 Del Ray Avenue, Suite 402, Bethesda, Maryland.  From ASI's date of registration in May 2014 until May 2017, its address with the Secretary of State was 5015 Battery Lane, Suite 703, Bethesda, Maryland.  In July 2019, ASI filed a resolution changing its registered agent from Alisa Silverman to CSC-Lawyers Incorporating Service Company.  Ms. Silverman's sister, Rachel Rubin, is married to Robert Rubin, a Vice President at Paragon.  Robert Rubin's name and address appear on the corporate charter approval sheet of ASI's Articles of Organization.  ASI is registered in SAM with DUNS number 079434384 and SAM number FT9JT1HQA964.

14.    Defendant Athena Joint Venture Services, LLC ("AJVS") is a Maryland company formed in February 2017.  AJVS' filings with the Maryland Secretary of State list its address as 4905 Del Ray Avenue, Suite 402, Bethesda, Maryland, and its registered agent as Alisa Silverman. According to the Secretary of State, the address for Ms. Silverman is 5015 Battery Lane, Suite 703, Bethesda, Maryland.  AJVS is registered in SAM with DUNS number 080568563 and SAM number CP38M26CLNB1.

15.    Collectively, PSI, PSP, ASI, and AJVS are sometimes referred to herein as the "Paragon Affiliated Defendants."

III.    **JURISDICTION AND VENUE**

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

17.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Even if there had been any such public disclosure, Relator is, within the meaning of the federal False Claims Act, an "original source" of the allegations herein because prior to any relevant disclosure, he voluntarily disclosed to the Government the information on which the allegations or transactions in this Complaint are based, and/or because he has knowledge that is independent of and materially adds to any publicly-disclosed allegations or transactions relevant to his claims, and voluntarily provided the information to the Government before filing this action.

18.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States.  Moreover, Defendants can be found in and have transacted business relevant and material to the allegations in this Complaint in the District of Maryland.

19.     Venue is proper in the District of Maryland pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact or have transacted business in this District that is relevant and material to the allegations in this Complaint. At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this District and/or maintain employees and offices in this District.

IV.    **APPLICABLE LAW**

   A.  **The Federal False Claims Act**

20.     The FCA was originally enacted during the Civil War.  Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United

States Government to recover losses sustained as a result of fraud against it. The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

21.     The FCA prohibits, inter alia: (a) knowingly presenting (or causing to be presented) to the Federal Government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) conspiring to violate any of these sections of the FCA. 31 U.S.C. §§ 3729(a)(1)(A)–(C). Any person who violates the FCA is liable for a mandatory civil penalty for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

22.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

23.     Based on these provisions, Relator seeks to recover all available damages, civil penalties, and other relief for the violations alleged herein.

**B. Small Business Set-Aside Programs**

24.     The Federal Government has long encouraged small business participation in federal contracting. Congress passed the Small Business Act in 1953 to declare the Government's commitment to the success of small business and to ensure that a "fair proportion" of Government

contracts go to small business entities. 15 U.S.C. § 631(a). Congress re-affirmed that commitment in the Small Business Jobs Act of 2010 (the "Jobs Act"), Publ. L. No. 111-240 (2010).

25.     In the Jobs Act, Congress created a Government-wide goal that 23 percent of the dollar value of all federal prime contracts be awarded to small businesses. 15 U.S.C. § 644(g)(1)(A).

26.     To meet the small business contracting goals, each federal agency involved in procurement creates opportunities called "set-asides" for either all small businesses or a subset of small businesses to compete against a pool of like-size contractors.

27.     Qualifying for a small business contracting program allows businesses to more readily gain lucrative opportunities with the Federal Government. In 2020, $145.7 billion went to small businesses to procure goods and services, which amounts to approximately 26 percent of all prime contract dollars. Press Release, Small Business Administration, Federal Gov't Awards Record-Breaking $145.7 Billion in Contracting to Small Businesses (July 28, 2021), https://www.sba.gov/article/2021/jul/28/federal-government-awards-record-breaking-1457-billion-contracting-small-businesses. Given the potential of receiving a contract set aside only for small businesses, and the amount of money available, it is not surprising that businesses explore all possible avenues to qualify.

28.     However, misrepresenting a firm as "small" in order to obtain set-aside contracts is strictly prohibited. The Small Business Act provides sanctions for false certifications up to $500,000 and imprisonment. 15 U.S.C. § 645(d)(2)(A). Moreover, misrepresentations of size status are expressly actionable under the FCA. 13 C.F.R. § 121.10(e)(2).

29.     Firms that wish to do business with the Government must register with the Government as small businesses and annually update their status in a federal database called the System for Award Management ("SAM").

30.     A proposal or bid on a set-aside contact is deemed to include a certification that the bidder is an eligible small business for that contract. 15 U.S.C. § 632(w)(2). Submissions of bids

for contracts, subcontracts, and cooperative agreements set aside for small businesses and registrations in the SAM database for the purpose of being considered for an award of a contract, subcontract, or cooperative agreement as a small business concern "shall be deemed affirmative, willful and intentional certifications of small business size and status." *Id.*; 13 C.F.R. § 121.108(a).

31.    Each time a large business misrepresents itself as a "small business" to win a contract bid, the large business has obtained a contract that should have been awarded to a bona fide small business instead.  Likewise, the large business that has misrepresented its size status has gained an unfair advantage over honest large businesses that have not made such misrepresentations.

32.    A small business concern ("SBC") is "small" and therefore eligible for federal small business programs and preferences when it meets the Small Business Administration's ("SBA") size standards.  13 C.F.R. § 121.101(a).  These standards have been developed for different industries under the North American Industry Classification System ("NAICS").  *Id.*  For security guards and patrol services—the type of services at issue in this case—the NAICS size standard as of August 18, 2019 is $22 million in annual receipts.  13 C.F.R. § 121.201.  An entity that, in conjunction with its affiliates (as described below), has annual receipts greater than $22 million is ineligible to compete for or to be awarded set-aside contracts for security guard services. *Id.*  From July 14, 2014 until August 18, 2019, the size standard for security guards and patrol services was $20.5 million.  79 Fed. Reg. 33,647, 33,664 (June 12, 2014); 84 Fed. Reg. 34,261, 34,277 (July 18, 2019).

33.    It is common for contractors to join together to compete for government contracts under teaming agreements.  Teaming arrangements allow companies to compete for government contracts that they might not be able to obtain and perform individually.  A properly structured teaming arrangement allows participating companies to work together in seeking an award and, under limited circumstances, can shield the teaming partners from being deemed "affiliates" for purposes of size standards.

34.    Entities are "affiliates" of each other when one entity controls, or has the power to control, the other.   13 C.F.R. § 121.103(a).   Affiliation is determined by the totality of the circumstances, considering factors such as ownership, management, previous relationships or ties to the other entity, and contractual relationships.  *Id.*

35.    Affiliation through common ownership and management can be found when a person or entity is a majority shareholder of an SBC or where the officers, directors or managing members of one concern are able to control the board of directors and/or management of another concern.  *Id*. § 121.103(e).

36.    Affiliation through identity of interests arises when two or more individuals or firms have substantially identical business or economic interests, such as family ties, common investments or firms that are economically dependent on each other.  *Id.* § 121.103(f).  In such instances, the SBA may treat the individuals or persons as one party whose interests are aggregated, unless the individuals or firms rebut the determination with evidence showing that the interests are in fact separate.  *Id.*

37.    Firms owned or controlled by married couples, parties to a civil union, parents, children, and siblings are presumed to be affiliated if they conduct business with each other, such as subcontracts or joint ventures, or share or provide loans, resources, equipment, locations, or employees with one another.  *Id.* § 121.103(f)(1).

38.    Identity of interest may also be presumed based on economic dependence if the concern in question derived 70% or more of its receipts from another concern over the previous three fiscal years.  *Id.* § 121.103(f)(2).

39.    Affiliation may also exist in the case of a newly organized concern, such as where:

> Former or current officers, directors, principal stockholders, managing members, or key employees of one concern organize a new concern in the same or related industry or field of operation, and serve as the new concern's officers, directors, principal stockholders, managing members, or key employees, and the one concern is furnishing or will furnish the new concern with contracts, financial or technical assistance, indemnification on bid or performance bonds, and/or other facilities, whether for a fee or otherwise.

11

*Id.* § 121.103(g).

40.     For purposes of affiliation, control can be both positive and negative.  "Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders."  *Id.* § 121.103(a)(3).

41.     Affiliation may also arise in the case of joint venturers.  "A joint venture is an association of individuals and/or concerns with interests in any degree or proportion intending to engage in and carry out business ventures for joint profit over a two-year period, for which purpose they combine their efforts, property, money, skill, or knowledge, but not on a continuing or permanent basis for conducting business generally."  *Id.* § 121.103(h).  "This means that

> a specific joint venture entity generally may not be awarded contracts beyond a two-year period, starting from the date of the award of the first contract, without the partners to the joint venture being deemed affiliated for the joint venture.  Once a joint venture receives a contract, it may submit additional offers for a period of two years from the date of that first award. An individual joint venture may be awarded one or more contracts after that two-year period as long as it submitted an offer including price prior to the end of that two-year period.  SBA will find joint venture partners to be affiliated, and thus will aggregate their receipts and/or employees in determining the size of the joint venture for all small business programs, where the joint venture submits an offer after two years from the date of the first award.  The same two (or more) entities may create additional joint ventures, and each new joint venture entity may submit offers for a period of two years from the date of the first contract to the joint venture without the partners to the joint venture being deemed affiliates.  At some point, however, such a longstanding inter-relationship or contractual dependence between the same joint venture partners will lead to a finding of general affiliation between and among them.

13 C.F.R. § 121.103(h).

42.     A joint venture must be in writing; must do business under its own name and be identified as a joint venture in the SAM database for the award of the prime contract; and may be a formal or informal partnership or exist as a separate legal entity.  *Id.*

43.     A joint venture—and therefore, affiliation—may also arise between a contractor and its "ostensible subcontractor."  *Id.* § 121.103(h)(2).  "An ostensible subcontractor is

> a subcontractor that is not a similarly situated entity, . . . [i.e., a subcontractor that does not have the same small business program status as the prime contractor], and performs primary and vital requirements of a contract, or of an order, or is a subcontractor upon which the prime contractor is unusually reliant. All aspects of the relationship between the prime and subcontractor are considered, including, but not limited to, the terms of the proposal (such as contract management, technical responsibilities, and the percentage of subcontracted work), agreements between the prime and subcontractor (such as bonding assistance or the teaming agreement), and whether the subcontractor is the incumbent contractor and is ineligible to submit a proposal because it exceeds the applicable size standard for that solicitation.

*Id.*; 13 C.F.R. § 125.1. The purpose of the ostensible subcontractor rule is to prevent large businesses from forming relationships with small businesses to evade SBA's size requirements.

44. Every joint venture must designate the small business as the managing venturer and an employee of the small business managing venturer as the manager responsible for performance of the contract. 13 C.F.R. § 125.8(b)(2)(ii). The managing venturer is responsible for controlling the day-to-day management and administration of the contractual performance of the joint venture, while other joint venture partners may participate in corporate governance and decision-making. *Id.* Although the responsible manager need not be an employee of the small business at the time the joint venture submits an offer, if he or she is not, there must be a signed letter of intent that the individual commits to be employed by the small business if the joint venture is the successful offeror. *Id.* Moreover, the responsible manager cannot be employed by the mentor and later become an employee of the small business for purposes of performance under the joint venture. *Id.* When the joint venture is a separate legal entity, the small business must own at least 51% of such entity.

45. To further ensure genuine participation of small businesses, SBA regulations also require that the small business partner to the joint venture perform at least 40% of the work performed by the joint venture. 13 C.F.R. § 125.8(c)(1). The work that the small business performs must be more than administrative or ministerial functions so that it gains substantive experience. *Id.* § 125.8(c)(3).

46. Before beginning work on the set-aside contract, the small business partner must submit a written certification to the contracting officer and the SBA, signed by an authorized

official of each partner to the joint venture, stating that the parties have entered a joint venture agreement that fully complies with the requirements described above and that they will perform the contract in compliance with those requirements. *Id.* § 125.8(d). Noncompliance with such requirements is a basis for suspension or debarment. *Id.* § 125.8(i).

47.     In general, joint venturers are affiliates whose revenues are aggregated for purposes of determining their size, and therefore their eligibility for set-aside contracts. *Id.* However, certain joint ventures are exempt from this finding of affiliation. One exception covers joint ventures formed by a small business (protégé) concern and its approved mentor under 13 C.F.R. § 125.8. 13 C.F.R. § 121.103(h)(1)(ii). Two firms approved by the SBA to be a mentor and protégé may form a joint venture for any Federal Government procurement. *Id.* The joint venture is exempt from the normal rules of affiliation if certain conditions are met, one of which is that the protégé concern must be small. *Id.*; 13 C.F.R. § 121.103(b)(6).

48.     The SBA had two mentor-protégé programs that were recently consolidated: the 8(a) Business Development Mentor-Protégé Program and the All Small Mentor-Protégé Program ("ASMPP"). Consolidation of Mentor-Protégé Programs and Other Government Contracting Amendments, 85 Fed. Reg. 66,146 (Oct. 16, 2020). The resulting consolidated program is the Mentor-Protégé Program ("MPP").

49.     The SBA created the 8(a) Mentor-Protégé program in 1998 to encourage approved mentors to provide various forms of business assistance to eligible 8(a) participants to aid in their development. *Id.*

50.     The Small Business Jobs Act of 2010, Publ. L. No. 111-240 (2010) ("Jobs Act") was enacted in recognition of the fact that mentor-protégé programs can serve an important business development function for small businesses, and it authorized the SBA to establish separate mentor-protégé programs for the SDVOSB and WOSB programs, both of which was modeled on the existing mentor-protégé program for 8(a) participants. 85 Fed. Reg. 66,146, 66,146–47; Jobs Act section 1347(b)(3). Thereafter, Congress enacted the National Defense

Authorization Act for Fiscal Year 2013 ("NDAA 2013"), Public Law 112-239.  *Id.* at 66,147.
Section 1641 of the NDAA 2013 authorized the SBA to establish a mentor-protégé program for
all small business concerns.  *Id.*

51.    The SBA established the All Small Mentor-Protégé Program ("ASMPP") in 2016
to help small companies compete for government contracts through mentor-provided business
development assistance.  *Id.*; 13 C.F.R. § 125.9.

52.    The consolidated MPP retained most of the rules of the 8(a) and ASMP programs.
As before, to qualify as a protégé, a business must "qualify as small for the size standard
corresponding to its primary NAICS code."  13 C.F.R. § 125.9(c).  The protégé must seek a mentor
with expertise in a primary NAICS code in which it is pursuing business and must submit various
reports   to   SBA   regarding   the   benefits   it   received   from   the   mentor-protégé
relationship.  *Id.* § 125.9(c), (g).

53.    Mentors   may   assist   the   protégé   by   providing   "technical and/or management
assistance; financial assistance in the form of equity investments and/or loans; subcontracts; trade
education; and/or assistance in performing prime contracts with the Government."  *Id.* § 125.9(a).
Once accepted into the MPP, an approved joint venture may compete for Federal contracts based
on the protégé's size and status.  *Id.* § 125.9(d).

54.    If a mentor and protégé are found to be affiliated, the protégé may be considered
"other-than-small"   and   therefore   ineligible   for   certain   federal   contracts.  *See* 13 C.F.R.
§§ 121.101–121.103, 125.8–125.9.

55.    Through the Jobs Act, Congress also sought to give the Government new tools to
protect "small business size and integrity."  The Senate Report accompanying the Jobs Act noted
that "many large corporations self-classifying as small businesses for contracting purposes" were
frustrating laws promoting small-business growth, but that "prosecutions of companies that
misrepresent their small business size and status have been rare."  S-Rep. 111-343 at 8.  To address
that problem, the Jobs Act created the "presumed loss rule," which provides that:

> In every contract [or] subcontract . . . which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract [or] subcontract . . . whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

15 U.S.C. § 632(w)(1).

56.     Several categories of small businesses qualify for additional special programs by virtue of the company's ownership and/or geographic location.  Each of these categories, such as socially and economically disadvantaged small businesses, has its own qualifications for certification by the SBA or self-certification and allows for additional opportunities to compete against similarly qualified small businesses (i.e., only those in their category).

### i.     The Service-Disabled Veteran-Owned Small Business ("SDVOSB") Procurement Program

57.     The Veterans Benefit Act of 2003 (the "VBA") created a procurement program for small business concerns owned and controlled by service-disabled veterans.  48 C.F.R. § 19.1401(a).  The purpose of the Service-Disabled Veteran-Owned Small Business ("SDVOSB") procurement program is to provide Federal contracting assistance to service-disabled veteran-owned SBCs ("SDVOSBCs").  48 C.F.R. § 19.1401(b).  The program "honors the extraordinary service rendered to the United States by veterans with disabilities incurred or aggravated in the line of duty during active service with the armed forces."  Executive Order No. 13360 (Oct. 21, 2004.)

58.     Under the VBA, government contracting officers may award contracts on the basis of competition restricted to SDVOSBCs.  15 U.S.C. § 657f; *see also* 48 C.F.R. § 6.206 ("To fulfill the statutory requirements of the Veterans Benefits Act . . . , contracting officers may set-aside solicitations to allow only [SDVOSBCs] to compete").

59.     Contracting officers may restrict competition to SDVOSBCs so long as they have a reasonable expectation that not less than two SDVOSBCs will submit offers and that the award can be made at a fair market price.  15 U.S.C. § 657f(d).

60.     An SDVOSBC is a concern that meets the following criteria:

16

    i.    The business is majority-owned (not less than 51%) by one or more service-disabled veterans;

    ii.    One or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran, controls the management and daily business operations; and

    iii.    At the time of the contract offer, the business is "small" within the size standard corresponding to the North American Industry Classification System ("NAICS") code assigned to the contract.

13 C.F.R. § 125.11.

61.    An SBC is "owned" by service-disabled veterans, and thus potentially eligible as an SDVOSBC, when one or more service-disabled veterans has direct and unconditional ownership of the concern.  *Id.* § 125.12(a).  In the case of partnerships, LLCs, and corporations, service-disabled veterans must own at least 51% of each class of partnership/membership/corporate interests.  *Id.* § 125.12(b)–(d).

62.    An SBC is "controlled" by service-disabled veterans when one or more service-disabled veterans (or in the case of a veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran) conducts both the concern's long-term decision-making and its day-to-day management and administration of business operations.  *Id.* § 125.13(a).

63.    An SDVOSBC may have affiliates, provided that the aggregate size of the SDVOSBC and all of its affiliates is small.  *Id.* § 125.12.  An SBC owned by service-disabled veterans is <u>not</u> an SDVOSBC when it is affiliated with an entity that is not small.  For example, the combined annual receipts of two or more affiliated commercial construction firms may be no more than $22 million for either of them to be eligible for an SDVOSBC set-aside contract.

64.    Therefore, to qualify as an SDVOSBC, a concern must be majority-owned by service-disabled veterans, must be controlled by service-disabled veterans, and must be "small"

(*i.e.*, must have annual receipts at or below the applicable threshold specified in the contract), inclusive of any and all affiliates.

65.    When the SDVOSBC is the prime contractor on an SDVOSBC contract for services, it may subcontract part of the contract, provided that it does "not pay more than 50% of the amount paid by the government to it to firms that are not similarly situated." *Id.* § 125.6(a)(1).

66.    An SDVOSBC must meet several requirements to submit an offer on a set-aside contract.  At the time an SDVOSBC submits a contract offer, it must represent: (a) that it is an SDVOSBC; (b) that it is small under the NAICS code assigned to the procurement; (c) that it will meet percentage of work requirements; and, if applicable, that it is an eligible (d) joint venture and/or (e) non-manufacturer.  *Id.* § 125.15(a); *see also* 48 C.F.R. § 19.1403(b).

67.    SDVOSBC status is an express condition of payment for SDVOSBC set-aside contracts.  Each and every SDVOSBC set-aside contract contains contract provisions specifying that: "Offers are solicited only from service-disabled veteran-owned small business concerns. Offers received from concerns that are not service-disabled veteran-owned small business concerns shall not be considered.  Any award resulting from this solicitation will be made to a service-disabled veteran-owned small business concern."  48 C.F.R. § 52.219-27(c)(1)–(2); *see also* 48 C.F.R. § 19.1407 (mandating insertion of 48 C.F.R. § 52.219-27 into set-aside solicitations and contracts).

68.    To protect the integrity of the SDVOSBC program, fraud involving the program is expressly actionable under the FCA.  13 C.F.R. § 125.29(b); *see also* 13 C.F.R. § 121.10.

### ii.    Women-Owned Small Business ("WOSB") and Economically Disadvantaged Women-Owned Small Business ("EDWOSB") Procurement Programs

69.    On December 21, 2000, Congress enacted the Small Business Reauthorization Act of 2000, Public Law 106-554.  Section 811 of that Act added a new section 8(m), 15 U.S.C. § 637(m), authorizing Federal contracting officers to restrict competition to eligible Women-Owned Small Businesses ("WOSBs") or Economically Disadvantaged Women-Owned Small Business ("EDWOSBs") for Federal contracts in certain industries.  The purpose of this provision

is to enable contracting officers to identify and establish a sheltered market for competition among WOSBs or EDWOSBs to provide goods and services to the Federal Government.  H.R. Rep. No. 106-879, at 2 (2000).

70.    Section 8(m) of the Small Business Act sets forth certain criteria for the EDWOSB and WOSB programs.  Specifically, the statute provides the following requirements in order for a contracting officer to restrict competition for EDWOSBs or WOSBs under this program:

i.    An eligible concern must be not less than 51 percent owned by one or more women who are "economically disadvantaged" (*i.e.* an EDWOSB).  However, SBA may waive this requirement of economic disadvantage for procurements in industries in which WOSBs are "substantially underrepresented."

ii.    A WOSB is a small business concern owned and controlled by women, meaning that is at least 51 percent owned by one or more women and the management and daily business operations of the concern is controlled by one or more women.

iii.    The contracting officer must have a reasonable expectation that, in industries in which WOSBs are underrepresented, two or more EDWOSBs will submit offers for the contract or, in industries where WOSBs are substantially underrepresented, two or more WOSBs will submit offers for the contract.

iv.    The anticipated award price of the contract must not exceed $4 million, except in the case of manufacturing contracts, where the anticipated price must not exceed $7 million.

v.    In the estimation of the contracting officer, the contract can be awarded at a fair and reasonable price.

vi.    Each competing concern must be duly certified by a Federal agency, a State government, or a national certifying entity approved by SBA, as an EDWOSB or WOSB, or must certify to the contracting officer and provide adequate documentation that it is an EDWOSB or WOSB.  The statute imposes penalties for a concern's misrepresentation of its status.

vii.    The contract must be for the procurement of goods or services with respect to an industry identified by SBA pursuant to a statutorily mandated study as one in which EDWOSBs are underrepresented or substantially underrepresented or WOSBs are substantially underrepresented with respect to Federal procurement contracting.

15 U.S.C. § 637(m), (n).

71.    A firm must be certified by the SBA as a WOSB or EDWOSB to be awarded a WOSB or EDWOSB set-aside or sole-source contract.  13 C.F.R. § 127.200(c)(1).  To do so, the firm must submit an application to the SBA signed by an officer of the concern.  *Id.* §§ 127.300,

127.301.  The SBA relies on the accuracy of the "representations and supporting information contained in the application," which "must be complete and accurate as of the date of submission." *Id.* § 127.301.

72.    A firm that wishes to maintain its certification as a WOSB or EDWOSB "must annually represent to SBA that it continues to meet all WOSB/EDWOSB eligibility criteria." *Id.* § 127.400(a).  "Once certified, a WOSB or EDWOSB must notify SBA of any material changes that could affect its eligibility within 30 calendar days of any such change." *Id.* § 127.401.

73.    A person or concern that misrepresents a concern's status as an EDWOSB or WOSB is subject to (1) suspension and debarment; (2) civil penalties and other remedies under the FCA and the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801–3812; and (3) criminal penalties.  13 C.F.R. § 127.700(e).

### C.  The Service Contract Act

74.    The Service Contract Act ("SCA"), 41 U.S.C. §§ 6701–07, applies to every contract entered into by the United States, the principal purpose of which is to furnish services in the United States through the use of service employees.  Contractors and subcontractors performing on such Federal contracts must observe minimum wage and safety and health standards, and must maintain certain records, unless a specific exemption applies.

75.    Every service employee performing any of the Government contract work under a service contract in excess of $2,500 must be paid not less than the monetary wages, and must be furnished fringe benefits, which the U.S. Department of Labor ("DOL") has determined to be prevailing in the locality for the classification in which the employee is working or, where the predecessor contractor had a collective bargaining agreement ("CBA") covering any such service employee, the wage rates and fringe benefits contained in the predecessor's CBA, including prospective wage and fringe benefits increases provided for in the CBA as a result of arm's length negotiations.  41 U.S.C. §§ 6702 – 6703; 48 C.F.R. §§ 22.1002-2, 22.1002-3.  These requirements do not apply if DOL determines after a hearing (1) that the wages and fringe benefits are

substantially at variance with those which prevail for services of a similar character in the locality, or, as relevant here, (2) that the wages and firing benefits are not the result of arm's length negotiations.  41 U.S.C. § 6703; 48 C.F.R. § 22.1002-3; 48 C.F.R. § 522.22-41(f).  In those instances, DOL issues a new or revised wage determination setting forth applicable wage rates and fringe benefits, which determination becomes part of the contract.  48 C.F.R. § 522.22-41(f).

76.    Moreover, the contractor is entitled to a contract price adjustment to reflect increased labor costs associated with complying with a DOL prevailing wage rate or a predecessor contractor's CBA.

77.    For multi-year and options contracts, such as those at issue here, the SCA Price Adjustment Clause is 48 C.F.R. § 52.222-43(d), which provides:

> The contract price, contract unit price labor rates, or fixed hourly labor rates will be adjusted to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits to the extent that the increase is made to comply with or the decrease is voluntarily made by the Contractor as a result of:
>
> ….
>
> (2) An increased or decreased wage determination otherwise applied to the contract by operation of law
>
> ….

48 C.F.R. § 52.222-43(d).

78.    Wage and fringe benefit increases provided for in a contractor's CBA trigger the Price Adjustment Clause.

## V.    DEFENDANTS DEFRAUDED THE DEPARTMENT OF HOMELAND SECURITY AND THE SMALL BUSINESS SET-ASIDE PROGRAMS

79.    Paragon and the Paragon Affiliated Defendants are affiliated concerns and, at all times relevant to this Complaint, have not been eligible to compete for, be awarded, or perform Government contracts that have been set aside for SBCs, including contracts set aside for SDVOSBs.

80.    At all times relevant to this Complaint, Paragon has had annual receipts in excess of $22 million.  Accordingly, Paragon and the Paragon Affiliated Defendants are not eligible to

compete for, to be awarded, or to perform Government contracts set aside for SBCs, including contracts set aside for award to SDVOSBCs.

81.    On February 9, 2010, Mabel O'Quinn incorporated PSI.    The articles of incorporation list Ms. O'Quinn and Andrea Dankanics as the initial directors of PSI.    Ms. O'Quinn's husband, Rick O'Quinn, is the Vice President of International Union, Security, Police, and Fire Professionals of America ("SPFPA"), a union that represents PSOs working under FPS contracts, including PSOs employed by Paragon, PSI, and ASI.    As alleged in more detail below, SPFPA is a union favored by Paragon and that Paragon used to bid for FPS contracts at lower prices than Paragon knew it would actually charge the Government once awarded such contracts.

82.    Andrea Dankanics (a/k/a Andrea Kaciban) is married to the President of Paragon's Protective Services Division, Les Kaciban.    Mr. Kaciban is also a member of SPFPA's Benefits Plan Board of Trustees.    On information and belief, PSI, acting on behalf of Paragon, choose to use Ms. Kaciban's maiden name in PSI's articles of incorporation to conceal the fact that she was married to a Paragon officer.

83.    On February 15, 2011, Ms. O'Quinn removed Ms. Dankanics as a director of PSI. Ms. O'Quinn remained as the President and sole officer of PSI.    In reality, however, Paragon and its agents, including Mr. Kaciban, continued to exercise control over PSI.

84.    On information and belief, PSI has only provided security services in conjunction with Paragon.    Relator bases this belief, in part, on a description of PSI's performance history that PSP submitted to FPS in connection with a bid for PSO services in New Jersey.    *Infra*.    That performance history showed that PSI had worked on three previous FPS contracts with Paragon, one in which Paragon was the prime contractor and two in which Paragon was a subcontractor to PSI.    Furthermore, 85% of PSI's accounts payable for fiscal years 2016 through 2018 were paid to Paragon.

85.    Furthermore, Paragon employees performed administrative services—including but not limited to bookkeeping, payroll, union dues processing, recruiting, insurance and

retirement plan administration, contract administration, business development and proposal writing, operations management, and quality control—on behalf of the Paragon Affiliated Defendants.  On information and belief, PSI has no employees or other staff except for Ms. O'Quinn, whose ownership of PSI was illusory.

86.    The SBA approved the mentor-protégé agreement between Paragon and PSI on April 20, 2018.    SBA, Active mentor-protégé agreements, https://www.sba.gov/document/ support-active-mentor-protege-agreements.  PSP purportedly owned 51% of the joint venture, and Paragon 49%.

87.    In reality, and despite that approval, PSI's and PSP's operations, finances, and distribution of resources were controlled by Paragon, which established PSI and PSP as fronts to obtain contract work for which Paragon was ineligible.

88.    On May 2, 2014, Robert Rubin and his sister-in-law, Alisa Silverman, filed articles of organization for ASI.  Robert Rubin's name and address appear on the corporate charter approval sheet of the articles of organization.  Mr. Rubin is currently Paragon's Vice President for Business Development.  Before he assumed that role, Mr. Rubin worked for Paragon as Vice President of Government Relations for 10 years.

89.    As with PSI and PSP, the SBA approved a small business mentor-protégé agreement between Paragon and ASI on January 27, 2017.

90.    In reality, and despite that approval, ASI's and AJVS' operations, finances, and distribution of resources were controlled by Paragon, which established ASI and AJVS as fronts to obtain contract work for which Paragon was ineligible.

91.    On information and belief, ASI has not conducted any Government business operations independent of Paragon.

92.    Furthermore, Paragon exercises control over the daily operations and administration of ASI and AJVS.

93.    For example, Paragon's General Counsel, Laura Hagan, sent an email UGSOA President Desire Sullivan on October 14, 2014 stating, "[ASI] is a very small company and we as the prime have already agreed to do all of their labor relations for them…. Do you want to just get me a proposed bridge agreement, under which Athena Services International agrees to the Paragon CBA [collective bargaining agreement] in its entirety?" At the time Ms. Hagan sent the email, ASI had only been in existence for five months. Moreover, Ms. Hagan sent the email more two years before the SBA approved a small business mentor-protégé agreement between Paragon and ASI, on January 27, 2017.

94.    Furthermore, the only person whom UGSOA knows to contact with respect to payroll and union dues for its members who are employed by PSI or Athena is a Paragon employee.

95.    In short, Paragon officers, including President Les Kaciban and Vice President Robert Rubin, managed and controlled PSI, PSP, ASI, and/or AJVS.

96.    Thus, at all relevant times, PSI and PSP were ineligible for SBC status because they were affiliates of Paragon for at least the following reasons:

   i.    One or more officers of Paragon controlled the management of PSI and PSP. 13 C.F.R. § 121.103(e). Common management included Les Kaciban, President of Paragon's Protective Services Division. On information and belief, Mr. Kaciban helped to incorporate PSI and/or PSP, and Mr. Kaciban had the power to control PSI and/or PSP through his spouse, Andrea Kaciban.

   ii.    PSI, PSP, and Paragon were controlled, in part, by two sets of spouses, Andrea Kaciban and Les Kaciban, and Mabel O'Quinn and Rick O'Quinn. 13 C.F.R. § 121.103(f)(1). Accordingly, PSI, PSP, and Paragon were affiliated through identity of interests.

   iii.    PSI derived more than 70% of its receipts from Paragon throughout PSI's existence. 13 C.F.R. § 121.103(f)(2). Accordingly, PSI and Paragon were affiliated through identity of interests and economic dependence.

24

97.    Likewise, at all relevant times, ASI and AJVS were ineligible for SBC status because they were affiliates of Paragon for at least the following reasons:

i.    One or more officers of Paragon controlled the management of ASI and AJVS. 13 C.F.R. § 121.103(e). Common management included Robert Rubin, who served as Paragon's Vice President for Business and Paragon's Vice President for Government Relations. Mr. Rubin and ASI's President and founder, Alisa Silverman, jointly incorporated ASI, and Mr. Rubin had the power to control ASI through Ms. Silverman, his sister-in-law.

ii.    ASI and Paragon are controlled by siblings, Ms. Silverman and her sister via the sister's spouse, Mr. Rubin. 13 C.F.R. § 121.103(f)(1). Accordingly, ASI and Paragon were affiliated through identity of interests.

iii.    ASI derived more than 70% of its receipts from Paragon throughout ASI's existence. 13 C.F.R. § 121.103(f)(2). Accordingly, ASI and Paragon were affiliated through identity of interests and economic dependence.

iv.    ASI and AJVS were "newly organized concerns" formed by current or former officers, stockholders, managing members, or key employees of Paragon, who then served as ASI and AJVS's officers, stockholders, managing members, or key employees, and Paragon furnished ASI and AJVS with contracts, financial or technical assistance, indemnification on bid or performance bonds, and/or other facilities. 13 C.F.R. § 121.103(g).

**A.  Defendants' Fraud in Obtaining FPS Contracts**

98.    Once the Paragon Affiliated Defendants falsely registered as SBCs, an SDVOSB, and WOSBs, they started bidding on contracts for which Paragon was ineligible because the contracts were reserved for SBCs and/or SDVOSBs. In many instances, Paragon was the incumbent contractor that the Paragon Affiliated Defendants sought to "replace." The following

are examples of such contracts.  Relator believes that the Paragon Affiliated Defendants have bid on additional set-aside contracts for which neither they nor Paragon were eligible.

### i.    Patronus Systems, Inc. Wins FPS SDVOSB Set-Aside Contract in West Virginia

99.    On April 14, 2015, the Department of Homeland Security, Federal Protective Service issued Solicitation No. HSHQE315D00002, seeking sources to provide armed PSO services at locations throughout West Virginia, excluding Berkley, Jefferson, and Morgan counties.  https://sam.gov/opp/6ed9f79c661a866c0d351e4622659b0c/view.  The solicitation was classified as a "Service-Disabled Veteran-Owned Small Business (SDVOSB) Set-Aside (FAR 19.14)."  The solicitation stated, "The requirement is 100% set aside for Service Disabled Veteran-Owned Small Businesses (SDVOSB)."

100.    The contract clauses and solicitations provisions included: 48 C.F.R. § 52.219-27, Notice of Service-Disabled Veteran-Owned Small Business Set-Aside (Nov. 2011).  Pursuant to that regulation, the solicitation sought offers:

> only from service service-disabled veteran-owned small business concerns. Offers received from concerns that are not service-disabled veteran-owned small business concerns shall not be considered. … [¶] …  Any award resulting from this solicitation will be made to a service-disabled veteran-owned small business concern.

48 C.F.R. § 52.219-27(c)(1)–(2).  The solicitation required bidders to certify compliance with applicable portions of Federal Acquisition Regulation ("FAR") 52.212-3, 48 C.F.R. § 52.212-3, that the bidder qualified as an SDVOSBC.  48 C.F.R. § 52.212-3(c).

101.    On or before May 14, 2015, PSI submitted a proposal under the solicitation.  As part of the proposal, PSI was required expressly to certify it qualified as an SDVOSB.  Moreover, PSI applied for and at all relevant times maintained registration as a Service Disabled Veteran- and Woman-Owned Small Business in the SAM database, falsely certifying that Patronus Systems, Inc. qualified as an SBC, a WOSB, and an SDVOSBC.  https://sam.gov/entity/961795031/coreData?status=active&emrKeyValue=3874625~1594294420517033.  PSI's website repeats those false assertions, identifying PSI as "a Woman-Owned Small Business and Service-Disabled

Veteran-Owned Small Business." https://www.patronususa.com/. In addition, PSI's submission of a proposal for a contract whose terms repeatedly stated that it was set aside for award to an SDVOSBC was a false implicit representation that PSI qualified as an SDVOSBC.

102.    Thereafter, FPS, unaware that PSI was ineligible for SDVOSB status, awarded PSI a contract pursuant to Solicitation No. HSHQE315D00002.

103.    At the time that it submitted its proposal and at the time it was awarded the contract pursuant to Solicitation No. HSHQE315D00002, PSI and its affiliate, Paragon, knew that PSI was not eligible to be awarded that contract or to receive payments pursuant to that contract. PSI and Paragon knew that PSI was "other than small" because PSI's receipts were required to be pooled with those of its affiliates, including Paragon, for purposes of evaluating SBC status. PSI and Paragon knew that PSI was a proxy corporation established and controlled by Paragon to evade the SBA's size determination, and that PSI was ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

104.    PSI has performed PSO services pursuant that contract, has submitted invoices or progress statements to the Government, and has received substantial payments from the Government for this work. PSI was not eligible to receive the benefits of any SDVOSB set-asides, and therefore was ineligible for the contract and for each payment it received thereunder. The total value of the contract was $33,883,963.49. https://www.usaspending.gov/award/CONT_IDV_HSHQE315D00002_7001.

### ii.    Patronus Systems, Inc. Wins FPS Small Business Set-Aside Contract in Eastern Washington and Idaho

105.    On December 3, 2015, DHS, FPS issued Solicitation No. HSHQWA15R00002, seeking sources to provide armed PSO services at various locations throughout Eastern Washington State and Idaho. The solicitation was set aside for SBCs and classified as a Total Small Business Set-Aside.

106.    On or before January 27, 2016, PSI submitted a proposal under the solicitation. As part of the proposal, PSI was required expressly to certify it qualified as an SBC. Moreover,

27

Patronus Systems, Inc. also applied for and at all relevant times maintained registration as a Service Disabled Veteran- and Woman-Owned Small Business in the SAM database, falsely certifying that Patronus Systems, Inc. qualified as an SBC, a WOSB, and an SDVOSBC. https://sam.gov/ entity/961795031/coreData?status=active&emrKeyValue=3874625~1594294420517033. PSI's website repeats those false assertions, identifying PSI as "a Woman-Owned Small Business and Service-Disabled Veteran-Owned Small Business." https://www.patronususa.com/. In addition, PSI's submission of a proposal for a contract whose terms repeatedly stated that it was set aside for award to an SBC was a false implicit representation that PSI qualified as an SBC.

107.    In or around March 2016, FPS, unaware that PSI was ineligible for small business status, awarded PSI Contract No. HSHQWA16D00002 pursuant to Solicitation No. HSHQWA15R00002.

108.    At the time that it submitted its proposal and at the time it was awarded the contract pursuant to Solicitation No. HSHQWA15R00002, PSI and its affiliate, Paragon, knew that PSI was not eligible to be awarded that contract or to receive payments pursuant to that contract. PSI and Paragon knew that PSI was "other than small" because PSI's receipts were required to be pooled with those of its affiliates, including Paragon, for purposes of evaluating SBC status. PSI and Paragon knew that PSI was a proxy corporation established and controlled by Paragon to evade the SBA's size determination, and that PSI was ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

109.    PSI has performed PSO services pursuant to Contract No. 7 HSHQWA16D00002, has submitted invoices or progress statements to the Government, and has received substantial payments from the Government for this work. PSI was not eligible to receive the benefits of any small business set-asides, and therefore was ineligible for Contract No. HSHQWA16D00002 and for each payment it received thereunder. The total value of Contract No. HSHQWA16D00002 is $40,399,510.

###### iii.    Athena Joint Venture Services, LLC Wins FPS PSO Services Small Business Set-Aside Contract in Utah and Wyoming

110.    On April 19, 2017, DHS, FPS issued Solicitation No. HSHQW817R00003 seeking sources to provide armed PSO services in various locations throughout Utah and Wyoming. https://sam.gov/opp/709bc098efb01d13884c36a921128e28/view.   The solicitation classified the contract opportunity as "Total Small Business Set-Aside (FAR 19.5)" and stated, "This acquisition is being as a small business set-aside."  *Id.*  Pursuant to Federal Acquisition Regulation ("FAR") 19.5, the solicitation sought offers "exclusively for participation by small business concerns."  48 C.F.R. § 19.501(a)(1).  The solicitation required bidders to certify compliance with applicable portions of Federal Acquisition Regulation ("FAR") 52.212-3, 48 C.F.R. § 52.212-3, that the bidder qualified as a small business concern.  48 C.F.R. § 52.212-3(c)(1).

111.    On or before May 22, 2017, AJVS submitted a proposal under the solicitation.  As part of the proposal, AJVS was required expressly to certify that it qualified as an SBC.  On or around March 2, 2017, AJVS registered for, and has thereafter maintained registration in the SAM database as a Self-Certified Small Disadvantaged Business, a Joint Venture WOSB, and a Joint Venture EDWOSB, falsely certifying that AJVS qualified for those designations. https://sam.gov/entity/080568563/coreData?status=active&emrKeyValue=4707148~ 1624272159830435.  As part of the registration, AJVS Managing Member Alisa Silverman (whose brother-in-law, Robert Rubin, is Paragon's Vice President for Business Development) submitted a certification on behalf of AJVS that stated:

> I have read each of the FAR and DFARS provisions presented on this page. By submitting this certification, I, **Alisa Silverman**, am attesting to the accuracy of the representations and certifications contained herein, including the entire NAICS table.  I understand that I may be subject to criminal prosecution under Section 1001, Title 18 of the United States Code or civil liability under the False Claims Act if I misrepresent **ATHENA SERVICES INTERNATIONAL, LLC** in any of these representations or certifications to the Government.

https://sam.gov/entity/080568563/repsAndCerts?status=active&emrKeyValue=4707148~ 1624272159830435.   Among those representations and certifications, Ms. Silverman certified that AJVS qualified as a small business concern and a small disadvantaged

business concern.  FAR 52.212-3, 48 C.F.R. § 52.212-3(c)(1), (4); FAR 52.219-1, 48

C.F.R. § 52.219-1(c)(1)–(2).

112.    Similarly, on November 20, 2014, ASI—the purported protégé of Paragon under

AJVS—registered for, and at all relevant times thereafter maintained registration in the SAM

database as a Self-Certified Small Disadvantaged Business, an EDWOSB, and a WOSB, falsely

certifying that ASI qualified for those designations.  As part of that registration, Ms. Silverman

submitted a certification on behalf of ASI that stated:

> I have read each of the FAR and DFARS provisions presented on this page.
> By submitting this certification, I, **Alisa Silverman**, am attesting to the
> accuracy of the representations and certifications contained herein,
> including the entire NAICS table.  I understand that I may be subject to
> criminal prosecution under Section 1001, Title 18 of the United States Code
> or civil liability under the False Claims Act if I misrepresent **ATHENA
> SERVICES INTERNATIONAL, LLC** in any of these representations or
> certifications to the Government.

https://sam.gov/entity/079434384/repsAndCerts?status=active&emrKeyValue=3816541~162427

0270342170.  Among those representations and certifications, Ms. Silverman certified that ASI

was an SBC, a small disadvantaged business concern, a WOSBC, a WOSB concern eligible under

the WOSB Program, and an EDWOSB concern eligible under the WOSB program.

113.    In addition to these express certifications, AJVS's submission of a proposal for a

contract whose terms repeatedly stated that it was set aside for award to an SBC was a false implicit

representation that AJVS and ASI qualified as SBCs.

114.    On December 22, 2017, FPS, unaware that AJVS was ineligible for small business

status, awarded Contract No. 70RFPW18DW8000001 to AJVS pursuant to the solicitation.

https://sam.gov/opp/21f9f092aecf59a33cc4e0abd3ed4664/view.

115.    At the time that it submitted its proposal and at the time it was awarded the contract

pursuant to Contract No. 70RFPW18DW8000001, ASI, AJVS, and their affiliate, Paragon, knew

that AJVS was not eligible to be awarded that contract or to receive payments pursuant to that

contract.  ASI, AJVS, and Paragon knew that AJVS was "other than small" because ASI's receipts

were required to be pooled with those of its affiliate and joint venture partner, Paragon, for

purposes of evaluating SBC status.  ASI, AJVS, and Paragon knew that ASI and AJVS were proxy corporations established and controlled by Paragon to evade the SBA's size determination, and that ASI and AJVS were ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

116.    AJVS    has    performed    PSO    services    pursuant    to    Contract    No. 70RFPW18DW8000001, has submitted invoices or progress statements to the Government, and has received substantial payments from the Government for this work.  AJVS was not eligible to receive the benefits of any small business set-asides, and therefore was ineligible for Contract No. 70RFPW18DW8000001 and for each payment it received thereunder.  The total value of Contract No. 70RFPW18DW8000001 is $44,994,558.66.  *Id.*

### iv.    Patronus Joint Venture Wins FPS PSO Services Small Business Set-Aside Contract in Southern New Jersey

117.    On June 11, 2018, DHS, FPS issued Solicitation 70RFP318RE3000002, seeking sources to provide PSO services for locations throughout the State of New Jersey, excluding the counties of Essex, Hudson, Middlesex, Monmouth, Morris, Passaic, and Union. https://sam.gov/opp/abde11d603712e44a92dadab2e25c31a/view.  The solicitation was classified as a "Total Small Business Set-Aside (FAR 19.5)."  Pursuant to FAR 19.5, the solicitation sought offers "exclusively for participation by small business concerns."  48 C.F.R. § 19.501(a)(1).  The solicitation required bidders to certify compliance with applicable portions of Federal Acquisition Regulation ("FAR") 52.212-3, 48 C.F.R. § 52.212-3, that the bidder qualified as a small business concern.  48 C.F.R. § 52.212-3(c)(1).

118.    At the time of the solicitation, the incumbent contract—whose performance period was from February 1, 2014 through January 31, 2019—was held by Paragon.  That contract had not been set aside for a small business and was instead obtained through full and open competition.

119.    In order to circumvent the SBC set-aside restrictions, Paragon decided to create a joint venture with PSI.  On July 12, 2018, Ms. O'Quinn filed articles of organization for the joint venture, PSP.

120.    Then, on August 6, 2018, PSP submitted a proposal under the solicitation.  As part of the proposal, PSP was required expressly to certify that it qualified as an SBC.  Moreover, PSP's purported protégé joint venture partner and affiliate, Patronus Systems, Inc., applied for and at all relevant times maintained registration as a Service Disabled Veteran- and Woman-Owned Small Business in the SAM database, falsely certifying that Patronus Systems, Inc. qualified as an SBC, a WOSB, and an SDVOSBC.  https://sam.gov/entity/961795031/coreData?status=active&emrKey Value=3874625~1594294420517033.   PSI's website repeats those false assertions, identifying PSI as "a Woman-Owned Small Business and Service-Disabled Veteran-Owned Small Business." https://www.patronususa.com/.  In addition, PSP's submission of a proposal for a contract whose terms repeatedly stated that it was set aside for award to an SBC was a false implicit representation that PSP and PSI qualified as SBCs.

121.    Thereafter, DHS, FPS selected PSP as the apparent successful offeror.

122.    At the time that it submitted its proposal, PSP, PSI, and their affiliate, Paragon, knew that PSP was not eligible to be awarded that contract or to receive payments pursuant to that contract.  PSI, PSP, and Paragon knew that PSP was "other than small" because PSI's receipts were required to be pooled with those of its affiliate and joint venture partner, Paragon, for purposes of evaluating SBC status.  PSI, PSP, and Paragon knew that PSI and PSP were proxy corporations established and controlled by Paragon to evade the SBA's size determination, and that PSI and PSP were ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

123.    On October 16, 2018, Relator's company, MaxSent, filed a size protest against PSP upon learning that DHS, FPS had awarded the procurement to PSP, alleging that PSI, the purportedly "small" protégé, was an affiliate of Paragon, and the joint venture was thus not eligible for the small business set-aside solicitation.

124.    On November 15, 2018, the SBA issued a size decision, concluding that PSI and Paragon were affiliates for the solicitation, and that PSP was a large business.  Specifically, the

SBA found that PSP's proposal stated that if PSP obtained the contract under the solicitation, a Paragon employee who was already working as the manager on the incumbent contract would stay on as the contract manager. That designation violated 13 C.F.R. § 125.8(b)(2)(ii), which provides that the responsible manager cannot be employed by the mentor and then become an employee of the small business for purposes of performance under the joint venture.

125. On November 28, 2018, Ms. O'Quinn filed articles of dissolution of PSP.

126. Thereafter, MaxSent was awarded the contract under Solicitation. But for Relator's protest, the contract and payments thereunder would have gone to PSP, PSI, and Paragon.

### v. Patronus Systems, Inc. Wins Contract for PSO Services in Kentucky Set Aside for Small Businesses

127. On March 1, 2018, DHS, FPS issued Solicitation No. 70RFP118RE4000005 seeking sources to provide armed PSO services in various locations throughout Kentucky. The synopsis of the solicitation stated, "This acquisition is being solicited under a small business set-aside." https://sam.gov/opp/1a61369bfb3632303adc8183a137e997/view. The synopsis also classified the procurement as a "Total Small Business Set-Aside (FAR 19.5)." *Id.* Pursuant to FAR 19.5, the solicitation sought offers "exclusively for participation by small business concerns." 48 C.F.R. § 19.501(a)(1).

128. At the time of the solicitation, Paragon held the incumbent contract with DHS, FPS for PSO services in Kentucky.

129. On or before April 11, 2018, PSI submitted a proposal under the solicitation. Patronus Systems, Inc. also applied for and at all relevant times maintained registration as a Service Disabled Veteran- and Woman-Owned Small Business in the SAM database, falsely certifying that Patronus Systems, Inc. qualified as an SBC, a WOSB, and an SDVOSBC. https://sam.gov/entity/961795031/coreData?status=active&emrKeyValue=3874625~1594294420517033. PSI's website repeats those false assertions, identifying PSI as "a Woman-Owned Small Business and Service-Disabled Veteran-Owned Small Business." https://www.patronususa.com/. In addition,

PSI's submission of a proposal for a contract whose terms repeatedly stated that it was set aside for award to an SBC was a false implicit representation that PSI qualified as an SBC.

130.    Moreover, in violation of SBA regulations, PSI's bid stated that the incumbent Patronus contract manager would continue to serve as the contract manager if PSI were awarded the contract.  *See* 13 C.F.R. § 125.8(b)(2)(ii) (stating that the responsible manager cannot be employed by the mentor and become an employee of the small business for purposes of performance under the joint venture).

131.    On April 3, 2019, FPS, unaware that PSI was ineligible for small business status, awarded   PSI   Contract   No.   70RFP119DE4000001   pursuant   to   the   solicitation. https://sam.gov/opp/1a61369bfb3632303adc8183a137e997/view?page=1#opportunity-award-summary.  The award notice summary expressly stated that the contract was set aside for small businesses.

132.    At the time that it submitted its proposal and at the time it was awarded Contract No. 70RFP119DE4000001, PSI and its affiliate, Paragon, knew that PSI was not eligible to be awarded that contract or to receive payments pursuant to that contract.  PSI and Paragon knew that PSI was "other than small" because PSI's receipts were required to be pooled with those of its affiliates, including Paragon, for purposes of evaluating SBC status.  PSI and Paragon knew that PSI was a proxy corporation established and controlled by Paragon to evade the SBA's size determination, and that PSI was ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

133.    PSI has performed PSO services pursuant to Contract No. 70RFP119DE4000001, has submitted invoices or progress statements to the Government, and has received substantial payments from the Government for this work.  PSI was not eligible to receive the benefits of any small business set-asides, and therefore was ineligible for Contract No. 70RFP119DE4000001 and for each payment it received thereunder.  The total value of Contract No. 70RFP119DE4000001 is $42,995,450.

### vi. Patronus Systems, Inc. Re-Awarded PSO Services Contract in West Virginia

134.     On February 25, 2020, DHS, FPS issued Solicitation No. 70RFP320RE3000001, seeking offers to provide armed PSO services throughout West Virginia. https://sam.gov/opp/1c610c845f1344859d7f570be3967e9e/view.  The solicitation stated that the opportunity was set-aside for women-owned small businesses and classified it as a "Women-Owned Small Business (WOSB) Program Set-Aside (FAR 19.15)."

135.     The solicitation expressly incorporated FAR 52.219-30, Notice of Set-Aside for, or Sole Source Award to, Women-Owned Small Business Concerns Eligible Under the Women-Owned Small Business Program (Dec 2015) (DEVIATION 2019-01) (15 U.S.C. 637(m)); FAR 52.219-28, Post Award Small Business Program Representation (Jul 2013) (15 U.S.C. 632(a)(2)).

136.     On or before April 6, 2020, PSI submitted a proposal under the solicitation.  PSI also applied for and maintained at all relevant times registration as a Service Disabled Veteran- and Woman-Owned Small Business in the SAM database, falsely certifying that Patronus Systems, Inc. qualified as an SBC, a WOSB, and an SDVOSBC. PSI's website repeats those false assertions, identifying PSI as "a Woman-Owned Small Business and Service-Disabled Veteran-Owned Small Business."  In addition, PSI's submission of a proposal for a contract whose terms repeatedly stated that it was set aside for award to a WOSB was a false implicit representation that PSI qualified as a WOSB.

137.     Thereafter, FPS, unaware that PSI was ineligible for small business status, awarded PSI a contract pursuant to the solicitation.

138.     At the time that it submitted its proposal and at the time it was awarded the contract pursuant to Solicitation No. 70RFP320RE3000001, PSI and its affiliate, Paragon, knew that PSI was not eligible to be awarded that contract or to receive payments pursuant to that contract.  PSI and Paragon knew that PSI was "other than small" because PSI's receipts were required to be pooled with those of its affiliates, including Paragon, for purposes of evaluating SBC status.  PSI and Paragon knew that PSI was a proxy corporation established and controlled by Paragon to evade

the SBA's size determination, and that PSI was ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

139.   PSI has performed PSO services pursuant to the contract awarded pursuant to Solicitation No. 70RFP320RE3000001, has submitted invoices or progress statements to the Government, and has received substantial payments from the Government for this work.  PSI was not eligible to receive the benefits of any small business set-asides, and therefore was ineligible for the contract and for each payment it received thereunder.  The total potential value of the contract is $43,433,522.50.  https://www.usaspending.gov/award/CONT_IDV_70RFP320DE3000001_7001.

### vii.   Patronus Systems, Inc. Awarded Contract for PSO Services in West Central Washington Set Aside for Small Businesses

140.   On June 7, 2021, DHS, FPS issued Solicitation No. 70FRPW21FRWA000006, seeking sources to provide armed PSO services throughout West Central Washington state.  The solicitation stated that the opportunity was set aside 100% for Service-Disabled Veteran-Owned Small Businesses.  The procurement was classified as a "Total Small Business Set-Aside (FAR 19.5)."  https://sam.gov/opp/b28f7f4237f1424e8a8013194aefcb86/view.  Pursuant to FAR 19.5, the solicitation sought offers "exclusively for participation by small business concerns."  48 C.F.R. § 19.501(a)(1).

141.   On or before June 17, 2021, PSI submitted a proposal under the solicitation.  As part of the proposal, PSI was required expressly to certify that it qualified as an SDVOSB and a SBC.  Moreover, PSI applied for and at all relevant times maintained registration as a Service Disabled Veteran- and Woman-Owned Small Business in the SAM database, falsely certifying that Patronus Systems, Inc. qualified as an SBC, a WOSB, and an SDVOSBC.  https://sam.gov/entity/961795031/coreData?status=active&emrKeyValue=3874625~1594294420517033.   PSI's website repeats those false assertions, identifying PSI as "a Woman-Owned Small Business and Service-Disabled Veteran-Owned Small Business."  https://www.patronususa.com/.  In addition,

PSI's submission of a proposal for a contract whose terms stated that it was set aside for award to an SDVOSBC was a false implicit representation that PSI qualified as an SDVOSBC.

142.    On or around October 14, 2021, FPS, unaware that PSI was ineligible for SDVOSB status, awarded PSI a contract pursuant to Solicitation No. 70FRPW21FRWA000006 with a period of performance from February 1, 2022 through January 31, 2027.

143.    At the time that it submitted its proposal and at the time it was awarded the contract pursuant to Solicitation No. 70FRPW21FRWA000006, PSI and its affiliate, Paragon, knew that PSI was not eligible to be awarded that contract or to receive payments pursuant to that contract. PSI and Paragon knew that PSI was "other than small" because PSI's receipts were required to be pooled with those of its affiliates, including Paragon, for purposes of evaluating SBC status. PSI and Paragon knew that PSI was a proxy corporation established and controlled by Paragon to evade the SBA's size determination, and that PSI was ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

### viii.    Patronus Systems, Inc. Re-Awarded PSO Services Contract in Eastern Washington and Idaho

144.    On June 7, 2021, DHS, FPS issued Solicitation No. 70RFPW21FRWA000007, seeking sources to provide armed PSO services at various locations throughout Eastern Washington State and Idaho.

145.    The solicitation and the synopsis of the solicitation stated that the opportunity was set-aside for women-owned small businesses and classified it as a "Women-Owned Small Business (WOSB) Program Set-Aside (FAR 19.15)."   https://sam.gov/opp/92f511da77a44d42a358ac03e8f4c2d8/view#award-summary.

146.    The solicitation expressly incorporated FAR 52.219-30, Notice of Set-Aside for, or Sole Source Award to, Women-Owned Small Business Concerns Eligible Under the Women-Owned Small Business Program (Mar. 2020) (15 U.S.C. 637(m)) and FAR 52.219-28, Post Award Small Business Program Representation (Nov. 2020) (15 U.S.C. 632(a)(2)).

37

147.    On or before July 30, 2021, PSI submitted a proposal under the solicitation.  As part of the proposal, PSI was required expressly to certify it qualified as a WOSBC and an SBC. Moreover, Patronus Systems, Inc. also applied for and at all relevant times maintained registration as a Service Disabled Veteran- and Woman-Owned Small Business in the SAM database, falsely certifying that Patronus Systems, Inc. qualified as an SBC, a WOSB, and an SDVOSBC.  https://sam.gov/entity/961795031/coreData?status=active&emrKeyValue=3874625~1594294420517033.

148.    PSI's website repeats those false assertions, identifying PSI as "a Woman-Owned Small Business and Service-Disabled Veteran-Owned Small Business."    https://www.patronususa.com/.   In addition, PSI's submission of a proposal for a contract whose terms repeatedly stated that it was set aside for award to an SBC was a false implicit representation that PSI qualified as an SBC.

149.    In or around October 12, 2021, FPS, unaware that PSI was ineligible for small business status, notified PSI that it had been awarded a contract pursuant to Solicitation No. 70RFPW21FRWA000007, with a period of performance from February 1, 2022 through January 31, 2027.

150.    At the time that it submitted its proposal and at the time it was awarded the contract pursuant to Solicitation No. 70RFPW21FRWA000007, PSI and its affiliate, Paragon, knew that PSI was not eligible to be awarded that contract or to receive payments pursuant to that contract. PSI and Paragon knew that PSI was "other than small" because PSI's receipts were required to be pooled with those of its affiliates, including Paragon, for purposes of evaluating SBC status.  PSI and Paragon knew that PSI was a proxy corporation established and controlled by Paragon to evade the SBA's size determination, and that PSI was ineligible for SBC status for the same reasons that Paragon was ineligible for SBC status.

**B.  Defendants' Misrepresentations Were Material**

151.    Defendants' false certifications to SBA and FPS that they were small businesses, SDVOSBCs, WOSBs, and/or EDWOSBs—and therefore eligible for the set-aside contract at issue—were material to FPS's decisions to award Defendants those contracts and to pay claims made thereunder.  Unaware of the false and fraudulent nature of the bids, FPS awarded contracts to the Paragon Affiliated Defendants and paid the Paragon Affiliated Defendants claims submitted under those contracts.  Defendants' noncompliance with the SBC, SDVOSBC, WOSB, and/or EDWOSB conditions was substantial as to the Government's decision to award the contracts and as to the Government's decision to pay Defendants under those contracts.  Had the Government known of the fraudulent conduct, it would not have awarded the contracts or paid the false claims that Defendants submitted thereunder.  Defendants' false statements and claims diverted Government funds intended by Congress to be provided, and which by law could only be provided, to small business concerns.

152.    Moreover, the Government regularly pursues cases, such as this one, against small businesses that misrepresent their size status.  *See, e.g.*, *United States ex rel. Ameliorate Partners, LLP v. ADS Tactical, Inc. et al.*, Case No. 13-cv-1880 (D.D.C.); *United States ex rel. Meadows v. Mountain States Construction, LLC*, No. 3:12-cv-0523 (M.D. Tenn.); *United States ex rel. Johnson v. Rea Contracting LLC, et al.*, No. 3:12-cv-3651 (D.S.C.); *United States v. HD Supply Waterworks* (N.D.N.Y.); *United States ex rel. Hopson v. Air Ideal, Inc. et al.*, No. 6:13-cv-775-Orl-37GJK (M.D. Fla.); *United States ex rel. Howard v. RQ Construction LLC, et al.*, No. 7:13-CV-48-D (E.D.N.C.); *United States ex rel. Saiz Construction Co. et al. v. Okland Construction Co., Inc.*, No. 2:11-cv-00362 (D. Utah); and *United States v. Moretrench Am. Corp.*, No. 14-cv-3250 (S.D.N.Y.).

VI.    **Paragon and the Paragon Affiliate Defendants Colluded with the International Union, Security, Police, and Fire Professionals of America to Shift the Burden of Artificially Inflated Labor Costs to the Government.**

153.    Both before and after Paragon and/or the Paragon Affiliated Defendant were awarded FPS contracts, Paragon managers and employees assisted SPFPA to replace the incumbent union representing PSOs at FPS sites, UGSOA.  SPFPA and Paragon and/or the Paragon Affiliated Defendants negotiate CBAs that increase wages and fringe benefits above from the levels that Paragon and/or the Paragon Affiliated Defendants included in their bids the Government.  Paragon and/or the Paragon Affiliated Defendants then cause the increased wages to be passed on to the Government by seeking upward price adjustments pursuant to the SBA price adjustment clauses in the FPS contracts.

154.    To effectuate this scheme, Paragon helped and encouraged SPFPA to oust UGSOA in various ways, including by giving SPFPA UGSOA's member lists; providing SPFPA UGSOA's contract expiration dates; directing Paragon supervisors to allow SPFPA representatives into federal buildings protected by FPS to organize workers; negotiating higher wages and better fringe benefits with SPFPA than with UGSOA; and informing SPFPA of petitions for recertification filed by UGSOA to allow SPFPA to campaign and compete with UGSOA.

155.    One instance in which Paragon assisted SPFPA to take over representation of PSOs and negotiated higher wages that Paragon then passed on to the Government is eastern Massachusetts.

156.    On January 31, 2013, Paragon was awarded FPS Contract No. HSHQE1-13-D-00002 to provide armed PSO services in Maine, Massachusetts, New Hampshire, and Vermont. The contract was bid under open competition, and it was awarded on an indefinite quantity basis for the period of performance of June 1, 2013 through November 30, 2018.  The contract incorporated the predecessor contractor's CBA with UGSOA and included SBA Price Adjustment Clause FAR 52.222-43.  Subsequently, Paragon and UGSOA negotiated a new CBA effective December 16, 2013 through December 16, 2016.

157.    In November 2016, Paragon PSOs in eastern Massachusetts voted to leave UGSOA and join SPFPA.  Thereafter, SPFPA negotiated a CBA with Paragon effective March 15, 2017 through March 14, 2020.  Under the new CBA, PSO wages increased 2.93%, from $21.81/hour to $22.45/hour, and a health and welfare benefit increased 3.57%, from $4.20/hour to $4.35/hour. The $0.15 increase was paid directly to employees on their paychecks.  Collectively, those changes resulted in a 3.62% wage increase.

158.    At the same time, the SPFPA CBA reduced certain fringe benefits compared to the UGSOA CBA.  The SPFPA CBA added probationary wage rate for new employees during the first 90 days of their employment, which was $2/hour less than the regular wage rate.  Under the prior CBA, such employees were paid the regular wage rate.  In addition, while the new CBA increased the health and welfare benefit amount, it applied the benefit only to hours actually worked.  Under the prior CBA, the benefit applied not only to hours worked, but also to training and vacation time.  On the whole, however, Relator believes that the increased wages and welfare and health benefit rates exceeded the losses caused by this change.

159.    When the SPFPA CBA took effect, Paragon became entitled to an adjustment to the contract's price to reflect Paragon's increased labor costs.  *See* 48 C.F.R. § 52.222-43(d)(2). On information and belief, Paragon sought and obtained the price adjustment.

160.    Paragon actively supported SPFPA efforts to convince UGSOA-represented PSOs to joint SPFPA.

161.    In the summer and fall of 2013, UGSOA received complaints from its members that SPFPA union representatives came to FPS sites to try to recruit PSOs.  UGSOA received a report that on August 9, 2013, an SPFPA representative went to the Federal Aviation Administration building in Burlington, Massachusetts to speak with PSOs then represented by UGSOA about joining SPFPA.  After a Paragon supervisor at the site told the SPFPA representative to leave, Paragon Senior Vice President Grady Baker called the site supervisor to tell him that the SPFPA representative had Paragon's "permission" to actively recruit Paragon

41

employees during work hours and that the supervisor was to permit this activity to occur. Mr. Baker also said, "We're going to bust up the UGSOA and you're in the inner circle now."

162.    On January 5, 2015, UGSOA's General Counsel, Robert Kapitan, sent an email to Paragon's General Counsel, Laura Hagan, stating, in part, "I understand that it is Paragon's policy to provide any requesting labor organization with a list of your employees' mailing addresses and phone numbers. With respect to UGSOA members, we consider this personal information and a violation of privacy laws to provide that to third parties." Ms. Hagan responded, in part, "I don't think that's the law, and I think that address and telephone information is generally held to be public information, with no reasonable expectation of privacy in the data. In the absence of such authority [that an employer is prohibited from giving employee lists to requesting labor unions], it seems to me that this issue is, at most, a permissive subject of bargaining, and Paragon respectfully declines to bargain over it."

163.    In other instances, Paragon and/or the Paragon Affiliated Defendants have bid for FPS contracts pursuant to solicitations that incorporated UGSOA CBAs, then helped to oust UGSOA, entered into pre-arranged CBAs with SPFPA that contained higher wages and benefits, and then submitted requests to FPS for upward adjustments to the prices of the contracts for which they had intentionally under-bid.

164.    For example, as alleged above, PSI submitted a bid on or before April 11, 2018 in response to Solicitation No. 70RFP118RE4000005 for PSO services in Kentucky. At that time, Paragon was the incumbent contractor. It had subcontracted certain guard services work to ASI, which had a CBA with UGSOA.

165.    A little over a month later, on May 21, 2018, SPFPA filed a petition for a representation election for ASI PSO employees in Kentucky who were subcontracted by Paragon. On June 27, 2018, the NLRB certified SPFPA as the bargaining representative of those PSO employees. https://www.nlrb.gov/case/09-RC-220537. The NLRB's election records show that

Alisa Silverman—who, as alleged above, was Co-Director of PSI until 2011 and is President of ASI—was ASI's "Legal Representative" for purposes of the election. *Id.*

166. After the election, a new CBA with SPFPA was negotiated that contained better wages and fringe benefits than the predecessor CBA. Thereafter, on information and belief, Paragon—through its affiliate PSI—requested and obtained from the FPS an upward adjustment to the contract's price to cover the increased wages and benefits.

167. PSI's 2018 bid for the Kentucky contract was false and fraudulent because PSI and Paragon knew that if FPS awarded the contract to PSI, PSI, acting on behalf of Paragon, would negotiate a CBA with wages and benefits that were higher than PSI had accounted for in its bid, and that the Government would have to pay for the increased costs. In short, PSI and Paragon misrepresented to the Government the true labor costs they intended to charge the Government, and thereby induced the Government to award PSI the contract.

168. For the same reasons, PSI's request for an upward price adjustment, which it made on behalf of itself and Paragon, was also false and fraudulent. Through this conduct, PSI and Paragon prevented the Government from obtaining competitive pricing.

169. Had the Government known that Paragon and the Paragon Affiliated Defendants submitted or caused to be submitted bid proposals that offered lower labor costs than the costs that Defendants knew would be negotiated shortly after the contracts were awarded, the Government would not have awarded the contracts to Paragon or to the Paragon Affiliated Defendants and it would not have made subsequent payments to Paragon or to the Paragon Affiliated Defendants under those contracts.

## COUNT I
## False Claims Act
## 31 U.S.C. § 3729(a)(1)(A)

170. Relator realleges and incorporates by reference the allegations made in all preceding paragraphs of this Complaint.

171.    This is a claim for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

172.    Through the acts above, Defendants and their agents, employees, and co-conspirators knowingly presented or caused to be presented to the United States false and fraudulent claims.

173.    As described above, Defendants were ineligible for participation in contracts set aside for SBCs or SDVOSBs.  Lawful status as an SBC or SDVOSB was a condition of payment under the contracts identified above.

174.    As described above, Paragon and the Paragon Affiliated Defendants bid for FPS contracts at lower prices than Paragon and its affiliates knew they would actually charge the Government once awarded such contracts.

175.    The United States was unaware of the falsity of the claims made and submitted by Defendants and their agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

176.    By reason of the acts described above, the United States has suffered damages in an amount to be determined at trial and continues to be damaged.

**COUNT II**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

177.    Relator realleges and incorporates by reference the allegations made in all preceding paragraphs of this Complaint.

178.    This is a claim for treble damages and forfeitures under the federal False Claims Act, 31 U.S.C. §§ 3279–33, as amended.

179.    Through the acts above, Defendants and their agents, employees, and co-conspirators knowingly made, used, or caused to be made or used, false records or statements material to false and fraudulent claims.  As described above, Defendants were ineligible for participation in contracts set aside for SBCs or SDVOSBs.  Lawful status as an SBC or SDVOSB

was a condition of payment under the contracts identified above. Nonetheless, the Paragon Affiliated Defendants made or used false records and statements, including through their registrations with the Government as SBCs, SDVOSBs, WOSBs, and/or EDWOSBs, and their certifications as such in connection with FPS bids.

180.    As described above, Paragon and the Paragon Affiliated Defendants bid for FPS contracts at lower prices than Paragon and its affiliates knew they would actually charge the Government once awarded such contracts. Defendants' made or used false records or statements concerning pricing in connection with their bids for FPS contracts.

181.    The United States was unaware of the falsity of the records and statements made, used, or caused to be made or used by Defendants and their agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

182.    By reason of the acts described above, the United States has suffered damages in an amount to be determined at trial and continues to be damaged.

**COUNT III**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

183.    Relator realleges and incorporates by reference the allegations made in all preceding paragraphs of this Complaint.

184.    Through the acts above, Defendants and their agents, employees, and co-conspirators conspired to knowingly present or cause to be presented to the United States false and fraudulent claims; and conspired to knowingly make, use, or cause to be made or used, false records or statements material to false and fraudulent claims.

185.    The United States was unaware of the falsity of the records, statements, and claims made, used, or caused to be made or used by Defendants and their agents, employees, and co-conspirators, and as a result thereof, paid money that it otherwise would not have paid.

186.    By reason of the acts described above, the United States has suffered damages in an amount to be determined at trial and continues to be damaged.

## **PRAYER**

WHEREFORE, *qui tam* plaintiff Todd Pattison prays for judgment against the Defendants as follows:

1.      That Defendants cease and desist from violating 31 U.S.C. §§ 3729–33;

2.      That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions in violation of the Federal False Claims Act, as well as the maximum civil penalty for each violation of 31 U.S.C. § 3729;

3.      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) of the Federal False Claims Act;

4.      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.      That the United States and Relator receive all such other relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

Dated: December 22, 2021                    Respectfully submitted,

Peter W. Chatfield (D. Md. No. 06270)
peter@phillipsandcohen.com
John W. Tremblay (*Pro hac vice* motion to be filed)
jtremblay@phillipsandcohen.com
Phillips & Cohen LLP
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 833-4567