# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* Todd Pattison, | ) ) ) | CV No. TDC 21-3260 |
| United States Department of Justice<br>Post Office Box 261<br>Ben Franklin Station<br>Washington, DC 20044, | ) ) ) ) ) | **COMPLAINT OF THE UNITED STATES OF AMERICA FOR:** |
| Plaintiffs, | ) ) | **1. VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(A)** |
| v. | ) ) | **2. VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(B)** |
| **PATRONUS SYSTEMS, INC.,** | ) ) | **3. VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. § 3729(a)(1)(C)** |
| 3000 N. Wickham Road, Suite 8<br>Melbourne, Florida 32935, | ) ) ) | **4. VIOLATIONS OF THE ANTI-KICKBACK ACT 41 U.S.C. § 8706(a)(1)**<br>**5. VIOLATIONS OF THE ANTI-KICKBACK ACT 41 U.S.C. § 8706(a)(2)** |
| **PATRONUS SYSTEMS PARTNERS, LLC,** | ) ) ) | **6. PAYMENT BY MISTAKE**<br>**7. UNJUST ENRICHMENT** |
| 3000 N. Wickham Road, Suite 8<br>Melbourne, Florida 32935, | ) ) ) | **JURY TRIAL DEMANDED** |
| **MABEL RUTH O'QUINN,** | ) ) ) | |
| 3000 N. Wickham Road, Suite 8<br>Melbourne, Florida 32935, | ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

## OVERVIEW

1.      This is an action brought by the United States to recover damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and under the Anti-Kickback Act, 41 U.S.C. § 8706, and to recover all remedies available under common law claims for payment under mistake of fact and unjust enrichment.

2.      This action arises from a fraudulent scheme involving Defendant Patronus Systems, Inc. ("Patronus"), Defendant Patronus Systems Partners, LLC ("PSP"), their nominal owner, Defendant Mabel Ruth O'Quinn, and five of the highest-ranking now-former executives of Paragon Systems, LLC ("Paragon"), a provider of protective security officers ("PSO") at federal buildings, to use Patronus as a sham small business to acquire Federal set-aside contracts for which substantially all work could be subcontracted to Paragon, which was itself not eligible for the small business set-aside contracts.  The parties also conspired to award set-aside contracts to Patronus in connection with contracts for which Paragon was the prime contractor.  Patronus was controlled by four of Paragon's now-former executives (collectively "Paragon Executives") — its President ("Paragon President"), Vice President of Operations ("VP Ops"), Compliance Manager and Contracts Manager (collectively the "Paragon Managers").  The Paragon Managers were the adult sons of the Paragon President.

2.      The Paragon President, the Paragon VP Ops, and the Paragon Managers received kickbacks from Patronus totaling over $4.6 million, primarily disguised as purported consulting payments.  The Patronus scheme is part of a larger fraudulent scheme which resulted in the payment of over $11 million in kickbacks and skimmed federal funds paid to the Paragon Executives by Patronus and three other ineligible Paragon subcontractors.[1]  Between approximately May and August 2023, the Paragon President and the Paragon Managers were terminated by Paragon.  A fifth Paragon executive, a Vice President of Business Operations ("VP BD") previously retired in 2022.

---

[1]      Paragon, Athena Services International, LLC ("ASI") and Athena Joint Venture Services, LLC were previously named defendants in this action, but the United States has reached settlements with them, and the owner of ASI, Alisa Silverman.  *See concurrently filed* Status Reports re: Defendants Paragon, ASI, and AJVS attaching settlement agreements.

3.     The Patronus scheme resulted in the submission of nearly 700 false claims by Patronus and Paragon, under both Patronus and Paragon contracts with the Federal Protective Services ("FPS"), a division of the United States Department of Homeland Security ("DHS") for protective security guard services at federal buildings across the United States.  These false claims resulted in DHS' payments of over $106 million paid directly or indirectly to Patronus.

## JURISDICTION

4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331.  The Defendants are doing and/or previously did business within this District.

## VENUE

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).  All Defendants are doing and/or previously did business within this District.

## PARTIES

### The United States of America

6.     The plaintiff is the United States of America.  The United States brings this lawsuit on behalf of its agencies, DHS, and the Small Business Administration ("SBA").  The DHS contracts at issue in this action for protective security guard services at federal buildings, include, but are not limited to, five contracts on which Patronus served as the prime contractor and subcontracted work to Paragon (contract numbers: 70RFP119DE4000001, 70RFP320DE3000001, 70RFP418DE5000001, HSHQE3-15-R-00002, and HSHQWA-16-D-00002) and seven contracts on which Patronus served as a subcontractor to Paragon (contract numbers: HSHQE4-13-D-00001, 70RFP420DE7000003, 70RFP118DE1000001, HSHQE1-13-D-00002, HSHQE4-12-D-00005, HSHQE4-17-D-00002).  These contracts were issued by at the DHS Headquarters located at 245 Murray Lane, SW, Washington, DC 20528-0075.  The SBA

awarded a Paycheck Protection Program ("PPP") loan to Patronus which is also at issue in this action.

7.     Relator Todd Pattison is a resident of Annapolis, Maryland. He is the Chief Executive Officer and President of CDA, Inc. d/b/a MaxSent, a company based in Annapolis, Maryland that provides protective security services for, *inter alia,* federal government buildings.

**The Defendants**

8.     Defendant Patronus Systems, Inc. ("Patronus") is a privately held corporation incorporated in Florida. It's principal place of business is 3000 N. Wickham Road, Suite 8, Melbourne, Florida. It is registered as a Service Disabled Veteran- and Woman-Owned Small Business and employs PSOs at various federal buildings under FPS contracts and subcontracts. Patronus' s President and nominal sole owner is Mabel O'Quinn. Patronus is licensed by the State of Maryland as a Security Guard Provider, under License No, 22PLU-SG17414.

9.     Defendant Patronus Systems Partners, LLC ("PSP") was a Florida corporation incorporated in July 2018 and located at 3000 N. Wickham Road, Suite 8, Melbourne, Florida. It was a joint venture between Paragon and Patronus. Ms. O'Quinn was the registered agent for PSP, and she filed articles of dissolution for the company with the Florida Secretary of State in November 2018.

10.     Defendant Mabel Ruth O'Quinn ("O'Quinn") is a resident of Florida whose business address is 3000 N. Wickham Road, Suite 8, Melbourne, Florida.

**The False Claims Act**

11.     The False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, is the primary remedial statute designed to deter fraud upon the United States. Sections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(C) of the FCA are relevant here.

12.     Section (a)(1) of the False Claims Act imposes civil liability, in pertinent part, upon any person, who in dealing with the Government, either "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" ... or "(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)[.]" 31 U.S.C. §§ 3729(a)(1)(A), (B), and (C).

13.     False Claims Act liability may be imposed where the United States was fraudulently induced to enter a contact where the Government was induced by, or relied upon, the fraudulent statement or omission when it awarded a contract or when it agreed to contract modifications.

14.     The False Claims Act defines "knowing" and "knowingly" to include actual knowledge, deliberate ignorance, or reckless disregard and requires no proof of specific intent to defraud.  *See* 31 U.S.C. § 3729(b)(1)(A), (B).  The term "material," as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *See* 31 U.S.C. § 3729(b)(4).

15.     As pertinent herein, the False Claims Act imposes liability of treble damages plus a civil penalty for each violation.  The False Claims Act also imposes a penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Adjustment Act of 1990, 28 U.S.C. 2461 note; Pub. Law No. 104-410.  *See* 31 U.S.C. 3729(a).  Pursuant to the Bipartisan Budget Act of 2015, all civil statutory penalties, including those set forth in the FCA, are required to be adjusted annually for inflation.  *See* Pub. Law. No. 114-74, § 701, 129 Stat. 584, 599.  As a result, for any FCA violation occurring after November 2, 2015, the FCA imposes a penalty of not less than $5,000 and not more than $10,000, as adjusted by the

Bipartisan Budget Act of 2015. *See* 28 C.F.R. § 85.5 (identifying civil statutory penalty amounts currently in effect, including Congressionally-mandated annual inflation adjustments). The current inflation-adjusted penalty for any FCA violation occurring after November 2, 2015, is not less than $13,946 and not more than $27,894 per claim. *See id.*

### The Anti-Kickback Act

16.     The Anti-Kickback Act (AKA), 41 U.S.C. § 8702, prohibits the payment, offer, or solicitation of a kickback from a federal contractor or a subcontractor. A kickback is defined broadly to include anything of value or compensation of any kind provided to a prime contractor or prime contractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract. 41 U.S.C. § 8701(a). The AKA does not require a quid-pro-quo agreement. The AKA also prohibits including the amount of a kickback in the contract price charged by a subcontractor to a prime contractor or by a prime contractor to the government. 41 U.S.C. § 8702(3).

### Small Business Set-Aside Contracts

17.     In creating the SBA, Congress sought to assist small businesses by ensuring that they receive a "fair proportion" of government contracts. 15 U.S.C. § 631(a). Congress further established by statute certain government-wide goals for the percentage of federal contracts awarded to small businesses. 15 U.S.C. § 644(g). Agencies have also created targeted sub-goals for certain categories of disadvantaged small businesses, including service-disabled veteran owned small businesses and woman-owned small businesses.

18.     A company must apply for and receive SBA approval to qualify as a woman-owned small business (WOSB), or service-disabled veteran owned small business (SDVOSB).

After being designated as such, the business may compete for the award of contracts that are set aside for eligible small businesses.

19.    To qualify as a small business, companies must meet defined eligibility criteria, including requirements concerning size, ownership, and operational control.  Regarding size, an organization must not exceed a specific threshold number of employees.  Notably, in assessing the size of an organization, businesses must consider any "affiliation" they have with other entities, and when a company is affiliated with other entities the employees of *all* affiliated businesses are aggregated to determine the size of the company.  *See* 13 C.F.R. § 121.105(4)(i). The test for affiliation encompasses a variety of factors, and, in general, "entities are affiliates with each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both."  § 121.103(a).

20.    Regarding ownership and control, an enterprise cannot qualify as a small business concern unless the person on whom the status of the business is based owns a majority of the company <u>and</u> exercises control over the day-to-day operations of the company, rather than merely being a mere figurehead owner in name only.  *See* 13 C.F.R. §§ 124.106, 125.13, and 127.102.

<u>**Paycheck Protection Program**</u>

21.    The PPP loan program was enacted to address the economic fallout from the COVID-19 pandemic by providing small businesses with low-interest rate loans guaranteed by SBA.  These loans could later be forgiven to the extent the proceeds were spent on payroll and certain other eligible businesses expenses.  PPP loans, like other SBA programs, were available only to "small businesses."  A company's own employees and revenue are considered together with the employees and revenue of any "affiliate" to determine whether it is a "small business."

Companies were considered "affiliates" if they shared common operational control. 13 C.F.R. § 121.301; 85 Fed. Reg. 20817 (Apr. 15, 2020) (Interim Final Rule regarding affiliation).

22.     Congress created the PPP under section 7(a) of the Small Business Act as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286 (Mar. 27, 2020). The PPP, which is administered through the SBA, provided emergency relief to small businesses affected by the COVID-19 pandemic and was designed to cover businesses' actual gross payroll expenses to keep people employed during the COVID-19 pandemic. *See* 15 U.S.C. § 636(a)(36).

23.     The SBA did not make PPP loans directly. Rather, the CARES Act delegated authority to private lenders, such as Kabbage, to make PPP loans pursuant to PPP requirements. *See* 15 U.S.C. § 636(a)(36)(F)(ii)–(iii).

24.     The CARES Act provided for borrower loan forgiveness for PPP funds used for certain expenses. *See* CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281, 297 (Mar. 27, 2020). To apply for PPP loan forgiveness, borrowers submitted loan forgiveness applications through their lenders, and lenders then rendered a forgiveness decision to the borrower and the SBA. *See* 85 Fed. Reg. 33004, 33005 (June 1, 2020); 85 Fed. Reg. 38304, 38306 (June 26, 2020). If a borrower received loan forgiveness, the SBA issued forgiveness payments to lenders. *See* 85 Fed. Reg. 33010, 33013 (June 1, 2020); 85 Fed. Reg. 38304, 38306 (June 26, 2020). If a borrower's forgiveness application was denied or the borrower otherwise defaulted on the PPP loan, the lender could request that the SBA purchase the guaranty of the PPP loan. *See* SBA Procedural Notice, No. 5000-812316 (July 15, 2021). So long as lenders adhered to the program requirements, the SBA would guarantee the unforgiven or defaulted loan amounts. *See* 15 U.S.C. § 626(a)(2)(F); 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020); 86 Fed. Reg. 8283, 8294

(Feb. 5, 2021). To receive forgiveness or guaranty payments, lenders submitted claims and certifications to the SBA. *See* SBA Form 3507, at ¶ 6; SBA Procedural Notice, No. 5000-20038, at 5 (July 23, 2020). The SBA then disbursed payments to lenders, which included the 1% interest due on the loan. *See* 85 Fed. Reg. 33004, 33005 (June 1, 2020); 85 Fed. Reg. 38304, 38306 (June 26, 2020); 86 Fed. Reg. 8283, 8288 (Feb. 5, 2021).

25. A PPP loan recipient cannot use PPP loan funds to pay its independent contractors because independent contractors are eligible for their own PPP loans.

**THE FRAUDULENT SCHEME**

26. The Paragon Executives entered into a scheme with O'Quinn, Patronus, and PSP to defraud the United States by (i) bidding on and submitting claims for payment on small business set-aside contracts awarded by DHS for which they were not eligible; (ii) submitting claims for ineligible subcontractor services on Paragon's prime contracts; and (iii) paying kickbacks to the Paragon Executives and otherwise skimming funds from federal contracts which were paid to the Paragon President. In reality, the Paragon Executives controlled Patronus and were surreptitiously paid over $4.4 million in kickbacks by Patronus. These kickbacks were disguised as consulting payments paid to certain of the Paragon Executives and shell companies that they controlled or to the spouse of one of the Paragon Executives. The Paragon Executives were assisted by some other Paragon executives and employees who provided services to Patronus either as part of a larger conspiracy or in return for payments from Patronus.

    A.    **Patronus Corporate History**

27. Patronus was incorporated in February 2010, by its initial Directors, O'Quinn and A.D., the spouse of the Paragon President. In the Patronus articles of incorporation, A.D. used her maiden name and her home address where she resided with the Paragon President. For

several years, Patronus did not conduct any substantial business.  During this time, O'Quinn was a full-time employee of the United States Department of the Air Force.  In February 2011, A.D. resigned as a director of Patronus and ended her ownership interest in Patronus.  However, until at least 2023, Patronus compensated A.D.'s family members – the Paragon President (A.D.'s spouse) and the Paragon Managers (A.D.'s step-children) – as if A.D. and her family still had an ownership interest in Patronus.

28.    In or about December 2015, Paragon's President sent O'Quinn and O'Quinn's Spouse, a draft operating agreement between Patronus and MCKHU, Inc., a shell company incorporated by the Paragon President, A.D., and the Paragon President's adult daughter.  The draft operating agreement identified MCKHU as a 40% owner of Patronus.   The draft operating agreement stated:

> ●    The Members' ownership interest in Patronus shall be as follows: MO [Mabel O'Quinn] sixty per cent (60%), MCKHU forty per cent (40%).
>
> ●    The management of Patronus is vested in its Board of Directors.  The Board of Directors will consist of MO [Mabel O'Quinn] and a representative of MCKHU.
>
> ●    MO [Mabel O'Quinn] shall be issued sixty per cent (60%) of the stock and MCKHU forty per cent (40%) of the stock.
>
> ●    No member shall sell, hypothecate, pledge, assign, or otherwise transfer, with or without consideration, any part of his Ownership Interest in the Company to any other person or entity unless agreed to by both MO [Mabel O'Quinn] and MCKHU.

From 2015 to at least 2023, Patronus' profits were distributed between O'Quinn and MCKHU in a 60/40 split as set forth in the draft operating agreement.

29.    The draft operating agreement allocated to O'Quinn the functions of human resources, security operations, and to act as Patronus' Treasurer.  It allocated to MCKHU the following functions, which constituted the bulk of Patronus' operations:

MCKHU will provide primary Corporate support and oversight in the following functions, subject to MO [Mabel O'Quinn] role as Managing member:

7.3.1   Finance, including invoicing, accounts payable, accounts receivable, bank reconciliations, general ledger maintenance, tax filing, insurance, contracts maintenance, budgeting , funding, and related matters.

7.3.2   Legal and Labor oversight, including contract compliance, licensure, collective bargaining agreement negotiation and maintenance, union relations, labor law compliance, employee termination and discipline review, and related matters.

7.4   No Member shall be entitled to additional compensation for carrying out its Responsibilities in accordance with this Agreement without the written consent of all Members.

30   On or about May 7, 2016, O'Quinn's Spouse sent Patronus' Bylaws, which had been signed by O'Quinn, to the Paragon President.  The language of the Patronus bylaws were substantially similar to the draft operating agreement and identified MCKHU as a 40% owner of Patronus:

●   The stockholders of Patronus shall be MRO and MCKHU.

●   The stock ownership in Patronus shall be as follows: MRO [Mabel O'Quinn] sixty percent (61%), MCKHU forty percent (40%).

●   The Board of Directors shall consist of MRO [Mabel O'Quinn], and a representative of MCKHU.  MRO [Mabel O'Quinn] is designated the President/CEO, MCKHU representative, [the MCKHU President], will be the Secretary/Treasurer.

31.   The Patronus bylaws similarly allocated to O'Quinn the functions of human resources, security operations, and to act as Patronus' Treasurer.  The bylaws allocated to MCKHU the following functions, which constituted the bulk of Patronus' operations:

7.1.3   MCKHU shall act as the Company Treasurer, preparing all invoices to clients and all items for accounts payable. The President/CEO, will have the final authority on payables and all check requests.

7.3   MCKHU Support. MCKHU will provide Corporate support and oversight in the following functions, not all inclusive, subject to wishes of the BOD (Board of Directors):

7.3.1    Finance, including invoicing, accounts payable, accounts receivable, bank reconciliations, general ledger maintenance, tax filing, insurance, contracts maintenance, budgeting, funding, and related matters,

7.3.2    Legal and Labor oversight, including contract compliance, licensure, collective bargaining agreement negotiation and maintenance, union relations, labor law compliance, employee termination and discipline review, and related matters.

7.4    No Stockholder shall. be entitled to additional compensation for carrying out its Responsibilities in accordance with this Agreement without the written consent of all Stockholders.

All of MCKHU's responsibilities to Patronus were carried out by the Paragon Managers, not the MCKHU President, the adult daughter of the Paragon President who had no involvement in the operations of Patronus.

32.    On June 2, 2015, O'Quinn falsely attested that Patronus was: (1) a small business; (2) a veteran-owned small business; (3) a service-disabled veteran-owned small business; (4) a disadvantaged small business; and (5) a woman-owned small business.  She certified that Patronus was not owned or controlled by a larger entity or affiliate, thereby concealing *de facto* ownership and operational control of Patronus that was exercised by the Paragon President and Paragon Managers.  She reaffirmed this attestation to United States until at least 2023.

## 1.    The Patronus MCKHU/Frontline "Consulting Agreements"

33.    Patronus entered into purported "consulting agreements" with two shell companies controlled by Paragon's President and the Paragon Managers, his adult sons, in order to surreptitiously pay them at least 40% of Patronus' profits disguised as purported consulting fees.  Additionally, these consulting agreements were one of the methods Patronus and O'Quinn used to hide the Paragon's Executives' operational control and *de facto* ownership of Praetorian.

34.    MCKHU, Inc., a shell corporation, was incorporated in Ohio in February 2015 by Paragon's President; his spouse, A.D.; and the Paragon President's adult daughter ("MCKHU

President"). MCKHU's business address was the Paragon President's residence. The members of MCKHU were the Paragon President's three adult children, including, but not limited to, the Paragon Managers, and, at one point, his mother. While the Paragon President was never the president of MCKHU, in 2015, he represented to MCKHU's bank, Bank of America, that he was the president of MCKHU and signed the account signature card as MCKHU's President. The Paragon President remained the sole signatory on the MCKHU bank account until at least March 2022 and he personally endorsed checks paid to MCKHU by various Paragon subcontractors.

35.     In April 2015, Patronus signed a "consulting agreement" with MCKHU, a shell company controlled by Paragon's President and the Paragon Managers, to provide consulting services at $195 per hour. All of the purported services provided to Patronus by MCKHU were provided by the Paragon Managers, largely from their offices at Paragon during normal business hours. Under that subcontract, MCKHU submitted *pro forma* invoices to Patronus which were devoid of any details of the services provided. In addition to the amounts that Patronus paid on a monthly basis to MCKHU, MCKHU also received substantial distribution payments from the profits of Patronus.

36.     From April 2015 to April 2019, when another shell company replaced MCKHU, Patronus paid MCKHU over nearly $1.5 million which, at $195 per hour, would equate to over 2,000 hours per year for those four years or 1,000 hours per year for each Paragon Manager, who were also working full time for Paragon and had a similar "consulting agreement" with Athena Services International, LLC ("ASI"), another sham subcontractor which was also controlled by the Paragon Executives and the Paragon VP BD. O'Quinn and Patronus knew that that Paragon Managers were simultaneously working for Paragon, and, upon information and belief, O'Quinn and Patronus knew that that Paragon Managers were simultaneously working for ASI.

Combined, the Paragon Managers' purported work for Paragon, Patronus, and ASI constituted more than two full-time jobs.

37.     In late 2018, a successful bid protest was filed against a Patronus-Paragon joint venture, which identified, *inter alia,* the involvement of A.D. in the incorporation of Patronus. The Paragon President and the Paragon Managers expressed concern to each other that their family address was available in publicly available Patronus corporate records and that their family name was included in publicly available MCKHU corporate records.  In September 2019, the Paragon President and Managers created three different Ohio LLC corporations to accept the payments from Patronus and two other Paragon subcontractors.  Frontline Solution, LLC ("Frontline") was created by the Paragon President and the Paragon Managers to accept the Patronus payments.  Frontline's account signature card listed the Paragon Managers and their adult sister as the members of the company.  Frontline transferred the Patronus funds to a fourth Ohio LLC corporation, Elite Capital Venture, LLC, which, in turn, distributed the funds to three additional Ohio LLC corporations which were named with initials that corresponded to the names of the Paragon President's adult daughter and the Paragon Managers.  While none of the Paragon Executives' names were included in the publicly available corporate records of these new LLC corporations, their bank records show that the Paragon Manager and the President's adult daughter were signatories on their accounts.

38.     In January 2019, Patronus signed a consulting agreement with Frontline for $225 per hour, which was later increased to $250 per hour.  Frontline submitted monthly invoices to Patronus, all of which contained identical descriptions of the work performed by Frontline:

>       Various Professional Services to include accounting, billing,
>       pricing, payroll, human resources, contracts administration,
>       compliance, and other GovCon support.

While the number of hours on the invoices varied, no timesheets were submitted, and the person who purportedly performed the work was not identified by name. However, the work performed by Frontline was performed solely by the Paragon Managers.

39.     From 2019 to mid-2022, Paragon paid Frontline over $2.5 million. At $250 per hour, that represented 10,000 hours over the three and one-half year period, or over 2,900 hours per year, which was 1,450 hours for each of the two Paragon Managers. During the same time period, the Paragon Managers were both full-time employees of Paragon, and had similar consulting arrangements, although not written agreements, with ASI and another Paragon subcontractor. O'Quinn and Patronus were aware that the Paragon Managers were working for both Paragon and Patronus, and, upon information and belief, O'Quinn and Patronus knew that that Paragon Managers were simultaneously working for ASI. During this time, the Paragon Managers were purportedly working the equivalent of four full-time jobs. Even if Patronus and O'Quinn were only aware that the Paragon Managers were working for Paragon and Patronus, they were aware that each of the Paragon Managers were purporting to work over 3,400 hours per year, or nearly 60% of their waking hours every day, seven days per week. These hours demonstrate that Patronus' payments to Frontline were not for hours of *bona fide* consulting services paid at fair market value but, instead, distributions of Patronus' profits to the Paragon President and Managers.

**B.      The Paragon-Patronus Fraudulent Bids, Contracts and Claims for Payment**

40.     Beginning in or about 2012, Paragon started partnering with women-owned and minority-owned small businesses in order to meet federal guidelines for the use of small business contractors. Rather than establish relationships with unrelated third-party small business subcontractors, which would not have paid the Paragon Executives millions in purported

"consulting fees," the Paragon Executives assisted in the creation of at least three entities that purported to be women-, minority-, or veteran-owned small business subcontractors, including Patronus, which they actually controlled through family members or friends. Because these Paragon small business contractors were controlled by the Paragon Executives, they were affiliated with Paragon, and did not qualify for small business contractor status.

41. On March 6, 2012, Paragon contacted O'Quinn's Spouse stating that Paragon's President suggested that Paragon work with O'Quinn's business as a SDVOSB. At all times relevant herein, O'Quinn's Spouse was the Vice President of one of the largest labor unions for, *inter alia,* protective security guard personnel, including guards who worked for Paragon, and later Patronus and the other sham subcontractors. The Paragon Executives knew O'Quinn's Spouse from his leadership role at the labor union. The United States is informed and believes, and on that basis alleges, that the Paragon President and O'Quinn's Spouse had developed a personal friendship. The next day, O'Quinn's Spouse emailed her resume to Paragon's VP BD and President, noting that Patronus did not have the required licenses. As with much of the early Patronus-Paragon business discussions, O'Quinn was not copied on these emails. Rather, the email communications were between O'Quinn's Spouse and the Paragon Executives.

### 1. Patronus' Initial Subcontracts with Paragon

42. Beginning in 2012, the Paragon Executives, together with Paragon's VP BD, selected Paragon federal contracts, including, but not limited to, Paragon's North Florida and Alabama contracts, on which Patronus would serve as a subcontractor. Paragon's VP BD selected Paragon's FPS guard contract for Jacksonville, Florida to subcontract to Patronus. At this point, Patronus was a start-up corporation with no experience or operations. Patronus' only selling point to Paragon was its relationship with the Paragon President and Paragon Managers,

and O'Quinn Spouse's connection to the security guard labor union. In 2014, Paragon's VP BD told another Paragon employee that the "main qualification" he looked for in subcontractors for the FPS contracts was "[m]alleability and our ability to focus their decisions." O'Quinn's Spouse edited the draft Patronus-Paragon subcontract, modifying the language and seeking comments from the Paragon Managers and the Paragon President.

43. In April 2015, O'Quinn, Patronus and Paragon submitted an Application for a Mentor Protégé Agreement between Paragon and Patronus signed by O'Quinn and the Paragon President. This application falsely claimed that Patronus was "a small service-disabled, woman owned firm[.]" The application was submitted to DHS by Paragon VP BD with a copy to O'Quinn. At the time of this email, O'Quinn, Patronus, and the Paragon Executives knew that Patronus was controlled by the Paragon President, the Paragon Managers, and O'Quinn's Spouse. For those reason, Patronus was an affiliate of Paragon under applicable SBA rules and, thus, was ineligible. Based on the false representations in the application, DHS approved the Paragon-Patronus Mentor Protégé Agreement in or about September 2015.

44. Paragon and Patronus' April 2015 application to DHS estimated that Paragon's in-house assistance to Patronus over 3 years would be limited to:

- 360 hours of Marketing and Business Development Assistance at an estimated cost of $18,000;
- 200 hours of Management and Technical Assistance at an estimated cost of $12,000;
- 450 hours of Financial Assistance at an estimated cost of $27,000.

Under the terms of the Paragon-Patronus Mentor Protégé Agreement, Paragon should have provided a total of 1,010 hours of assistance at an average of $57 per hour for a total worth of $57,000 for three years.

45.     The reality of the relationship between Paragon and Patronus was substantially different from the representations made to DHS in the mentor protégé agreement.  From September 2015 to September 2018, the time frame of the Paragon – Patronus DHS Mentor Protégé Agreement, Patronus paid MCKHU for what would have been over 26,000 hours of work at $57 per hour or the equivalent of more than four full time employees over the three year period:

| Time Frame | MCKHU Payment | Calculated Hours |
|:---:|:---:|:---:|
| 2015-2016 | $41,000 | 719 |
| 2016-2017 | $527,414 | 9,252 |
| 2017-2018 | $959,015 | 16,824 |
| | **$1,527,429** | **26,795** |

Moreover, the Mentor Protégé Agreement did not provide for Patronus paying Paragon for the assistance.  Therefore, the Paragon-Patronus Mentor Protégé Agreement provided no justification for Patronus' massive payment to MCKHU and ultimately to the Paragon President, the Paragon Managers, and their family members.

46.     In or about March 2014, Patronus became a subcontractor on Paragon's FPS North Florida contract and its follow-on contract, until May 2023, when the contract ended.  In or about December 2015, Patronus became a subcontractor on Paragon's FPS Alabama contract until about June 2018, when the contract ended.  In or about August 2017, Patronus became a subcontractor on Paragon's FPS Southern Virginia contract, will about March 2018, when the contract ended.  In or about October 2018, Patronus became a contractor on Paragon's FPS New England contract until about December 2022.  In or about October 2020, Patronus became a subcontractor on Paragon's FPS Louisiana contract, until June 2023, when Paragon cancelled the subcontract.

47.     In connection with these subcontracts, the Paragon Executives sought approval for Patronus to serve as its subcontractor, falsely identifying Patronus as an eligible small business subcontractor.  On many occasions the Paragon Executives falsely informed DHS that Patronus was a woman owned SDVOSB and sought DHS's approval to use Patronus as a subcontractor, including on March 19, 2014 on Paragon's FPS North Florida, on May 18, 2017, Paragon's FPS Southern Virginia contract, and on August 18, 2021, on Paragon's FPS New England contract.  At all times relevant, Patronus was controlled by the Paragon Executives and, thus, was not an eligible small business.

48      Paragon's Small Business Subcontracting Plan, which was prepared by the Paragon Contracts Manager and submitted to DHS as part of its bids, falsely represented that Patronus was a small business.  Because of the relationship between Patronus and the Paragon Executives who controlled the operations of Patronus, it was not an eligible small business.  The Paragon Contracts Manager also worked for Patronus and continues to do so to this day.  For example, the Paragon Contracts Manager did not disclose the over $1 million that his family business, MCKHU, had been paid by Patronus by April 24, 2018, the date of the Small Business Contracting Plan.  The representations in the Small Business Subcontracting Plans were material to the contracts.

49.     Even before the subcontract agreements were in place, Patronus began invoicing Paragon.  For example, on January 22, 2014, O'Quinn's Spouse contacted Paragon's President asking for the name of the Paragon employees to submit Patronus' invoices, the Paragon President told O'Quinn's Spouse to submit the invoices directly to him.  Given the size of Paragon and the hundreds of subcontractors it had, it was unusual that the Paragon President handled the receipt of one small subcontractor's invoices.  Later, the Paragon President told

O'Quinn's Spouse to coordinate with one of his adult sons, Paragon's Contracts Manager, regarding the Patronus invoices.

50.     Under these subcontracts, Patronus and O'Quinn knowingly submitted at least 228 false invoices to Paragon, which, in turn, caused Paragon to submit false claims for payment to the United States.  Both the Patronus invoices to Paragon and the Paragon claims for payment submitted to the United States were false in that Patronus and O'Quinn knew that the Paragon Executives controlled Patronus, making Patronus an affiliate of Paragon and an ineligible subcontractor and that Patronus was paying kickbacks to the Paragon Executives.   Ultimately, the United States paid over $205 million to Paragon on these Paragon contracts, of which over $11.87 million in federal funds was retained by Patronus:

(a)     On or about March 18, 2014, Paragon and Patronus signed a subcontract for the FPS North Florida contract.  O'Quinn signed the subcontract.  On March 19, 2014, Paragon's VP BD sought approval of a subcontract between Paragon and Patronus for the FPS North Florida contract, claiming that Patronus was a woman-owned and a SDVOB company.  No disclosure was made of the control of Patronus by the Paragon Executives or that Paragon was paying kickbacks to the Paragon Executives.  From April 2014 to June 2023, Patronus submitted 112 invoices to Paragon totaling over $4.7 million.  See Appendix B. The false invoices caused Paragon to submit false claims to the United States on the FPS North Florida contract that included the amounts for the Patronus subcontract.

(b)     On or about March 4, 2015, Paragon and Patronus signed a subcontract for the FPS Alabama contract.  O'Quinn signed the subcontract.  From May 2015 to July 2018, Patronus submitted 43 invoices to Paragon totaling over $1.8 million.  See

Appendix B. The false invoices caused Paragon to submit false claims to the United States on the FPS Alabama contract that included the amounts for the Patronus subcontract.

(c)     On May 18, 2018, Paragon's VP BD sought approval of a subcontract between Paragon and Patronus for the FPS Southern Virginia contract, claiming that Patronus was a woman-owned and a SDVOB company.  No disclosure was made of the control of Patronus by the Paragon Executives or that Paragon was paying kickbacks to the Paragon Executives.  A draft subcontract agreement was prepared in June 2017 for the FPS Southern Virginia contract.  The services under the Southern Virginia subcontract were not provided by Patronus but by ASI, another ineligible subcontractor controlled by the Paragon Executives in order to create a work record for ASI.  From September 2017 to March 2018, Patronus submitted six invoices to Paragon totaling over $400,000.  *See* Appendix B.  The false invoices caused Paragon to submit false claims to the United States on the FPS Southern Virginia contract that included the amounts for the Patronus subcontract.  The Patronus-Paragon subcontract for the Southern Virginia contract was terminated on or about March 31, 2018.

(d)     On or about August 20, 2019, Paragon and Patronus signed a subcontract for the FPS Louisiana contract.  O'Quinn signed the subcontract.  From September 2019 to June 2023, Patronus submitted 45 invoices to Paragon totaling over $2.2 million.  *See* Appendix B.  The false invoices caused Paragon to submit false claims to the United States on the FPS Louisiana contract that included the amounts for the Patronus subcontract.

(e)     On or about August 11, 2021, Paragon and Patronus signed a subcontract for the FPS New England contract. O'Quinn signed the subcontract. On August 13, 2021, Paragon's VP BD sought approval of a subcontract between Paragon and Patronus for the FPS Louisiana contract, claiming that Patronus was a woman-owned and a SDVOB company. No disclosure was made of the control of Patronus by the Paragon Executives or that Paragon was paying kickbacks to the Paragon Executives. From August 2021 to June 2023, Patronus submitted 22 invoices to Paragon totaling over $2.6 million. *See* Appendix B. The false invoices caused Paragon to submit false claims to the United States on the FPS New England contract that included the amounts for the Patronus subcontract.

51.     Had the United States known of the affiliation and control between Patronus and Paragon and Patronus' payment of kickbacks to the Paragon Executives, the United States would not have paid these claims.

## 2.     Patronus' Bids on Federal Set Aside Contracts

52.     Beginning in 2015, Patronus was the prime contractor on three small business set aside contracts where Paragon served as Patronus' subcontractor. These contracts were Indefinite-Delivery Indefinite-Quantity (IDIQ) contracts for Armed Protective Security Officers in federal buildings in specific geographic regions. All of the contracts were small business set aside contracts. The prime contracts at issue were:

(a)     FPS West Virginia (HSHQE3-15-R-00002) from December 1, 2015 to November 30, 2020;

(b)     FPS West Virginia (70RFP320DE3000001), from December 1, 2020 to November 30, 2025;

(c)     FPS Eastern Washington and Idaho (HSHQWA-16-D-00002) from December 1, 2016 to March 31, 2022;

(d)    FPS Eastern Washington and Idaho (HSHQWA-16-D-00002) from April 1, 2022 to March 31, 2027; and

(e)    FPS Kentucky (70RFP119DE4000001) from July 1, 2019 to June 30, 2024.

53.    The Patronus bids, including Patronus' pricing which hid the kickbacks paid to the Paragon Executives, were prepared by the Paragon Executives and O'Quinn and signed by O'Quinn.  For example, in April 2020, the Proposal Manager at Paragon, sent Patronus' Technical Submission for Patronus to submit in connection with DHS Request for Proposal 70RFP320DE3000001, including the price submission, which had been prepared by Paragon's Contracts Manager.  Paragon's Proposal Manager emailed these documents to O'Quinn, Paragon's President and the Paragon VP BD.

54.    In bidding on each of these set-aside contracts, Patronus and O'Quinn falsely represented that Patronus was a SDVOSB and a WOSB despite the fact that it was controlled by Paragon executives to whom it was paying millions in kickbacks.  The United States is informed and believes, and on that basis alleges that, following an internal investigation, Paragon withdrew as the subcontractor from these contracts in or about September 2023.

55.    Each of the Patronus prime contracts for West Virginia, Kentucky, and Eastern Washington and Idaho incorporated compliance with the Anti-Kickback Act, 41 U.S.C. § 8706, *et seq.,* into the terms of the contracts.  The Anti-Kickback Act probits the payment and receipt of payments in connection with federal contracts.  Had Patronus not paid the kickbacks to the Paragon Executives, they would not have had Paragon assist them in obtaining the contracts and would not have served as Patronus' subcontractor.  In fact, prior to the kickback payments to the Paragon Executives, Paragon had done no business with Patronus.

56.     In its bids Patronus touted its relationship with Paragon without disclosing

Paragon's operational control of Patronus or that Patronus and O'Quinn were paying millions in

kickbacks to the Paragon Executives through their shell companies, MCKHU and later Frontline,

Patronus and O'Quinn stated in the Executive Summary of Patronus' 2015 proposal for the FSP

West Virginia contract:

> Patronus was able to establish a mutually beneficial arrangement
> with Paragon Systems, Inc, a leader in the PSO industry. The
> relationship is already bearing fruit after two successful FPS PSO
> services subcontracts, one in Northern FL and one in AL, in the
> past year.

57.     Patronus submitted its bid, signed by O'Quinn, on the initial FPS West Virginia

contract on or about May 14, 2015. The FPS West Virginia contract was awarded on or about

September 30, 2015. Patronus submitted its bid on the follow-on contract (contract no.

70RFP320DE3000001) on or about July 29, 2020 and that contract issued on or about August 3,

2020. From January 2016 to May 2023, Patronus submitted 148 invoices totaling over $48.8

million to the United States. *See* Appendix A.

58.     Patronus and O'Quinn stated in the Executive Summary of its 2016 proposal for

the FSP Eastern Washington and Idaho (EWAID) contract:

> Patronus has established a mutually beneficial arrangement with
> Paragon Systems, Inc, a leader in the security industry. The
> relationship is already demonstrating success under two Federal
> Protective Service (FPS) PSO services subcontracts (FPS Northern
> Florida and FPS Alabama Statewide) in the past two years.

59.     Patronus submitted its bid, signed by O'Quinn, on the FPS EWAID contract on or

about January 26, 2016. The FPS EWAID contract was awarded on or about April 8, 2016.

Patronus submitted its bid on the follow-on contract (contract no. 79RFPW21RWA000007) on

or about July 29, 2020 and the contract issued on or about August 3, 2020. From January 2017

to May 2023, Patronus submitted 212 invoices totaling over $56.8 million to the United States. *See* Appendix A.

60.    Patronus and O'Quinn stated in the Executive Summary of Patronus' 2018 proposal for the FSP Kentucky proposal:

> This successful and thoughtful relationship has enabled senior Patronus leadership to work directly with senior Paragon leadership and has resulted in a mutually beneficial arrangement to both Patronus, Paragon, and our Government clients.

61.    Patronus submitted its bid, signed by O'Quinn, on the FPS Kentucky contract on May 2, 2018.  The FPS contract was awarded on or about April 3, 2019.  From August 2019 to May 2023, Patronus submitted 48 invoices totaling over $22.9 million to the United States.  *See* Appendix A.

62.    Patronus and O'Quinn knowingly submitted over 400 false invoices to the United States under its prime contracts with DHS which caused the United States to pay Patronus over $128 million.  Patronus and O'Quinn knew that the Patronus invoices submitted to the United States were false in that the Paragon Executives controlled Patronus, making Patronus an affiliate of Paragon and an ineligible subcontractor and that Patronus was paying kickbacks to the Paragon Executives.

63.    Had the United States known of the affiliation between Patronus and Paragon and the payment of kickbacks to the Paragon Executives, the United States would not have awarded the contracts to Patronus and would not have paid these claims.

### C.    The Paragon Executives' Control of Patronus

64.    From 2015 to at least late 2018, the Paragon President and Managers and O'Quinn's Spouse controlled Patronus' finances and operations.  They routinely discussed Patronus' business without including O'Quinn who was then merely a figurehead.  During this

period of time, O'Quinn's Spouse and the Paragon Managers exchanged over 200 text messages which dealt solely with Patronus' business.  Among the business discussions held among the Paragon President and Managers and O'Quinn's were Patronus' payments of distributions to MCKHU, Patronus' payments to ASI, another sham small business subcontractor, a substantial loan from MCKHU to Patronus, and Patronus' leasing of vehicles.

65.     O'Quinn was aware that O'Quinn's Spouse should not be involved in Patronus' business.  In November 2015, O'Quinn emailed a Patronus employee telling her to use a revised version of a document:  "Use this document or change the author of the document on the one you use (had [O'Quinn's Spouse's] name)."  Similarly, Quinn's Spouse also knew he was not supposed to be involved with Patronus' business.  On March 24, 2022, O'Quinn's Spouse was deposed in an unrelated matter.  He testified that:

> [My] wife does tell me if she won something.· Okay?  But no
> details.   I'm not involved with her business.  I don't sit on any
> board.  I don't give her advice.   It's her business.

66.     Patronus, O'Quinn, and the Paragon Executives concealed the Paragon Executives' control of Patronus through the use of an anonymized email address which did not include the account holder's name.  In December 2015, O'Quinn's Spouse created an anonymous email address -- accounting@patronus.usa – for the use of the Paragon Managers so that they could communicate with Patronus employees, Paragon employees, Government representatives, and third parties, such as vendors. without disclosing that two Paragon executives were operating and controlling Patronus.  Later, Patronus set up another similar email address for Paragon's Director of Payroll who was working for Patronus as its payroll manager, at the request of Paragon's VP Ops.

67.     Not only did the Paragon President and Paragon Managers take steps to hide their involvement in the operations of Patronus, they made false statements about the extent of the involvement of O'Quinn's Spouse.  On November 9, 2018, after working closely on Patronus-related matters with O'Quinn's Spouse for over three years, the Paragon President chastised Paragon's insurance broker for copying O'Quinn's Spouse on emails about Patronus:  "Just so you know, [O'Quinn's Spouse] has nothing to do with Patronus, please stop sending him things."  The insurance broker had corresponded extensively with O'Quinn's Spouse about Patronus' insurance over the preceding three years and had copied the Paragon President and Paragon Managers on that correspondence.  The United States is informed and believes that the Paragon President's email was prompted by the then-pending bid protest against Patronus.

68.     From the beginning of the scheme, the Paragon Executives took an active role in handling Patronus' financial records, including setting up Patronus' books, revising and reformatting Patronus' financial records that were submitted to DHS in connection with bids and to financial institutions, preparing income tax documents, preparing financial projections, and using the Paragon President's long-term Ohio-based accountant to prepare Patronus' tax returns.  The Paragon President and Managers' control over Patronus' finances continued until at least August 2022, and during this time the Paragon Manager's regularly provided the Paragon President with updates on their work for Patronus.  Paragon and O'Quinn provided the Paragon Managers with log-in information and passwords for Paragon's bank accounts, allowing the Paragon Managers to access the accounts to pay Patronus bills.

69.     For example, from November 2016 to April 2021, Patronus had a financial shortfall which made it unable to make payments to Paragon, which was serving as a subcontractor on set-aside contract awarded to Patronus.  The Paragon Managers suggested that

O'Quinn withhold payment on a Paragon invoice, which was due in January 2017, until Patronus received its first payment on a new FPS contract: "Once we get through that period we should be fine." The United States is informed and believes that the cause of Patronus's financial shortfall was that from November 11, 2016 to April 30, 2017, it paid MCKHU $223,815 and $272,072 to O'Quinn. These payments rendered Patronus unable to pay its bills as they came due.

70.     In early 2016, the Paragon Contracts Manager informed a third-party vendor that Patronus was his company, "a federal contractor of armed security guards with annual revenues of $7 million and about 100 employees" and identified both Patronus as Athena [ASI] by name. Around the same time, the Paragon Contracts Manager also represented to another vendor that he was the CFO of Patronus.

### D.     Payments to the Paragon Executives

71.     From at least 2016 to 2023, Patronus paid over $4.6 million to the Paragon President, the Paragon Managers and, to a lesser extent, the Paragon VP Ops. These payments constituted kickbacks and demonstrate the control that these Paragon Executives exercised over Patronus.

#### 1.     Payments to Shell Companies Owned and Controlled by the Paragon President and the Paragon Managers

72.     Between April 2016 and April 2023, when the Patronus, O'Quinn, the Paragon President, and the Paragon Managers were served with investigatory subpoenas, Patronus paid MCKHU and Frontline 50 payments over $4.6 million. MCKHU received nearly $2.2 million, and Frontline received nearly $2.5 million. These payments were disguised as "consulting payments" to these two shell companies, which, in turn, transferred the funds to the Paragon President, the Paragon Managers, and, to a lesser extent, other members of their families.

| Date | Payor | Payee | Amount |
|---|---|---|---|
| 4/12/2016 | Patronus | MCKHU Inc. | $18,500.00 |
| 7/12/2016 | Patronus | MCKHU Inc. | $22,500.00 |
| 1/23/2017 | Patronus | MCKHU Inc. | $90,000.00 |
| 3/9/2017 | Patronus | MCKHU Inc. | $101,520.55 |
| 3/17/2017 | Patronus | MCKHU Inc. | $32,295.00 |
| 4/5/2017 | Patronus | MCKHU Inc. | $230,000.00 |
| 5/1/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 5/16/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 6/8/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 7/21/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 8/11/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 9/15/2017 | Patronus | MCKHU Inc. | $10,745.00 |
| 10/5/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 11/3/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 11/24/2017 | Patronus | MCKHU Inc. | $198,720.00 |
| 3/7/2018 | Patronus | MCKHU Inc. | $415,000.00 |
| 3/29/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 4/27/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 5/14/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 5/16/2018 | Patronus | MCKHU Inc. | $10,765.00 |
| 6/11/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 7/11/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 8/22/2018 | Patronus | MCKHU Inc. | $108,000.00 |
| 10/1/2018 | Patronus | MCKHU Inc. | $108,000.00 |
| 12/3/2018 | Patronus | MCKHU Inc. | $200,000.00 |
| 4/5/2019 | Patronus | MCKHU Inc. | $361,345.00 |
| 12/30/2019 | Patronus | Frontline Source | $498,543.75 |
| 7/7/2020 | Patronus | Frontline Source | $189,225.00 |
| 8/19/2020 | Patronus | Frontline Source | $198,618.75 |
| 12/22/2020 | Patronus | Frontline Source | $193,950.00 |
| 3/4/2021 | Patronus | Frontline Source | $189,000.00 |
| 4/7/2021 | Patronus | Frontline Source | $111,825.00 |
| 5/6/2021 | Patronus | Frontline Source | $129,600.00 |
| 6/3/2021 | Patronus | Frontline Source | $63,900.00 |
| 7/1/2021 | Patronus | Frontline Source | $62,775.00 |
| 8/2/2021 | Patronus | Frontline Source | $69,300.00 |
| 9/2/2021 | Patronus | Frontline Source | $67,275.00 |
| 10/1/2021 | Patronus | Frontline Source | $67,500.00 |
| 11/5/2021 | Patronus | Frontline Source | $69,750.00 |
| 12/3/2021 | Patronus | Frontline Source | $69,975.00 |
| 3/17/2022 | Patronus | Frontline Source | $59,625.00 |
| 6/13/2022 | Patronus | Frontline Source | $58,750.00 |

| | | | |
|---|---|---|---|
| 9/13/2022 | Patronus | Frontline Source | $49,500.00 |
| 10/11/2022 | Patronus | Frontline Source | $48,750.00 |
| 11/9/2022 | Patronus | Frontline Source | $47,250.00 |
| 12/20/2022 | Patronus | Frontline Source | $46,750.00 |
| 1/6/2023 | Patronus | Frontline Source | $45,500.00 |
| 2/27/2023 | Patronus | Frontline Source | $46,000.00 |
| 3/17/2023 | Patronus | Frontline Source | $42,500.00 |
| 4/3/2023 | Patronus | Frontline Source | $41,750.00 |
| | | | **$4,655,358.05** |

73. Each of these 50 payments constituted a kickback to the Paragon Executives.

### E. Payments to Paragon's VP Operations through his Spouse

74. Patronus also paid kickbacks to another Paragon Executive, Paragon's VP Ops, disguised as "consulting fees" paid to his spouse, R.B. Initially, on January 1, 2016, R.B., using her maiden name, which she did not routinely use, emailed O'Quinn and Patronus an invoice for $11,000 for "WV Transition Management" and "December 2015 Oversight Management." Later invoices to Patronus were submitted under the name Grigsby Consulting Services. R.B. performed no work for Patronus and had no contact with Patronus other than the submission of monthly invoices from February 2016 to at least March 2023. When Patronus received the initial invoice, O'Quinn's Spouse asked Paragon's President if he concurred in the invoice. Paragon's President responded, responded "How is our cash?" (emphasis added), apparently referring to Patronus' funds as "our cash." O'Quinn's Spouse provided Paragon's President information about Patronus' cash balances and later informed Paragon's President that he had "[p]aid that invoice."

75. After Patronus paid the initial invoice, Grigsby Consulting sent Patronus another invoice in February 2016 for $1,000. O'Quinn objected to O'Quinn 's Spouse about paying for more consulting by Paragon's VP Ops: "Did U agree to have [Paragon's VP Ops] do more 'consulting'??? I do not agree." Every Grigsby Consulting invoice to Patronus stated that R.B.,

not the VP Ops, was providing "Oversight Management Consulting Services" on the FPS West Virginia contract. Despite O'Quinn's objections, Patronus paid Grigsby Consulting via nearly 90 checks to R.B. totaling over $87,000 for the next six years. The payments to Grigsby Consulting and the Paragon VP Ops were controlled by Paragon's President, not O'Quinn. If O'Quinn had actually controlled Patronus, she could have refused to pay any of the invoices for consulting services to Grigsby Consulting.

76.     In January 2016, R.B., provided a signed Independent Contractor Agreement to Patronus and O'Quinn. The agreement listed specific purported duties for R.B., including reviewing time and attendance records and financials, serving as the chief advisor to the Wet Virginia contract manager, and advising on operational logistics. R.B. lacked the experience and skills to perform these services for Patronus. Later, when R.B. was the President of Praetorian Shield, Inc., another sham protective security officer subcontractor controlled by Paragon, the Paragon Managers questioned her ability to run that business, describing her as being "in over her head" at Praetorian Shield.

77.     In December 2020, O'Quinn again questioned the Paragon Managers why Patronus was continuing to pay consulting fees to Grigsby Consulting. If O'Quinn had actually controlled Patronus, she could have cancelled this consulting arrangement without the approval of the Paragon Managers. The Paragon Managers encouraged O'Quinn to discuss the matter with R.B. and the Paragon VP Ops, demonstrating that they knew that R.B. was not performing services for Patronus. The Paragon VP Ops prepared a list of services that Grigsby Consulting purportedly provided to Patronus, which R.B. forwarded to O'Quinn and Patronus. There remained no substantive communications between R.B. and Patronus or O'Quinn. Similarly, the only communications between the Paragon VP Ops and Patronus came through his Paragon

email account and occurred during regular business hours when he was working in the Paragon offices. Rather, Patronus was paying Patronus' VP Ops for work performed at Paragon's offices during the normal course of Paragon's business.

78.    From January 2016 to April 2023, when the Patronus, O'Quinn, the Paragon President, and the Paragon Managers were served with investigatory subpoenas, Patronus paid 85 payments to the Paragon VP Ops totally $98,000. These payments were disguised as "consulting payments" to R.B., using her maiden name, the Paragon VP Ops' Spouse, many of which were endorsed to the VP Ops.

| Date | Payor | Payor/Payee | Amount |
|---|---|---|---|
| 2/10/2016 | Patronus Systems | Grigsby Consulting | $11,000.00 |
| 3/21/2016 | Patronus Systems | Grigsby Consulting | $2,000.00 |
| 4/4/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/3/2016 | Patronus Systems | Grigsby Consulting | $2,000.00 |
| 7/12/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/5/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/2/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/3/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/1/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/5/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/6/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/2/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/3/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/3/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/1/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/1/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/15/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/2/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/4/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/5/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/3/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/4/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/3/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |

| | | | |
|---|---|---|---|
| 6/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/3/2018 | Patronus Systems | Grigsby Consulting | $2,000.00 |
| 10/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/3/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/5/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/4/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/2/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/4/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/3/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/1/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/1/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/5/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/4/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/11/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/2/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/6/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/1/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/8/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/4/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/5/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/3/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/6/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/3/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/3/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/4/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/5/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/5/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |

| | | | |
|---|---|---|---|
| 2/3/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/3/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/1/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/4/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/6/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/5/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/4/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/6/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/7/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/11/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/5/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/26/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/6/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/4/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| | | | $98,000.00 |

79.     Each of these 85 payments constituted a kickback to the Paragon VP Ops.

**F.      Paragon's Payroll Director was also Patronus' Payroll Director**

80.     Paragon also exercised control over Patronus by having Paragon's Payroll Director work as Patronus's Payroll Director from October 2016 until 2023.  The Payroll Director worked for Patronus at the request of Paragon's VP Ops and was paid over $112,000 by Patronus.  The Payroll Director's work for Patronus further demonstrates the control of Patronus by the Paragon Executives.

81.     In both her Paragon job and her Patronus job, the Payroll Director worked closely with the Paragon Managers and knew that they were working for Patronus as consultants.  The Payroll Director knew that the Paragon Managers used an anonymized Patronus email address -- accounting@Patronus.com.  The Payroll Director also used an anonymized Patronus email address – payroll@patronususa.com – to conduct her business on behalf of Patronus, often while at her desk at Paragon.

82.     The Payroll Director did not want other Paragon employees to know she was also working as Patronus' Payroll Director.  The Payroll Director told Patronus employees not to send Patronus payroll emails to her Paragon email account or to her personal Gmail account. Similarly, O'Quinn told employees of Patronus' payroll company, Valiant, not to use the Payroll Director's Paragon email address to communicate about her work at Patronus.

83.     The Payroll Director continued to work for Patronus until at least March 2023, interviewing candidates for employment and preparing payroll.  She performed her Patronus work from Paragon's offices during Paragon's regular business hours.

### G.     The Patronus – Paragon Failed Joint Venture

84.     On June 11, 2018, FPS issued Request for Proposal (RFP) for protective security officers for certain federal buildings located in New Jersey.  Defendant PSP was incorporated on July 12, 2018 by O'Quinn to bid on the FPS New Jersey contract.  On August 6, 2018, PSP submitted a bid for the FSP New Jersey contract.  O'Quinn and the Paragon President signed the Joint Venture Agreement dated "July 17, 2018;" however, the document was backdated and, in fact, it was signed three months later after a bid protest was filed against PSP.

85.     On October 16, 2018, a bid protest was submitted against PSP based on size, alleging that Patronus was an affiliate of Paragon based on, *inter alia*, A.D's roles as a director of Patronus and the wife of the Paragon President.  The bid protest contained no allegations about the millions of dollars that Patronus was paying to the Paragon President and the Paragon Managers, as these facts were unknown to the protestor.

86.     On October 18, 2018, two days after the bid protest was filed, the Paragon VP BD sent O'Quinn the Paragon-PSP joint venture agreement.  On October 19, 2018, O'Quinn

responded that she was just in the process of signing it. Paragon and Patronus never prepared or signed a joint venture agreement until after the bid protest was filed against them.

87. In Paragon and Patronus' opposition to the bid protest, Patronus and O'Quinn did not disclose the millions of dollars that Patronus paid to Paragon executives or the control of Patronus' business by the Paragon Executives. Both O'Quinn and the Paragon President certified that the information in the bid protest response was accurate. On November 3, 2018, PSP lost the bid protest nonetheless. By then end of November, O'Quinn dissolved PSP.

88. As a result of the bid protest, the Paragon Executives memorialized fewer communications with O'Quinn's Spouse and memorialized a greater number of communications with O'Quinn herself. O'Quinn continued to rely on the Paragon Managers to perform nearly all back office services for Patronus.

89. On October 26, 2018, a former Paragon employee sent an email about the small business subcontracting scheme at Paragon which was ultimately forwarded to O'Quinn's Spouse and later the Paragon President which detailed the connections between the Paragon President and the O'Quinn's. Mr. Wagner's email did not address the involvement of the Paragon Managers, who were the adult sons of the Paragon President, in the operation of Patronus' business or Patronus' payments of million to shell companies owned by the Paragon President and the Paragon Managers. Mr. Wagner wrote: "So, you have Patronus – with [O'Quinn's Spouse] getting access and doing side deals with Paragon while his wife [O'Quinn] is part owner with [the Paragon President's] wife and winning contracts without any past performance . . . ." Co-workers of O'Quinn's Spouse forwarded Mr. Wagner's email to O'Quinn's Spouse, noting "This is everywhere."

### G.     Patronus' PPP Fraud

90.     In or about April 2020, O'Quinn and the Paragon Managers decided to seek a PPP loan for Patronus.  O'Quinn signed the application on or about April 6, 2020, and on May 4, 2020, Patronus received $1,828,713 in PPP funds.

91.     After the PPP loan was funded, Frontline, a shell company which funneled funds to the Paragon President and the Paragon Managers, received:  (a) $189,225 on July 6, 2020; (b) $198,618 on August 18, 2020; (c) $193,950 on November 1, 2020; and (d) $189,000 on December 31, 2020.  PPP loan funds could not be use to pay third-party consultants such as Frontline purported to be.  All payments were made from the same account where Patronus deposited the PPP funds – Patronus Account No. X5524.

92.     In the same month when the PPP loan was funded, O'Quinn increased her own personal monthly distributions from $2,000 to $7,600 in June and July 2020.  In July 2020, Ms. O'Quinn again increased her monthly distributions to $40,0000 where they remained through 2021.  All payments were made from the same account where Patronus deposited the PPP funds – Patronus Account No. X5524.

93.     On February 19, 2021, Patronus applied for SBA loan forgiveness on its PPP loan.  O'Quinn signed the PPP loan forgiveness application on behalf of Patronus.  In doing so, Patronus, through O'Quinn, expressly and impliedly certified that Patronus had complied with all applicable PPP rules relating to the use of PPP funds, including that at least 60% of the proceeds were used to pay Patronus employees.  On April 4, 2021, Patronus' PPP loan was forgiven in full.  Beginning that month, Frontline received additional payments: (a) $111,825 on April 7, 2021; and (b) $129,000 on May 6, 2021.  All payments were made from the same account where Patronus deposited the PPP funds – Patronus Account No. X5524.

94.     On December 6, 2021, the Paragon Managers informed O'Quinn that she had $844,078 in equity in Patronus than MCKHU/Frontline had taken due to the forgiveness of Patronus' PPP loan.  The Paragon Managers asked O'Quinn is she wanted to adjust her salary, saying "It doesn't really make any difference to us, other than the impact of cash flow but with the addition of Maine pre-billing [which was part of the Paragon New England subcontract with Patronus] we have a but more liquidity."  On December 6, 2021, O'Quinn forwarded the email to Paragon's President, who responded only to her on December 7, 2021: "oh my[.]  This is cash . . . [O'Quinn's mother-in-law and Paragon's bookkeeper] did not say you have 800k on [the] books that is your[s] to take??"  On February 14, 2022, Patronus paid $300,035 to O'Quinn.

95.     On December 7, 2021, the Paragon Managers emailed O'Quinn asking "So how do we get our share of the equity, specifically the PPP?"  O'Quinn responded: "We decide at the end of each year how much can be pulled for each of us.  We leave enough money so we can still operate."  The Paragon Managers responded, "We are trying to spread things evenly rather than in big spikes.  We should have a call to go over.  I think there's a fundamental disconnection on the accounting for an owner versus vendor."  After that point, Patronus began paying Frontline approximately $66,000 per month instead of large payments at then end of each year.

## COUNT I
## VIOLATION OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A)
## AGAINST ALL DEFENDANTS

96.     The United States re-alleges and incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

97.     By virtue of the wrongful acts described herein, from at least 2014 through the present, all Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to the United States false or fraudulent claims for payment

in violation of 31 U.S.C. § 3729(a)(1)(A). These claims were submitted by Patronus and O'Quinn in connection with Patronus' FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts and Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts.

98. These claims were false in that:

(a) In bids to the United States, Patronus and O'Quinn falsely described Patronus' small business status without disclosing that the Paragon Executives controlled Patronus and without disclosing that Patronus and O'Quinn were paying the Paragon Executives millions in kickbacks in violation of federal law, making Patronus an affiliate of Paragon and, thus ineligible to bid on the small business set-aside contracts, including but not limited to FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts;

(b) The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives tainted all claims for payment submitted by Patronus on its small business set-aside contracts, including but not limited to FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts; and

(c) The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives caused Paragon to submit false claims for payment under its contracts where Patronus served as a subcontractor, including but not limited to Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts.

99. Additionally, the conduct of O'Quinn and Patronus fraudulently induced the United States to enter into small business set-aside contracts with Patronus. Specifically,

O'Quinn and Patronus' false representations of Patronus' small business status and their failure to disclose the control of Patronus by the Paragon Executives and Patronus' payment of kickbacks to the Paragon Executives fraudulently induced the United States to enter into small business set-aside contracts with Patronus, including but not limited to FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts.

100. The United States relied on 411 fraudulent invoices and claims for payment submitted by Patronus and O'Quinn, in paying Patronus $128 million.

101. The United States relied on 352 fraudulent invoices and claims for payment submitted by Paragon, which Patronus and O'Quinn caused to be submitted, in paying Paragon, over $205 million of which $11.8 million was paid to Patronus. Patronus submitted 228 false invoices to Paragon.

102. From claims submitted as a prime contractor and as a subcontractor to Paragon, Patronus received a total of $140 million to which it was not legally entitled. Patronus and O'Quinn submitted 228 invoices to Paragon as a subcontractor and 411 invoices submitted to the United States as a prime contractor, for a total of 639 false claims.

103. The false representations, invoices, records, statements, reports, and certifications described herein were material to the United States' decision to pay Paragon and Patronus and had a natural tendency to influence and did influence those payment decisions. Had the United States known of the false claims for payment, it would not have paid the invoices.

104. The false representations, records, statements, reports, and certifications described herein were material to the United States' decision to enter into small business set-aside contracts with Patronus and had a natural tendency to influence and did influence those contracting

decisions. Had the United States known of the false representations, it would not have entered into the contracts or paid any of the invoices under the contracts.

105. Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

106. As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages in the amount of at least $140 million and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties as described in Paragraph 15 above, and other monetary relief as appropriate.

107. On or about April 14, 2020, Patronus and O'Quinn submitted an application for a PPP loan. On May 4, 2020, Patronus received $1,828,713 in PPP funds. On April 4, 2021, Patronus' PPP loan was forgiven.

108. The bulk of Patronus' PPP loan was used to pay bogus consulting fees to Frontline, which were kickbacks, and to pay substantial distributions to O'Quinn. These were not legitimate uses for PPP funds.

109. Patronus' application for PPP loan forgiveness was a false claim which resulting in a loss to SBA totaling more than $1,828,713. Had SBA known the facts described above, the United States would not have paid, forgiven, or provided guarantees on the Patronus SBA loan.

110. As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages in the amount of at least $1,828,713 for the PPP loan and its forgiveness and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties as described in Paragraph 15 above, and other monetary relief as appropriate.

# COUNT II
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)
### AGAINST ALL DEFENDANTS

111. The United States re-alleges and incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

112. By virtue of the wrongful acts described herein, from 2014 through the present, all Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, made, used, and/or caused to be made or used, false records, statements, and certifications material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(b). In particular, Defendants made, used, and caused to be made or used, false records, statements, and certifications in the invoices and accompanying documentation of Patronus and Paragon that were submitted to the United States. These false representations included O'Quinn and Patronus' false representations of Patronus' small business status and the failure to disclose the payment of kickbacks to the Paragon Executives. The false representations also caused Paragon to make false statements to the United States concerning Patronus' small business status.

113. The United States relied on these fraudulent records, statements, and certifications in paying Patronus and Paragon, which resulted in the payment of over $140 million to Patronus, to which it was not legally entitled.

114. The false representations, records, statements, reports, and certifications described herein were material to United States' decision to provide pay Patronus and Paragon and had a natural tendency to influence and did influence those decisions.

115. Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

116.     As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, plus 639 civil money penalties as described in Paragraph 15 above , and other monetary relief as appropriate.

117.     On or April 14 2020, Patronus and O'Quinn submitted an application for a PPP loan.  On May 4, 2020, Patronus received $1,828,713 in PPP funds.  On April 4, 2021, Patronus' PPP loan was forgiven by SBA.

118.     The bulk of Patronus' PPP loan was used to pay bogus consulting fees to Frontline, which were kickbacks and to pay massive distributions to O'Quinn.  These were not legitimate uses for PPP funds.

119.     Patronus' application for PPP loan forgiveness was a false claim which resulting in a loss to SBA totaling more than $1,828,713.  Had SBA known the facts described above, the United States would not have paid, forgiven, or provided guarantees on the Patronus SBA loan.

120.     As a result of the false representations, records, statements, reports, and certifications, the United States has suffered actual damages in the amount of at least $1,828,713 for the PPP loan and its forgiveness and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties as described in Paragraph 15 above, and other monetary relief as appropriate,

### COUNT III
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(C)
### AGAINST ALL DEFENDANTS

121.     The United States re-alleges and incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

122. All defendants participated in a conspiracy to get false and fraudulent claims paid by the United States. No later than April 15, 2015, O'Quinn and Patronus entered into a conspiracy with the Paragon President and Paragon Manager, acting through their shell company, MCKHU, for the Paragon Executives to control and operate Patronus and for Patronus to pay kickbacks from Patronus' profits in return for Patronus being awarded Paragon subcontracts These kickbacks were disguised as consulting payments to MCKHU. The conspiracy included the preparation and submission of false bids and false claims to the United States by Patronus, O'Quinn, and the Paragon executives in connection with Patronus' prime contracts and causing Paragon to submit false claims to the United States in connection with Paragon's prime contracts where Patronus served as a subcontractor. In January 2016, the conspiracy expanded when the Paragon President instructed Paragon and O'Quinn's spouse to pay additional kickbacks to the spouse of the Paragon Vice President Ops. O'Quinn joined the conspiracy in early 2016 which she agreed that Patronus would make the payments, which were again disguised as kickback payments.

123. These claims were false in that:

(a) In bids to the United States, Patronus and O'Quinn falsely described Patronus' small business status without disclosing that the Paragon Executives controlled Patronus and without disclosing that Patronus and O'Quinn were paying the Paragon Executives millions in kickbacks in violation of federal law, making Patronus an affiliate of Paragon and, thus ineligible to bid on the small business set-aside contracts, including but not limited to FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts;

(b)    The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives tainted all claims for payment submitted by Patronus on its small business set-aside contracts, including but not limited to FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts; and

(c)    The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives caused Paragon to submit false claims for payment under its contracts where Patronus served as a subcontractor, including but not limited to Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts.

124.    The United reasonably States relied on these fraudulent records, statements, and certifications in paying Patronus and Paragon, which resulted in the direct and indirect payment of over $140 million to which Patronus was not legally entitled.

125.    The false representations, records, statements, reports, and certifications described herein were material to United States' decision to provide pay Patronus and Paragon and had a natural tendency to influence and did influence those decisions.

126.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

127.    As a result of these false records, statements, reports, and certifications, the United States has suffered actual damages and is entitled to recover three times the amount by which it has been damaged, , plus 639 civil money penalties as described in Paragraph 15 above , and other monetary relief as appropriate.

128.    On or about April 3, 2020, Patronus, O'Quinn and the Paragon Managers entered into an agreement to obtain a PPP loan to pay massive payments to O'Quinn and the Paragon

Manager's shell company, Frontline. On April 14, 2020, Patronus and O'Quinn submitted an application for a PPP loan. On May 4, 2020, Patronus received $1,828,713 in PPP funds. On April 4, 2021, Patronus' PPP loan was forgiven by SBA.

129.     The bulk of Patronus' PPP loan was used to pay bogus consulting fees to Frontline, which were kickbacks. and to pay massive distributions to O'Quinn. These were not legitimate uses for PPP funds.

130.     Patronus' application for PPP loan forgiveness was a false claim which resulting in a loss to SBA totaling more than $1,828,713. Had SBA known the facts described above, the United States would not have paid or forgiven the Patronus SBA loan.

131.     As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages in the amount of at least $1,828,713 for the PPP loan and its forgiveness and is entitled to recover three times the amount by which it has been damaged, plus civil money penalties as described in Paragraph 15 above, and other monetary relief as appropriate.

### COUNT IV
### VIOLATION OF THE ANTI-KICKBACK ACT
### 41 U.S.C. § 8706(a)(1)
### AGAINST DEFENDANTS
### MABEL O'QUINN AND PATRONUS SYSTEMS INC.

132.     The United States re-alleges and incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

133.     From at least January 2015 to August 2023, O'Quinn and Patronus knowingly paid at least 50 kickback payments totaling over $4.6 million to shell companies, including but not limited to MCKHU and/or Frontline, which were owned and/or controlled by the Paragon President and/or the Paragon Managers, and/or other members of their families, in return for

receiving Paragon subcontracts, including but not limited to Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts and/or for Paragon's assistance in obtaining and performing set-aside contracts in Patronus' name, including but not limited to Patronus' FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts.

134.    From at least January 2016 to August 2023, O'Quinn and Patronus knowingly paid at least 85 kickback payments totally approximately $89,000 to the spouse of the Paragon VP Ops in return for receiving Paragon subcontracts, including but not limited to Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts and/or for Paragon's assistance in obtaining and performing set-aside contracts in Patronus' name, including but not limited to Patronus' FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts.

135.    From at least January 2015 to August 2023, O'Quinn and Patronus knowingly included the amount of the kickbacks paid directly or indirectly to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops in both the contract prices that Patronus charged Paragon when Patronus served as Paragon's subcontractor and/or when in the contract prices Patronus, as a prime contractor, charged the Federal government.  O'Quinn signed all Patronus bids submitted to the United States for prime contracts.

136.    O'Quinn and Patronus acted knowingly when paying the kickbacks and including the amount of the kickbacks in Patronus' bids and contracts for prime contracts and in its subcontracts with Paragon.

137.    The Anti-Kickback Act was incorporated into Patronus' FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts and Anti-Kickback Act was

incorporated into Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts where Patronus served as a subcontractor.

138.    As a result of O'Quinn and Patronus' knowing payment of 135 kickbacks to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops which totaled over $4.6 million, the United States is entitled to recover twice the amount of each kickbacks involved and a penalty of $27,894 for each occurrence.

**COUNT V**
**VIOLATION OF THE ANTI-KICKBACK ACT**
**41 U.S.C. § 8706(a)(2)**
**AGAINST DEFENDANTS**
**MABEL O'QUINN AND PATRONUS SYSTEMS INC.**

139.    The United States re-alleges and incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

140.    From at least January 2015 to August 2023, O'Quinn and Patronus paid at least 50 kickback payments totaling over $4.6 million to shell companies, including but not limited to MCKHU and/or Frontline which were owned and/or controlled by the Paragon President and/or the Paragon Managers, and/or other members of their families in return for receiving Paragon subcontracts, including but not limited to Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts and/or for Paragon's assistance in obtaining and performing set-aside contracts in Patronus' name, including but not limited to Patronus' FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts.

141.    From at least January 2016 to August 2023, O'Quinn and Patronus paid at least 85 kickback payments totally approximately $89,000 to the spouse of the Paragon VP Ops in return for receiving Paragon subcontracts, including but not limited to Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts and/or for Paragon's assistance

in obtaining and performing set-aside contracts in Patronus' name, including but not limited to Patronus' FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts.

142. From at least January 2015 to August 2023, O'Quinn and Patronus included the amount of the kickbacks paid directly or indirectly to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops in both the contract prices that Patronus changed Paragon when Patronus served as Paragon's subcontractor and/or when in the contract prices Patronus, as a prime contractor, charged the federal government. O'Quinn signed all Patronus bids submitted to the United States for prime contracts.

143. The Anti-Kickback Act was incorporated into Patronus' FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts and Anti-Kickback Act was incorporated into Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama contracts where Patronus served as a subcontractor.

144. As a result of O'Quinn and Patronus' payment of 135 kickbacks to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops which totaled over $4.6 million, the United States is entitled to recover a penalty equal to the amount of each kickback.

**COUNT VI**
**PAYMENT BY MISTAKE**
**AGAINST DEFENDANT**
**PATRONUS SYSTEMS, INC.**

145. The United States re-alleges and incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

146. This is a common law claim by the United States to recover payments made by the United States to Patronus based on a mistake of fact. This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

147. By virtue of the wrongful acts described herein, from 2015 through the present, Patronus obtained and kept Federal funds to which it was not entitled that were paid based on a mistake of fact by the United States. Specifically, the United States was unaware that:

(a) Patronus was an affiliate of Paragon due to the control of Patronus by the Paragon Executives which rendered all claims for payment to the United States by Patronus as a prime contractor false and all claims for payment to Paragon by Patronus as a subcontractor to Paragon false, which caused Paragon to submit false claims for payment to the United States and to make false statements to the United States; and

(b) Patronus and O'Quinn were paying kickbacks to the Paragon Executives, including but not limited to the Paragon President, the Paragon Managers, and the Paragon VP Ops, which rendered all claims for payment to the United States by Patronus as a prime contractor false and all claims for payment to Paragon by Patronus as a subcontractor to Paragon false, which caused Paragon to submit false claims for payment to the United States and to make false statements to the United States; and

(c) Patronus and O'Quinn received forgiveness of a PPP loan for $1,828,713 which was used to pay distributions and kickbacks to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops, which were not legitimate uses for PPP loan funds.

148. Based on the foregoing, the United States mistakenly paid over $141 million to Patronus for tainted services and forgiven PPP loan funds, and the circumstances dictate that, in equity and good conscience, the amount of these payments should be returned to the United States.

149. Had the United States known the facts described above, the United States would not have paid such claims.

## COUNT VII
## UNJUST ENRICHMENT
## AGAINST ALL DEFENDANTS

150. The United States re-alleges and incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

151. This is a claim by the United States for unjust enrichment under the common law arising from the unjust receipt of federal funds by Patronus and O'Quinn while engaged in the illegal conduct described herein. This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

152. By virtue of the wrongful acts described herein, from 2015 through the present, Defendants Patronus and O'Quinn directly or indirectly obtained federal funds by which they were unjustly enriched. Specifically, the United States was unaware that:

(a) Patronus was an affiliate of Paragon due to the control of Patronus by the Paragon Executives which rendered all claims for payment to the United States by Patronus as a prime contractor false and all claims for payment to Paragon by Patronus as a subcontractor to Paragon false, which caused Paragon to submit false claims for payment to the United States and to make false statements to the United States; and

(b) Patronus and O'Quinn were paying kickbacks to the Paragon Executives, including but not limited to the Paragon President, the Paragon Managers, and the Paragon VP Ops, which rendered all claims for payment to the United States by Patronus as a prime contractor false and all claims for payment to Paragon by Patronus as a subcontractor to Paragon false, which caused Paragon to submit false claims for payment

to the United States and to make false statements to the United States; and (c)

Patronus and O'Quinn received forgiveness of a PPP loan for $1,828,713 which was used to pay distributions and kickbacks to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops, which were not legitimate uses for PPP loan funds. Had SBA known the facts described above, the United States would not have paid, forgiven, or provided guaranties on such claims.

153.    Based on the foregoing, Patronus and O'Quinn have been unjustly enriched, and the circumstances dictate that, in equity and good conscience, the money should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor and against Defendants, jointly and severally, as follows:

1.    On Counts I - III, under the False Claims Act, 31 U.S.C. 3729 et seq., against all Defendants for treble the amount of the United States' actual damages, plus civil penalties as are allowable by law for each false claim or record;

3.    On Count IV, under the Anti-Kickback Act, 41 U.S.C. § 8706(a)(1), against all Defendants for double the amount of the kickbacks paid, plus civil penalties as are allowable by law for reach kickback payment;

4.    On Count V, under the Anti-Kickback Act, 41 U.S.C. § 8706(a)(2), against all Defendants for civil penalties in the amount of the kickbacks paid as are allowable by law for reach kickback payment;

5.    On Count VI for payment by mistake against Patronus, for the amount paid to Patronus by the United States plus interest;

6.  On Count VII for unjust enrichment against all Defendants for the amounts by which the Defendants were unjustly enriched, plus interest;

7.  For all costs of this civil action; and

8.  For such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

Dated: November 5, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

EREK L. BARRON
United States Attorney
District of Maryland

By: _____
SARAH MARQUARDT (No. 17294)
Assistant United States Attorneys
36 S. Charles Street, 4th Floor |
Baltimore, MD 21201
Telephone (410) 209-4801

JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
ALICIA J. BENTLEY
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, DC 20044

Attorneys for the United States of America

## DEMAND FOR A JURY TRIAL

The United States demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Dated: November 5, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

EREK L. BARRON
United States Attorney
District of Maryland

By: _____
SARAH MARQUARDT (No. 17294)
Assistant United States Attorneys
36 S. Charles Street, 4th Floor |
Baltimore, MD 21201
Telephone (410) 209-4801

JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
ALICIA J. BENTLEY
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, DC 20044

Attorneys for the United States of America

# APPENDIX A -- PARAGON PRIME CONTRACT INVOICES

| FPS Kentucky | | |
|---|---|---|
| **70RFP119DE4000001** | | |
| **Date** | **Invoice No.** | **Amount** |
| 8/14/2019 | KY-001 | $550,915.29 |
| 9/11/2019 | KY-002 | $546,204.11 |
| 10/17/2019 | KY-003 | $494,396.47 |
| 11/14/2019 | KY-004 | $536,518.94 |
| 12/27/2019 | KY-005 | $462,222.90 |
| 1/13/2020 | KY-006 | $494,589.12 |
| 2/12/2020 | KY-007 | $518,163.14 |
| 4/1/2020 | KY-008 | $484,213.17 |
| 4/20/2020 | KY-009 | $505,939.59 |
| 5/15/2020 | KY-010 | $414,556.99 |
| 6/16/2020 | KY-011 | $399,597.07 |
| 7/21/2020 | KY-012 | $414,507.10 |
| 8/21/2020 | KY-013 | $424,777.83 |
| 9/19/2020 | KY-014 | $403,483.25 |
| 10/26/2020 | KY-015 | $404,893.23 |
| 10/20/2020 | KY-016 | $25,237.99 |
| 11/13/2020 | KY-017 | $409,118.16 |
| 12/11/2020 | KY-018 | $363,881.10 |
| 1/13/2021 | KY-019 | $388,985.52 |
| 2/12/2021 | KY-020 | $358,459.20 |
| 3/9/2021 | KY-021 | $325,917.57 |
| 4/15/2021 | KY-022 | $433,066.59 |
| 5/12/2021 | KY-023 | $416,054.10 |
| 6/19/2021 | KY-024 | $408,238.38 |
| 7/14/2021 | KY-025 | $456,268.23 |
| 8/21/2021 | KY-026 | $460,703.42 |
| 10/4/2021 | KY-027 | $493,311.21 |
| 9/14/2021 | KY-028 | $11,220.25 |
| 10/13/2021 | KY-029 | $464,132.07 |
| 11/16/2021 | KY-030 | $484,236.79 |
| 12/10/2021 | KY-031 | $468,359.16 |
| 1/18/2022 | KY-032 | $499,904.18 |
| 1/20/2022 | KY-033 | $44,516.36 |
| 2/28/2022 | KY-034 | $466,003.81 |
| 3/4/2022 | KY-035 | $196,526.00 |
| 4/6/2022 | KY-036R | $435,236.91 |
| 3/5/2022 | KY-037 | $71,699.30 |
| 4/27/2022 | KY-038 | $552,510.69 |
| 5/16/2022 | KY-039 | $567,284.29 |
| 6/17/2022 | KY-040 | $567,116.07 |
| 7/13/2022 | KY-041 | $566,327.43 |
| 8/19/2022 | KY-042 | $571,772.31 |
| 9/21/2022 | KY-043 | $646,410.17 |
| 9/22/2022 | KY-044 | $24,680.19 |
| 10/17/2022 | KY-045 | $591,255.37 |
| 11/11/2022 | KY-046 | $569,494.39 |
| 12/12/2022 | KY-047 | $561,156.94 |
| 1/12/2023 | KY-048 | $581,591.22 |
| 2/11/2023 | KY-049 | $575,752.80 |
| 3/10/2023 | KY-050 | $548,684.02 |
| 4/13/2023 | KY-051 | $658,153.24 |
| 5/11/2023 | KY-052 | $582,730.15 |
| | | **$22,900,973.78** |

| FPS EWAID | | |
|---|---|---|
| **HSHQWA-16-D-00002** | | |
| **Date** | **Invoice No.** | **Amount** |
| 1/11/2017 | EWAID-001 | $576,503.41 |
| 1/12/2017 | EWAID-002 | $121,342.99 |
| 1/12/2017 | EWAID-003 | $14,674.95 |
| 2/8/2017 | EWAID-004 | $567,820.07 |
| 2/8/2017 | EWAID-005 | $113,951.59 |
| 2/8/2017 | EWAID-006 | $24,351.59 |
| 3/8/2017 | EWAID-007 | $522,564.91 |
| 3/8/2017 | EWAID-008 | $109,458.63 |
| 3/8/2017 | EWAID-009 | $24,455.43 |
| 4/10/2017 | EWAID-010 | $596,002.75 |
| 4/10/2017 | EWAID-011 | $136,877.04 |
| 4/10/2017 | EWAID-012 | $29,608.29 |
| 4/11/2017 | EWAID-013 | $7,434.35 |
| 4/11/2017 | EWAID-014 | $3,458.45 |
| 5/9/2017 | EWAID-015 | $573,954.12 |
| 5/9/2017 | EWAID-016 | $119,175.40 |
| 5/9/2017 | EWAID-017 | $22,831.72 |
| 5/11/2017 | EWAID-018 | $166.60 |
| 5/17/2017 | EWAID-019 | $71,498.09 |
| 5/17/2017 | EWAID-020 | $2,941.26 |
| 6/7/2017 | EWAID-021 | $606,226.39 |
| 6/7/2017 | EWAID-022 | $130,828.34 |
| 6/7/2017 | EWAID-023 | $33,906.45 |
| 7/17/2017 | EWAID-024 | $592,693.75 |
| 7/17/2017 | EWAID-025 | $131,251.23 |
| 7/17/2017 | EWAID-026 | $28,831.19 |
| 8/8/2018 | EWAID-027 | $585,688.05 |
| 8/8/2018 | EWAID-028 | $119,153.87 |
| 8/8/2018 | EWAID-029 | $27,364.12 |
| 9/7/2017 | EWAID-030 | $615,209.71 |
| 9/7/2017 | EWAID-031 | $136,787.33 |
| 9/7/2017 | EWAID-032 | $29,188.48 |
| 10/10/2017 | EWAID-033 | $575,829.21 |
| 10/10/2017 | EWAID-034 | $119,162.58 |
| 10/10/2017 | EWAID-035 | $25,607.96 |
| 11/8/2017 | EWAID-036 | $596,828.89 |
| 11/8/2017 | EWAID-037 | $125,497.32 |
| 11/8/2017 | EWAID-038 | $24,451.02 |
| 12/8/2017 | EWAID-039 | $574,714.31 |
| 12/8/2017 | EWAID-040 | $116,244.87 |
| 12/8/2017 | EWAID-041 | $17,758.01 |
| 1/11/2018 | EWAID-042 | $588,427.22 |
| 1/11/2018 | EWAID-043 | $119,585.48 |
| 1/11/2018 | EWAID-044 | $19,589.52 |
| 2/9/2018 | EWAID-045 | $598,323.64 |
| 2/9/2018 | EWAID-046 | $125,228.20 |
| 2/9/2018 | EWAID-047 | $24,720.14 |
| 2/13/2018 | EWAID-048 | $615.12 |
| 2/13/2018 | EWAID-049 | $1,742.84 |
| 3/8/2018 | EWAID-050 | $539,848.80 |
| 3/8/2018 | EWAID-051 | $113,592.18 |
| 3/8/2018 | EWAID-052 | $29,931.00 |
| 3/8/2018 | EWAID-053 | $5,644.72 |
| 4/6/2018 | EWAID-054 | $608,199.91 |
| 4/6/2018 | EWAID-055 | $132,109.84 |
| 4/6/2018 | EWAID-056 | $26,945.33 |
| 5/8/2018 | EWAID-057 | $586,234.99 |
| 5/8/2018 | EWAID-058 | $125,561.39 |
| 5/8/2018 | EWAID-059 | $24,895.96 |
| 6/8/2018 | EWAID-060 | $603,855.62 |
| 6/8/2018 | EWAID-061 | $131,674.13 |
| 6/8/2018 | EWAID-062 | $22,533.90 |
| 7/8/2018 | EWAID-063 | $585,748.02 |
| 7/8/2018 | EWAID-064 | $125,997.10 |
| 7/8/2018 | EWAID-065 | $24,230.60 |
| 8/8/2018 | EWAID-066 | $598,966.44 |
| 8/8/2018 | EWAID-067 | $126,455.62 |
| 8/8/2018 | EWAID-068 | $21,545.60 |
| 9/11/2018 | EWAID-069 | $618,084.88 |
| 9/11/2018 | EWAID-070 | $137,761.26 |
| 9/11/2018 | EWAID-071 | $26,259.99 |
| 10/12/2018 | EWAID-072 | $575,183.53 |
| 10/12/2018 | EWAID-073 | $112,661.80 |
| 10/12/2018 | EWAID-074 | $17,379.70 |
| 11/9/2018 | EWAID-075 | $612,201.36 |
| 11/9/2018 | EWAID-076 | $130,287.00 |
| 11/9/2018 | EWAID-077 | $34,747.26 |
| 12/11/2018 | EWAID-078 | $579,858.42 |
| 12/11/2018 | EWAID-079 | $116,503.84 |
| 12/11/2018 | EWAID-080 | $30,697.62 |
| 1/14/2019 | EWAID-081 | $576,159.96 |
| 1/14/2019 | EWAID-082 | $107,280.53 |
| 1/14/2019 | EWAID-083 | $24,696.60 |

| | | | | | |
|---|---|---|---|---|---|
| 2/11/2019 | EWAID-084 | $592,683.54 | 3/12/2020 | EWAID-127 | $564,018.19 |
| 2/11/2019 | EWAID-085 | $124,568.87 | 3/12/2020 | EWAID-128 | $159,529.06 |
| 2/11/2019 | EWAID-086 | $27,785.84 | 3/12/2020 | EWAID-129 | $8,728.43 |
| 3/5/2019 | EWAID-087 | $126,726.24 | 4/10/2020 | EWAID-130 | $591,772.94 |
| 3/5/2019 | EWAID-088 | $544,052.79 | 4/10/2020 | EWAID-131 | $150,817.85 |
| 3/5/2019 | EWAID-089 | $112,943.29 | 5/10/2020 | EWAID-132 | $549,537.51 |
| 3/11/2019 | EWAID-090 | $26,442.63 | 5/10/2020 | EWAID-133 | $96,976.74 |
| 4/18/2019 | EWAID-091 | $607,887.10 | 6/12/2020 | EWAID-134 | $537,036.87 |
| 4/18/2019 | EWAID-092 | $125,037.80 | 6/12/2020 | EWAID-135 | $85,912.19 |
| 4/18/2019 | EWAID-093 | $34,147.41 | 7/9/2020 | EWAID-136 | $552,001.88 |
| 5/8/2019 | EWAID-094 | $609,802.91 | 7/9/2020 | EWAID-137 | $86,398.40 |
| 5/8/2019 | EWAID-095 | $131,091.65 | 8/11/2020 | EWAID-138 | $565,641.71 |
| 5/8/2019 | EWAID-096 | $30,359.87 | 8/11/2020 | EWAID-139 | $89,837.66 |
| 6/8/2019 | EWAID-097 | $621,936.82 | 9/9/2020 | EWAID-140 | $559,394.46 |
| 6/8/2019 | EWAID-098 | $130,599.84 | 9/9/2020 | EWAID-141 | $85,212.88 |
| 6/8/2019 | EWAID-099 | $20,670.02 | 10/9/2020 | EWAID-142 | $549,090.12 |
| 7/9/2019 | EWAID-100 | $590,156.50 | 10/9/2020 | EWAID-143 | $86,011.72 |
| 7/9/2019 | EWAID-101 | $119,003.75 | 11/11/2020 | EWAID-144 | $541,209.34 |
| 7/9/2019 | EWAID-102 | $18,716.48 | 11/11/2020 | EWAID-145 | $84,822.06 |
| 7/30/2019 | EWAID-103 | $2,593.86 | 12/9/2020 | EWAID-146 | $508,358.57 |
| 7/30/2019 | EWAID-104 | $8,074.03 | 12/9/2020 | EWAID-147 | $74,960.25 |
| 8/7/2019 | EWAID-105 | $621,963.10 | 1/14/2021 | EWAID-148 | $551,959.17 |
| 8/7/2019 | EWAID-106 | $130,617.13 | 1/14/2021 | EWAID-149 | $90,103.91 |
| 8/7/2019 | EWAID-107 | $19,025.71 | 2/12/2021 | EWAID-150 | $538,267.21 |
| 9/9/2019 | EWAID-108 | $621,129.92 | 2/12/2021 | EWAID-151 | $73,076.45 |
| 9/9/2019 | EWAID-109 | $131,091.65 | 6/2/2021 | EWAID-152 | $172,496.52 |
| 9/9/2019 | EWAID-110 | $19,458.03 | 2/22/2021 | EWAID-153 | $24,804.86 |
| 10/8/2019 | EWAID-111 | $153,128.54 | 5/23/2021 | EWAID-154 | $30,956.00 |
| 10/8/2019 | EWAID-112 | $24,711.45 | 3/16/2021 | EWAID-155 | $506,894.54 |
| 10/8/2019 | EWAID-113 | $5,153.89 | 3/16/2021 | EWAID-156 | $82,963.00 |
| 10/9/2019 | EWAID-114 | $586,460.99 | 4/10/2021 | EWAID-157 | $596,966.96 |
| 10/9/2019 | EWAID-115 | $156,013.16 | 4/10/2021 | EWAID-158 | $101,042.63 |
| 10/9/2019 | EWAID-116 | $6,979.66 | 4/12/2021 | EWAID-159 | $571,241.34 |
| 11/14/2019 | EWAID-117 | $626,468.87 | 5/11/2021 | EWAID-160 | $571,241.34 |
| 11/14/2019 | EWAID-118 | $176,155.14 | 5/11/2021 | EWAID-161 | $96,995.04 |
| 12/9/2019 | EWAID-119 | $594,935.87 | 6/11/2021 | EWAID-162 | $571,575.11 |
| 12/9/2019 | EWAID-120 | $145,918.78 | 6/11/2021 | EWAID-163 | $90,833.87 |
| 1/7/2020 | EWAID-121 | $587,311.16 | 6/25/2021 | EWAID-164 | $10,961.28 |
| 1/7/2020 | EWAID-122 | $156,794.83 | 7/13/2021 | EWAID-165 | $567,483.42 |
| 2/11/2020 | EWAID-123 | $595,995.85 | 7/13/2021 | EWAID-166 | $96,332.96 |
| 2/11/2020 | EWAID-124 | $164,953.17 | 8/10/2021 | EWAID-167 | $578,196.89 |
| 2/14/2020 | EWAID-125 | $625.32 | 8/10/2021 | EWAID-168 | $96,479.31 |
| 2/14/2020 | EWAID-126 | $130.28 | 9/16/2021 | EWAID-169 | $601,444.71 |

| Date | Invoice | Amount |
|------|---------|--------|
| 9/16/2021 | EWAID-170 | $106,482.15 |
| 10/14/2021 | EWAID-171 | $598,720.73 |
| 10/14/2021 | EWAID-172 | $106,710.70 |
| 11/15/2021 | EWAID-173 | $598,890.76 |
| 11/15/2021 | EWAID-174 | $101,234.08 |
| 12/10/2021 | EWAID-175 | $586,273.68 |
| 12/10/2021 | EWAID-176 | $98,151.00 |
| 1/14/2022 | EWAID-177 | $605,559.71 |
| 1/14/2022 | EWAID-178 | $108,076.00 |
| 2/10/2022 | EWAID-179 | $592,401.86 |
| 2/10/2022 | EWAID-180 | $101,099.79 |
| 3/8/2022 | EWAID-181 | $547,644.87 |
| 3/8/2022 | EWAID-182 | $97,644.02 |
| 4/11/2022 | EWAID-183 | $627,122.24 |
| 4/11/2022 | EWAID-184R | $121,984.04 |
| 5/12/2022 | EWAID-185 | $598,209.71 |
| 5/12/2022 | EWAID-186 | $164,275.31 |
| 6/10/2022 | EWAID-187 | $608,803.47 |
| 6/10/2022 | EWAID-188 | $168,347.32 |
| 7/13/2022 | EWAID-189 | $596,472.14 |
| 7/13/2022 | EWAID-190 | $168,333.23 |
| 8/17/2022 | EWAID-191 | $600,932.80 |
| 8/17/2022 | EWAID-192 | $158,319.74 |
| 3/29/2023 | EWAID-193 | $63,678.65 |
| 3/28/2023 | EWAID-194 | $12,204.59 |
| 9/13/2022 | EWAID-195 | $635,876.08 |
| 9/13/2022 | EWAID-196 | $184,264.51 |
| 10/13/2022 | EWAID-197 | $599,106.97 |
| 10/13/2022 | EWAID-198 | $168,568.25 |
| 11/14/2022 | EWAID-199 | $616,389.53 |
| 11/14/2022 | EWAID-200 | $153,788.26 |
| 12/13/2022 | EWAID-201 | $603,812.53 |
| 12/13/2022 | EWAID-202 | $151,496.80 |
| 1/11/2023 | EWAID-203 | $622,480.95 |
| 1/11/2023 | EWAID-204 | $165,914.25 |
| 2/11/2023 | EWAID-205 | $619,173.35 |
| 2/11/2023 | EWAID-206 | $162,175.90 |
| 3/8/2023 | EWAID-207 | $569,158.74 |
| 3/8/2023 | EWAID-208 | $156,103.11 |
| 4/11/2023 | EWAID-209 | $652,689.84 |
| 4/11/2023 | EWAID-210 | $184,114.03 |
| 5/9/2023 | EWAID-211 | $599,655.46 |

| Date | Invoice | Amount |
|------|---------|--------|
| 5/9/2023 | EWAID-212 | $150,668.66 |
| | | **$56,877,160.68** |

| FPS WEST VIRGINIA | | |
| --- | --- | --- |
| HSHQE3-15-D-00002 | | |
| Date | Invoice No. | Amount |
| 1/12/2016 | WV-001 | $580,900.83 |
| 2/9/2016 | WV-002 | $523,896.76 |
| 3/7/2016 | WV-003 | $535,907.69 |
| 4/13/2016 | WV-004 | $597,870.01 |
| 5/8/2016 | WV-005 | $559,266.83 |
| 6/9/2016 | WV-006 | $562,794.20 |
| 7/13/2016 | WV-007 | $575,902.98 |
| 8/16/2016 | WV-008 | $550,497.27 |
| 8/16/2016 | WV-009 | $8,037.10 |
| 9/9/2016 | WV-010 | $600,252.86 |
| 10/7/2016 | WV-011 | $568,992.06 |
| 10/10/2016 | WV-012 | $39,107.38 |
| 10/10/2016 | WV-013 | $1,028.76 |
| 10/1/2016 | WV-014 | $31,946.64 |
| 11/9/2016 | WV-015 | $84.00 |
| 11/14/2016 | WV-016 | $541,138.50 |
| 12/8/2016 | WV-017 | $528,031.14 |
| 1/5/2017 | WV-018 | $2,520.00 |
| 1/5/2017 | WV-019 | $23,300.34 |
| 1/5/2017 | WV-020 | $19,315.80 |
| 1/8/2017 | WV-021 | $536,571.19 |
| 1/8/2017 | WV-022 | $10,792.09 |
| 2/13/2017 | WV-023 | $522,137.48 |
| 2/13/2017 | WV-024 | $10,802.23 |
| 3/9/2017 | WV-025 | $487,242.87 |
| 3/9/2017 | WV-026 | $14,404.86 |
| 4/11/2017 | WV-027 | $570,167.05 |
| 4/11/2017 | WV-028 | $24,758.22 |
| 5/1/2017 | WV-029 | $283.64 |
| 5/1/2017 | WV-030 | $1,324.19 |
| 5/1/2017 | WV-031 | $8,450.04 |
| 5/10/2017 | WV-032 | $516,324.48 |
| 5/10/2017 | WV-033 | $24,008.10 |
| 6/8/2017 | WV-034 | $554,111.00 |
| 6/8/2017 | WV-035 | $17,648.08 |
| 7/18/2017 | WV-036 | $532,361.89 |
| 7/18/2017 | WV-037 | $16,460.44 |
| 8/7/2017 | WV-038 | $497,312.09 |
| 8/7/2017 | WV-039 | $18,928.51 |
| 9/13/2017 | WV-040 | $550,403.42 |
| 9/13/2017 | WV-041 | $35,791.02 |
| 9/15/2017 | WV-042 | $39,997.29 |
| 10/13/2017 | WV-043 | $511,860.58 |
| 10/13/2017 | WV-044 | $37,045.20 |
| 10/24/2017 | WV-045 | $112,362.26 |
| 11/14/2017 | WV-046 | $532,758.11 |
| 11/15/2017 | WV-047 | $19,355.80 |
| 12/22/2017 | WV-048 | $497,214.60 |
| 12/22/2017 | WV-049 | $21,198.62 |
| 1/19/2018 | WV-050 | $510,764.30 |
| 1/19/2018 | WV-051 | $18,120.80 |
| 2/21/2018 | WV-052 | $528,048.85 |
| 2/21/2018 | WV-053 | $21,380.80 |
| 3/16/2018 | WV-054 | $478,148.33 |
| 3/16/2018 | WV-055 | $15,598.70 |
| 4/16/2018 | WV-056 | $545,971.00 |
| 4/16/2018 | WV-057 | $15,069.78 |
| 5/16/2018 | WV-058 | $523,757.71 |
| 5/16/2018 | WV-059 | $15,099.70 |
| 6/21/2018 | WV-060 | $545,159.05 |
| 6/21/2018 | WV-061 | $14,655.08 |
| 7/18/2018 | WV-062 | $530,771.89 |
| 7/18/2018 | WV-063 | $190,650.99 |
| 7/18/2018 | WV-064 | $23,428.96 |
| 8/8/2018 | WV-065 | $55,832.89 |
| 8/11/2018 | WV-066 | $540,596.94 |
| 8/11/2018 | WV-067 | $13,049.20 |
| 9/17/2018 | WV-068 | $591,370.76 |
| 9/17/2018 | WV-069 | $18,482.28 |
| 10/3/2018 | WV-070 | $3,286.25 |
| 10/22/2018 | WV-071 | $519,076.90 |
| 10/22/2018 | WV-072 | $13,431.11 |
| 11/13/2018 | WV-073 | $574,911.17 |
| 11/13/2018 | WV-074 | $16,272.38 |
| 12/13/2018 | WV-075 | $522,082.86 |
| 12/13/2018 | WV-076 | $12,446.36 |
| 1/15/2019 | WV-077 | $497,876.43 |
| 1/15/2019 | WV-078 | $10,364.07 |
| 2/12/2019 | WV-079 | $536,263.03 |
| 2/12/2019 | WV-080 | $16,531.93 |
| 3/12/2019 | WV-081 | $500,154.97 |
| 3/12/2019 | WV-082 | $15,216.91 |
| 4/11/2019 | WV-083 | $552,634.71 |

| Date | Invoice | Amount | Date | Invoice | Amount |
|---|---|---|---|---|---|
| 4/11/2019 | WV-084 | $18,297.87 | 10/19/2021 | WV-127 | $522,536.05 |
| 5/16/2019 | WV-085 | $562,275.20 | 12/2/2021 | WV-128 | $516,495.53 |
| 5/16/2019 | WV-086 | $15,557.12 | 1/20/2022 | WV-129 | $499,128.26 |
| 6/12/2019 | WV-087 | $566,295.76 | 1/25/2022 | WV-130 | $510,864.45 |
| 6/12/2019 | WV-088 | $17,894.03 | 2/23/2022 | WV-131 | $491,251.49 |
| 7/15/2019 | WV-089 | $525,520.31 | 3/18/2022 | WV-132 | $480,326.03 |
| 7/15/2019 | WV-090 | $11,791.92 | 4/13/2022 | WV-133 | $551,630.06 |
| 8/7/2019 | WV-091 | $578,435.26 | 5/20/2022 | WV-134 | $533,754.29 |
| 8/7/2019 | WV-092 | $11,374.79 | 6/30/2022 | WV-135 | $51,841.60 |
| 9/17/2019 | WV-093 | $75,257.63 | 6/30/2022 | WV-136 | $540,060.22 |
| 9/17/2019 | WV-094 | $579,889.08 | 8/4/2022 | WV-137 | $527,062.00 |
| 9/17/2019 | WV-095 | $13,796.48 | 8/15/2022 | WV-138 | $532,726.53 |
| 10/15/2019 | WV-096 | $537,084.36 | 9/13/2022 | WV-139 | $621,729.11 |
| 10/15/2019 | WV-097 | $12,415.50 | 10/27/2022 | WV-140 | $581,022.96 |
| 11/14/2019 | WV-098 | $579,380.24 | 11/23/2022 | WV-141 | $573,015.94 |
| 11/18/2019 | WV-099 | $13,717.33 | 12/23/2022 | WV-142 | $560,632.51 |
| 12/26/2019 | WV-100 | $520,134.16 | 1/25/2023 | WV-143 | $577,573.05 |
| 12/26/2019 | WV-101 | $12,866.40 | 2/24/2023 | WV-144 | $570,532.21 |
| 1/15/2020 | WV-102 | $550,815.76 | 3/27/2023 | WV-145 | $531,340.19 |
| 3/2/2020 | WV-103 | $570,230.31 | 5/2/2023 | WV-146 | $620,432.50 |
| 3/12/2020 | WV-104 | $527,710.37 | 5/25/2023 | WV-147 | $567,962.10 |
| 4/23/2020 | WV-105 | $558,442.85 | | | **$48,827,227.65** |
| 5/14/2020 | WV-106 | $456,082.95 | | | |
| 6/15/2020 | WV-107 | $445,395.73 | | | |
| 7/15/2020 | WV-108 | $461,682.43 | | | |
| 8/13/2020 | WV-109 | $469,557.19 | | | |
| 9/23/2020 | WV-110 | $466,923.83 | | | |
| 10/15/2020 | WV-111 | $468,613.58 | | | |
| 11/16/2020 | WV-112 | $480,379.87 | | | |
| 12/16/2020 | WV-113 | $437,005.36 | | | |
| 1/21/2021 | WV-114 | $483,993.95 | | | |
| 2/18/2021 | WV-115 | $466,326.54 | | | |
| 3/11/2021 | WV-116 | $450,833.67 | | | |
| 4/12/2021 | WV-117 | $530,704.67 | | | |
| 4/23/2021 | WV-118 | $122,393.38 | | | |
| 9/9/2021 | WV-119 | $22,574.70 | | | |
| 5/23/2021 | WV-120 | $521,625.57 | | | |
| 6/15/2021 | WV-121 | $499,688.73 | | | |
| 8/3/2021 | WV-122 | $511,068.70 | | | |
| 8/19/2021 | WV-123 | $518,561.52 | | | |
| 9/20/2021 | WV-124 | $546,749.38 | | | |
| 9/27/2021 | WV-125 | $81,769.16 | | | |
| 10/4/2021 | WV-126 | $4,823.34 | | | |

| FPS Alabama | | |
|---|---|---|
| **HSHQE4-13-D-00001** | **HSHQE4-17-D-00002** | |
| **Date** | **Invoice** | **Amount** |
| 5/18/2015 | A001 | $10,965.84 |
| 5/20/2015 | A002 | $28,023.76 |
| 6/11/2015 | A003 | $43,480.86 |
| 6/15/2015 | A004 | $41,119.68 |
| 7/22/2015 | A005 | $43,474.48 |
| 7/22/2015 | A006 | $43,474.48 |
| 7/23/2015 | A007 | $43,657.96 |
| 9/2/2015 | A008 | $45,636.39 |
| 10/12/2015 | A009 | $46,142.80 |
| 10/15/2015 | A010 | $43,947.07 |
| 12/30/2015 | A011 | $45,497.76 |
| 1/9/2016 | A012 | $43,871.15 |
| 1/10/2016 | A013 | $45,730.29 |
| 5/9/2016 | A014 | $45,120.73 |
| 5/10/2016 | A015 | $42,505.88 |
| 5/11/2016 | A026 | $45,976.05 |
| 7/20/2016 | A017 | $45,710.46 |
| 7/20/2016 | A018 | $48,399.92 |
| 7/20/2016 | A019 | $46,999.44 |
| 10/24/2016 | A020 | $50,456.17 |
| 10/24/2016 | A021 | $49,380.58 |
| 10/24/2016 | A022 | $49,686.11 |
| 11/21/2016 | A023 | $47,990.66 |
| 12/1/2016 | A024 | $44,311.52 |
| 1/1/2017 | A025 | $49,426.57 |
| 3/15/2017 | A026 | $46,512.51 |
| 4/1/2017 | A027 | $48,895.24 |
| 5/1/2017 | A028 | $47,838.21 |
| 6/1/2017 | A029 | $48,119.23 |
| 7/1/2017 | A030 | $48,959.22 |
| 8/1/2017 | A031 | $47,282.24 |
| 9/1/2017 | A032 | $49,277.00 |
| 10/1/2017 | A033 | $48,411.46 |
| 11/1/2017 | A034 | $48,076.68 |
| 12/1/2017 | A035 | $49,598.07 |
| 1/1/2018 | A036 | $43,783.94 |
| 2/1/2018 | A037 | $47,929.48 |
| 3/1/2018 | A038 | $45,894.61 |
| 4/1/2018 | A039 | $49,824.78 |
| 5/1/2018 | A040 | $48,286.92 |

| 6/1/2018 | A041 | $1,538.62 |
|---|---|---|
| 7/1/2018 | A042 | $1,608.55 |
| 7/23/2018 | A043 | $6,667.29 |
| | | **$1,819,490.66** |

| Date | Invoice | Amount | | Date | Invoice | Amount |
|---|---|---|---|---|---|---|
| **FPS North Florida** | | | | 7/1/2017 | F041 | $43,694.44 |
| **HSHQE4-12-D-00005** | | | | 8/1/2017 | F042 | $40,610.91 |
| **Date** | **Invoice** | **Amount** | | 9/1/2017 | F043 | $40,656.64 |
| 4/15/2014 | F001 | $30,283.20 | | 10/1/2017 | F044 | $37,442.45 |
| 4/17/2014 | F002 | $33,311.82 | | 11/1/2017 | F045 | $27,302.96 |
| 6/9/2014 | F003 | $32,056.48 | | 12/1/2017 | F046 | $39,428.88 |
| 7/10/2014 | F004 | $27,715.99 | | 1/1/2018 | F047 | $34,226.92 |
| 8/31/2014 | F005 | $32,029.63 | | 2/1/2018 | F048 | $40,919.64 |
| 9/4/2014 | F006 | $31,364.30 | | 3/1/2018 | F049 | $36,983.88 |
| 10/5/2014 | F007A | $30,254.22 | | 4/1/2018 | F050 | $3,247.74 |
| 10/15/2014 | F008 | $25,430.32 | | 5/1/2018 | F051 | $40,614.00 |
| 12/23/2014 | F009 | $35,802.05 | | 6/1/2018 | F052 | $44,171.84 |
| 1/6/2015 | F010 | $32,185.65 | | 7/1/2018 | F053 | $43,286.09 |
| 1/15/2015 | F011A | $30,887.99 | | 7/23/2018 | F054 | $38,376.22 |
| 3/2/2015 | F012 | $30,255.71 | | 8/20/2018 | F055 | $42,450.36 |
| 3/31/2015 | F013A | $37,117.45 | | 9/20/2018 | F056 | $39,744.13 |
| 4/14/2015 | F014A | $35,640.21 | | 10/22/2018 | F057 | $33,325.71 |
| 5/18/2015 | F015 | $39,512.02 | | 11/15/2018 | F058 | $45,406.80 |
| 5/22/2015 | F016 | $43,354.22 | | 12/20/2018 | F059 | $59,333.24 |
| 6/15/2015 | F017 | $34,928.59 | | 1/22/2019 | F060 | $37,878.93 |
| 7/23/2015 | F018 | $36,157.36 | | 2/20/2019 | F061 | $41,525.52 |
| 9/2/2015 | F019 | $34,643.22 | | 3/20/2019 | F062 | $51,741.99 |
| 10/28/2015 | F020 | $34,771.56 | | 4/22/2019 | F063 | $48,423.90 |
| 10/28/2015 | F021 | $31,145.49 | | 5/21/2019 | F064 | $48,436.60 |
| 1/6/2016 | F022 | $27,023.80 | | 6/21/2019 | F065 | $50,234.44 |
| 1/10/2016 | F023 | $24,677.57 | | 7/19/2019 | F066 | $46,642.15 |
| 1/10/2016 | F024 | $30,014.67 | | 8/19/2019 | F067 | $51,837.46 |
| 5/15/2016 | F025 | $25,118.09 | | 9/20/2019 | F068 | $39,745.71 |
| 5/16/2016 | F026 | $29,657.75 | | 10/22/2019 | F069 | $43,389.20 |
| 5/17/2016 | F027 | $36,426.48 | | 11/21/2019 | F070 | $49,721.61 |
| 7/18/2016 | F028 | $38,937.79 | | 12/10/2019 | F071 | $49,283.20 |
| 7/19/2016 | F029 | $35,208.83 | | 1/29/2020 | F072 | $48,168.91 |
| 7/20/2016 | F30 | $41,840.68 | | 2/21/2020 | F073 | $54,096.38 |
| 10/24/2016 | F031 | $34,492.44 | | 3/20/2020 | F074 | $42,970.59 |
| 10/24/2016 | F032 | $38,537.61 | | 4/22/2020 | F075 | $40,696.78 |
| 10/24/2016 | F033 | $40,346.72 | | 5/20/2020 | F076 | $29,008.60 |
| 11/21/2016 | F034 | $35,962.90 | | 6/25/2020 | F077 | $28,004.48 |
| 12/1/2016 | F035 | $37,406.53 | | 7/21/2020 | F078 | $27,745.84 |
| 1/1/2017 | F036 | $43,710.01 | | 8/21/2020 | F079 | $30,325.86 |
| 3/15/2017 | F037 | $38,935.23 | | 9/23/2020 | F080 | $33,071.58 |
| 4/1/2017 | F038 | $41,963.99 | | 10/22/2020 | F081 | $36,774.50 |
| 5/1/2017 | F039 | $42,031.40 | | 11/20/2020 | F082 | $34,485.32 |
| 6/1/2017 | F040 | $40,197.85 | | 12/21/2020 | F083 | $27,946.62 |

| | | |
|---|---|---|
| 1/20/2021 | F084 | $36,971.29 |
| 2/20/2021 | F085 | $34,220.07 |
| 3/20/2021 | F086 | $33,056.52 |
| 4/21/2021 | F087 | $34,911.24 |
| 5/21/2021 | F088 | $30,313.08 |
| 6/21/2021 | F089 | $38,355.60 |
| 7/20/2021 | F090 | $37,926.30 |
| 8/20/2021 | F091 | $38,699.54 |
| 9/20/2021 | F092 | $39,185.64 |
| 10/21/2021 | F093 | $39,974.22 |
| 11/21/2021 | F094 | $43,456.80 |
| 12/20/2021 | F095 | $41,491.04 |
| 1/20/2022 | F096 | $48,169.20 |
| 2/23/2022 | F097 | $39,846.67 |
| 3/20/2022 | F098 | $51,623.05 |
| 4/21/2022 | F099 | $52,899.72 |
| 5/20/2022 | F100 | $56,442.72 |
| 6/21/2022 | F101 | $80,931.65 |
| 7/24/2022 | F102 | $71,290.68 |
| 8/22/2022 | F103 | $59,626.90 |
| 9/24/2022 | F104 | $69,613.80 |
| 10/20/2022 | F105 | $76,051.29 |
| 11/22/2022 | F106 | $79,370.47 |
| 12/21/2022 | F107 | $71,060.22 |
| 1/20/2023 | F108 | $80,369.85 |
| 2/20/2023 | F109 | $87,519.78 |
| 3/20/2023 | F110 | $86,358.09 |
| 4/20/2023 | F111 | $87,512.61 |
| 6/5/2023 | F112 | $80,790.71 |
| | | **$4,732,755.59** |

| FPS Louisiana | | |
|---|---|---|
| HSHQC7-15-D-00001 | | |
| **Date** | **Invoice** | **Amount** |
| 9/20/2019 | L001 | $69,834.84 |
| 10/22/2019 | L002 | $49,208.16 |
| 11/21/2019 | L003 | $49,208.16 |
| 12/20/2019 | L004 | $1,675.33 |
| 1/29/2020 | L005 | $48,111.56 |
| 2/21/2020 | L006 | $51,600.44 |
| 3/20/2020 | L007 | $53,474.19 |
| 4/22/2020 | L008 | $51,435.09 |
| 5/20/2020 | L009 | $45,074.41 |
| 6/25/2020 | L010 | $47,815.69 |
| 7/21/2020 | L011 | $48,262.24 |
| 8/21/2020 | L012 | $50,301.58 |
| 9/23/2020 | L013 | $45,230.13 |
| 10/22/2020 | L014 | $52,843.00 |
| 11/20/2020 | L015 | $49,867.13 |
| 12/21/2020 | L016 | $47,587.83 |
| 1/20/2021 | L017 | $47,734.28 |
| 2/20/2021 | L018 | $45,057.43 |
| 3/20/2021 | L019 | $42,915.95 |
| 4/21/2021 | L020 | $40,826.28 |
| 5/21/2021 | L021 | $44,003.96 |
| 6/21/2021 | L022 | $46,292.24 |
| 7/20/2021 | L023 | $55,531.69 |
| 8/20/2021 | L024 | $58,060.90 |
| 9/20/2021 | L025 | $49,723.65 |
| 10/21/2021 | L026 | $57,769.91 |
| 11/22/2021 | L027 | $45,515.06 |
| 12/20/2021 | L028 | $43,947.15 |
| 1/20/2022 | L029 | $50,735.51 |
| 2/23/2022 | L030 | $47,673.03 |
| 3/23/2022 | L031 | $56,378.85 |
| 4/21/2022 | L032 | $58,359.93 |
| 5/20/2022 | L033 | $50,562.85 |
| 6/21/2022 | L034 | $54,615.88 |
| 7/25/2022 | L035 | $56,560.60 |
| 8/22/2022 | L036 | $62,031.28 |
| 9/21/2022 | L037 | $63,460.77 |
| 10/20/2022 | L038 | $63,146.71 |
| 11/22/2022 | L039 | $62,583.63 |
| 12/21/2022 | L040 | $53,409.91 |

| Date | Invoice | Amount |
|---|---|---|
| 1/20/2023 | L041 | $57,516.83 |
| 2/20/2023 | L042 | $53,473.07 |
| 3/20/2023 | L043 | $57,882.96 |
| 4/20/2023 | L044 | $54,595.50 |
| 6/5/2023 | L045 | $48,201.79 |
| | | **$2,290,097.38** |

| **FPS New England (Maine)** | | |
|---|---|---|
| **70RFP118DE1000001** | | |
| **Date** | **Invoice** | **Amount** |
| 8/20/2021 | ME001 | $120,927.40 |
| 9/20/2021 | ME002 | $120,927.40 |
| 10/21/2021 | ME003 | $126,973.33 |
| 11/22/2021 | ME004 | $96,096.67 |
| 12/20/2021 | ME005 | $92,592.22 |
| 1/20/2022 | ME006 | $112,738.36 |
| 2/23/2022 | ME007 | $114,474.87 |
| 3/23/2022 | ME008 | $110,754.33 |
| 4/21/2022 | ME009 | $118,701.20 |
| 5/20/2022 | ME010 | $110,317.30 |
| 6/21/2022 | ME011 | $124,728.41 |
| 7/24/2022 | ME012 | $108,650.74 |
| 8/22/2022 | ME013 | $114,007.41 |
| 9/21/2022 | ME014 | $124,950.34 |
| 10/20/2022 | ME015 | $127,551.07 |
| 11/22/2022 | ME016 | $125,774.21 |
| 12/21/2022 | ME017 | $119,921.79 |
| 1/20/2023 | ME018 | $145,396.48 |
| 2/20/2023 | ME019 | $123,756.81 |
| 3/20/2023 | ME020 | $132,451.11 |
| 4/20/2023 | ME021 | $138,265.46 |
| 6/5/2023 | ME022 | $125,451.64 |
| | | **$2,635,408.55** |

| **FPS Southern Virginia** | | |
| **HSHQE3-14-D-00005** | | |
| **Date** | **Invoice** | **Amount** |
| 9/1/2017 | SVA001 | $138,993.60 |
| 11/1/2017 | SVA002 | $48,846.47 |
| 11/1/2017 | SVA003 | $46,426.96 |
| 12/1/2007 | SVA004 | $63,453.60 |
| 2/15/2018 | SVA005 | $46,907.67 |
| 2/15/2018 | SVA006 | $57,101.17 |
| | | **$401,729.47** |

| FPS Alabama | | |
|---|---|---|
| **HSHQE4-13-D-00001** | | |
| **Date** | **Invoice** | **Amount** |
| 6/16/2015 | AL-069 | $589,535.56 |
| 7/16/2015 | AL-070 | $600,192.36 |
| 9/15/2015 | AL-071 | $600,109.32 |
| 8/18/2015 | AL-072 | $594,724.80 |
| 9/14/2015 | AL-073 | $582,214.06 |
| 10/15/2015 | AL-074 | $598,555.83 |
| 11/16/2015 | AL-077 | $603,317.87 |
| 1/4/2016 | AL-078 | $599,762.63 |
| 1/15/2016 | AL-079 | $615,759.16 |
| 2/17/2016 | AL-080 | $575,229.11 |
| 3/10/2016 | AL-081 | $582,712.81 |
| 4/8/2016 | AL-082 | $653,915.25 |
| 5/16/2016 | AL-083 | $610,425.07 |
| 6/22/2016 | AL-084 | $616,142.74 |
| 7/28/2016 | AL-085 | $626,985.56 |
| 8/11/2016 | AL-086 | $595,561.60 |
| 9/19/2016 | AL-087 | $657,106.03 |
| 12/2/2016 | AL-088 | $617,049.82 |
| 1/12/2017 | AL-089 | $657,311.90 |
| 1/12/2017 | AL-090 | $654,556.22 |
| 1/19/2017 | AL-091 | $690,623.32 |
| 3/23/2017 | AL-092R | $674,000.92 |
| 3/20/2017 | AL-093 | $642,548.66 |
| 4/17/2017 | AL-094 | $752,157.44 |
| 5/15/2017 | AL-095 | $673,274.99 |
| 6/22/2017 | AL-096 | $745,238.90 |
| 8/8/2017 | AL-097R | $736,610.19 |
| 8/29/2017 | AL-098 | $700,422.51 |
| 10/11/2017 | AL-099 | $773,512.71 |
| 11/2/2017 | AL-100 | $803,794.04 |
| 1/8/2018 | AL-101 | $803,787.12 |
| 2/9/2018 | AL-102 | $684,366.84 |
| 2/1/2018 | AL-103 | $684,291.63 |
| 3/1/2018 | AL-104 | $684,231.41 |
| 3/22/2018 | AL-105 | $653,833.00 |
| 4/19/2018 | AL-106 | $742,967.14 |
| 5/29/2018 | AL-107 | $716,044.07 |
| 6/27/2018 | AL-108 | $750,429.49 |
| 7/11/2018 | AL-109 | $723,658.02 |
| | | **$25,866,960.10** |

| FPS North Florida HSHQE4-12-D-00005 / HSHQE4-17-D-00002 | | |
|---|---|---|
| **Date** | **Invoice** | **Amount** |
| 6/24/2014 | NFL-019 | $1,099,201.70 |
| 7/16/2014 | NFL-020 | $1,094,195.12 |
| 8/18/2014 | NFL-021 | $1,140,257.12 |
| 9/19/2014 | NFL-023 | $1,145,476.51 |
| 10/21/2014 | NFL-025 | $1,135,067.67 |
| 11/24/2014 | NFL-026 | $1,182,822.40 |
| 1/15/2015 | NFL-027 | $1,020,218.93 |
| 2/10/2015 | NFL-028 | $1,149,249.54 |
| 3/11/2015 | NFL-029 | $1,112,846.80 |
| 3/26/2015 | NFL-031 | $1,042,861.91 |
| 5/1/2015 | NFL-032 | $1,193,687.23 |
| 5/28/2015 | NFL-033 | $1,192,116.52 |
| 6/26/2015 | NFL-034 | $1,140,316.80 |
| 7/31/2015 | NFL-036 | $1,231,910.77 |
| 8/26/2015 | NFL-038 | $1,268,852.85 |
| 9/28/2015 | NFL-039 | $1,226,720.62 |
| 10/19/2015 | NFL-040 | $1,216,511.05 |
| 11/20/2015 | NFL-041 | $1,229,146.32 |
| 12/16/2015 | NFL-042 | $1,126,678.81 |
| 2/3/2016 | NFL-043 | $1,257,353.53 |
| 2/25/2016 | NFL-045 | $1,160,138.43 |
| 2/21/2016 | NFL-046 | $1,169,202.80 |
| 4/20/2016 | NFL-047 | $1,316,427.99 |
| 5/23/2016 | NFL-050 | $1,264,103.57 |
| 6/24/2016 | NFL-051 | $1,268,057.19 |
| 8/1/2016 | NFL-052 | $1,328,768.19 |
| 8/26/2018 | NFL-053 | $1,246,636.37 |
| 9/23/2016 | NFL-054 | $1,385,406.95 |
| 11/7/2016 | NFL-055 | $1,269,928.91 |
| 12/6/2016 | NFL-056 | $1,235,475.36 |
| 1/9/2017 | NFL-057 | $1,276,823.29 |
| 2/3/2017 | NFL-058 | $1,329,852.05 |
| 3/8/2018 | NFL-059 | $1,304,302.24 |
| 4/3/2017 | NFL-060 | $1,214,087.29 |
| 5/1/2017 | NFL-061 | $1,384,600.78 |
| 5/30/2017 | NFL-062 | $1,234,372.82 |
| 6/23/2017 | NFL-063 | $1,329,267.89 |
| 7/25/2017 | NFL-064 | $1,320,146.01 |
| 8/24/2017 | NFL-065 | $1,122,177.82 |
| 10/4/2017 | NFL-066 | $1,410,132.83 |
| 11/29/2017 | NFL-067 | $1,017,443.40 |
| 3/13/2018 | NFL-069R | $1,238,147.10 |
| 3/13/2018 | NFL-070 | $1,278,184.57 |
| 3/29/2018 | NFL-071 | $1,330,272.66 |
| 3/29/2018 | NFL-072 | $1,220,530.34 |
| 5/16/2018 | NFL-073 | $1,415,858.53 |
| 6/6/2018 | NFL-074 | $1,355,724.33 |
| 6/26/2018 | NFL-075 | $1,403,008.72 |
| 7/27/2018 | NFL-076 | $1,341,781.50 |
| 8/15/2018 | NFL-077 | $1,358,296.14 |
| 10/1/2018 | NFL-078 | $1,468,623.54 |
| 10/25/2018 | NFL-079 | $1,254,214.54 |
| 11/30/2018 | NFL-080 | $1,396,987.64 |
| 12/7/2018 | NFL-081 | $618,824.17 |
| 12/27/2018 | NFL-082 | $1,323,024.54 |
| 1/31/2019 | NFL-083 | $1,173,611.28 |
| 2/21/2019 | NFL-084 | $1,291,691.95 |
| 3/14/2019 | NFL-085 | $1,260,393.23 |
| 5/31/2019 | NFL-086 | $1,368,212.74 |
| 6/11/2019 | NFL-087 | $1,389,250.91 |
| 6/19/2019 | NFL-088 | $1,414,760.85 |
| 7/25/2019 | NFL-089 | $1,319,410.85 |
| 10/4/2019 | NFL-090 | $1,417,277.43 |
| 9/23/2019 | NFL-091 | $1,373,987.38 |
| 11/22/2019 | NFL-092 | $1,321,216.73 |
| 1/16/2020 | NFL-093 | $1,484,452.19 |
| 12/30/2019 | NFL-094 | $1,321,055.76 |
| 1/30/2020 | NFL-095 | $1,347,961.06 |
| 2/28/2020 | NFL-096 | $1,431,314.10 |
| 3/31/2020 | NFL-097 | $1,315,936.04 |
| 4/30/2020 | NFL-098 | $1,366,578.00 |
| 6/2/2020 | NFL-099 | $1,117,900.80 |
| 6/18/2020 | NFL-100 | $1,102,976.56 |
| 7/23/2020 | NFL-101 | $1,221,887.88 |
| 9/17/2020 | NFL-102 | $1,246,148.40 |
| 9/29/2020 | NFL-103 | $1,227,943.23 |
| 10/26/2020 | NFL-104 | $1,191,754.95 |
| 11/27/2020 | NFL-105 | $1,288,845.64 |
| 1/8/2021 | NFL-106 | $1,219,246.07 |
| 2/10/2021 | NFL-107 | $1,229,407.99 |

| | | |
|---|---|---|
| 3/15/2021 | NFL-108 | $1,132,096.97 |
| 4/6/2021 | NFL-109 | $1,156,127.54 |
| 5/10/2021 | NFL-110 | $1,351,087.85 |
| 5/25/2021 | NFL-111 | $1,293,373.78 |
| 6/30/2021 | NFL-112 | $1,229,398.45 |
| 7/29/2021 | NFL-113 | $1,314,795.49 |
| 8/31/2021 | NFL-114 | $1,320,196.84 |
| 11/5/2021 | NFL-115 | $1,433,262.60 |
| 10/29/2021 | NFL-116 | $1,383,531.73 |
| 11/23/2021 | NFL-117 | $1,426,401.90 |
| 1/18/2022 | NFL-118 | $1,394,979.30 |
| 1/28/2022 | NFL-119 | $1,476,016.64 |
| 2/25/2022 | NFL-120 | $1,437,844.48 |
| 3/22/2022 | NFL-121 | $1,365,031.68 |
| 5/27/2022 | NFL-122 | $1,628,179.52 |
| 6/17/2022 | NFL-123 | $1,603,657.28 |
| 8/8/2022 | NFL-124 | $1,595,880.00 |
| 8/1/2022 | NFL-125 | $1,582,993.93 |
| 10/11/2022 | NFL-126 | $1,558,392.32 |
| 10/11/2022 | NFL-127 | $1,727,349.76 |
| 11/14/2022 | NFL-128 | $1,439,074.56 |
| 11/30/2022 | NFL-129 | $1,544,116.86 |
| 12/30/2022 | NFL-130 | $1,498,891.31 |
| 2/16/2023 | NFL-131 | $1,646,433.00 |
| 2/27/2023 | NFL-132 | $1,623,095.40 |
| 3/24/2023 | NFL-133 | $1,497,992.40 |
| 4/19/2023 | NFL-134 | $1,768,425.00 |
| | | **$139,668,171.31** |

| FPS Louisiana | | |
|---|---|---|
| HSHQC7-15-D-00001 | | |
| **Date** | **Invoice** | **Amount** |
| 12/18/2019 | LA-216 | $112,817.72 |
| 12/18/2019 | LA-217 | $370,017.40 |
| 12/18/2019 | LA-218 | $26,545.60 |
| 12/18/2019 | LA-219 | $218,328.52 |
| 12/18/2019 | LA-220 | $33,542.90 |
| 1/21/2020 | LA-221 | $123,880.87 |
| 1/21/2020 | LA-222 | $389,116.76 |
| 1/21/2020 | LA-223 | $27,712.91 |
| 1/21/2020 | LA-224 | $236,131.35 |
| 1/21/2020 | LA-225 | $31,010.84 |
| 2/13/2020 | LA-226 | $129,000.25 |
| 2/13/2020 | LA-227 | $392,485.79 |
| 2/13/2020 | LA-228 | $29,316.57 |
| 2/13/2020 | LA-229 | $253,707.08 |
| 2/13/2020 | LA-230 | $33,337.32 |
| 3/25/2020 | LA-231 | $112,870.14 |
| 3/25/2020 | LA-232 | $359,358.94 |
| 3/25/2020 | LA-233 | $26,069.01 |
| 3/25/2020 | LA-234 | $226,451.26 |
| 3/25/2020 | LA-235 | $38,503.83 |
| 5/1/2020 | LA-236 | $125,356.95 |
| 5/1/2020 | LA-237 | $399,596.05 |
| 5/1/2020 | LA-238 | $19,664.92 |
| 5/1/2020 | LA-239 | $218,488.16 |
| 5/1/2020 | LA-240 | $29,003.31 |
| 6/1/2020 | LA-241 | $73,743.45 |
| 6/1/2020 | LA-242 | $382,693.97 |
| 6/1/2020 | LA-243 | $0.00 |
| 6/1/2020 | LA-244 | $101,442.91 |
| 6/1/2020 | LA-245 | $7,150.88 |
| 6/30/2020 | LA-246 | $67,354.38 |
| 6/30/2020 | LA-247 | $382,553.34 |
| 6/30/2020 | LA-248 | $0.00 |
| 6/30/2020 | LA-249 | $96,323.54 |
| 6/30/2020 | LA-250 | $9,283.95 |
| 7/29/2020 | LA-251 | $98,168.98 |
| 7/29/2020 | LA-252 | $391,388.79 |
| 7/29/2020 | LA-253 | $0.00 |
| 7/29/2020 | LA-254 | $105,309.24 |
| 7/29/2020 | LA-255 | $18,852.32 |
| 8/21/2020 | LA-256 | $108,807.14 |
| 8/21/2020 | LA-257 | $401,556.44 |
| 8/21/2020 | LA-258 | $7,008.66 |
| 8/21/2020 | LA-259 | $106,369.27 |
| 8/21/2020 | LA-260 | $8,857.34 |
| 9/29/2020 | LA-261 | $98,582.70 |
| 9/29/2020 | LA-262 | $397,755.69 |
| 9/29/2020 | LA-263 | $22,797.95 |
| 9/29/2020 | LA-264 | $102,325.30 |
| 9/29/2020 | LA-265 | $7,994.88 |
| 11/3/2020 | LA-266 | $102,132.41 |
| 11/3/2020 | LA-267R | $388,917.60 |
| 11/3/2020 | LA-268 | $28,127.82 |
| 11/3/2020 | LA-269 | $105,599.04 |
| 11/3/2020 | LA-270 | $9,077.62 |
| 11/3/2020 | LA-271 | $731,756.88 |
| 12/11/2020 | LA-272 | $101,700.99 |
| 12/11/2020 | LA-273 | $392,088.24 |
| 12/11/2020 | LA-274 | $100,382.01 |
| 12/11/2020 | LA-275 | $39,429.14 |
| 12/11/2020 | LA-276 | $678,155.36 |
| 1/6/2021 | LA-277 | $103,893.81 |
| 1/6/2021 | LA-278 | $378,349.35 |
| 1/6/2021 | LA-279 | $98,447.65 |
| 1/6/2021 | LA-280 | $37,038.87 |
| 1/6/2021 | LA-281 | $528,086.71 |
| 2/3/2021 | LA-282 | $113,673.15 |
| 2/3/2021 | LA-283 | $401,464.33 |
| 2/3/2021 | LA-284 | $107,884.48 |
| 2/3/2021 | LA-285 | $35,583.92 |
| 2/26/2021 | LA-286 | $102,948.10 |
| 2/26/2021 | LA-287 | $385,998.23 |
| 2/26/2021 | LA-288 | $97,519.83 |
| 2/26/2021 | LA-289 | $31,676.34 |
| 3/23/2021 | LA-290 | $104,548.55 |
| 3/23/2021 | LA-291 | $347,223.82 |
| 3/23/2021 | LA-292 | $88,776.42 |
| 3/23/2021 | LA-293 | $28,683.30 |
| 4/27/2021 | LA-294 | $133,782.64 |
| 4/27/2021 | LA-295 | $416,219.62 |
| 4/27/2021 | LA-296R | $131,049.38 |
| 4/27/2021 | LA-297 | $53,542.18 |
| 5/27/2021 | LA-298 | $128,129.13 |

| Date | Invoice | Amount | Date | Invoice | Amount |
|---|---|---|---|---|---|
| 5/27/2021 | LA-299 | $401,077.75 | 3/25/2022 | LA-342 | $349,150.50 |
| 5/27/2021 | LA-300 | $126,638.35 | 3/25/2022 | LA-343 | $192,044.56 |
| 5/27/2021 | LA-301 | $31,260.64 | 3/25/2022 | LA-344 | $29,670.30 |
| 6/24/2021 | LA-302 | $123,036.80 | 4/29/2022 | LA-345 | $184,585.23 |
| 6/24/2021 | LA-303 | $394,499.30 | 4/29/2022 | LA-346 | $393,964.64 |
| 6/24/2021 | LA-304 | $122,485.97 | 4/29/2022 | LA-347 | $229,710.06 |
| 6/24/2021 | LA-305 | $42,942.81 | 4/29/2022 | LA-348 | $33,026.94 |
| 7/27/2021 | LA-306 | $149,340.21 | 6/8/2022 | LA-349 | $173,439.18 |
| 7/27/2021 | LA-307 | $401,836.40 | 6/8/2022 | LA-350 | $380,519.10 |
| 7/27/2021 | LA-308 | $192,676.88 | 6/8/2022 | LA-351 | $225,394.38 |
| 7/27/2021 | LA-309 | $43,149.66 | 6/8/2022 | LA-352 | $26,493.48 |
| 9/3/2021 | LA-310 | $149,586.30 | 7/11/2022 | LA-353 | $181,384.43 |
| 9/3/2021 | LA-311 | $401,836.40 | 7/11/2022 | LA-354 | $386,273.34 |
| 9/3/2021 | LA-312 | $218,048.73 | 7/11/2022 | LA-355 | $231,025.54 |
| 9/3/2021 | LA-313 | $43,149.66 | 7/11/2022 | LA-356 | $22,307.67 |
| 9/30/2021 | LA-314 | $153,019.16 | 9/29/2022 | LA-357 | $179,979.44 |
| 9/30/2021 | LA-315 | $387,349.26 | 9/29/2022 | LA-358 | $378,680.94 |
| 9/30/2021 | LA-316 | $214,230.98 | 9/29/2022 | LA-359 | $233,606.16 |
| 9/30/2021 | LA-317 | $42,068.84 | 9/29/2022 | LA-360R | $24,023.91 |
| 9/30/2021 | LA-318 | $3,304.10 | 9/13/2022 | LA-361 | $180,734.54 |
| 10/22/2021 | LA-319 | $102,961.81 | 9/13/2022 | LA-362 | $384,756.19 |
| 10/22/2021 | LA-320 | $370,097.71 | 9/13/2022 | LA-363 | $226,812.96 |
| 10/22/2021 | LA-321 | $194,210.34 | 9/13/2022 | LA-364 | $43,496.46 |
| 10/22/2021 | LA-322 | $42,692.39 | 10/13/2022 | LA-365 | $204,872.60 |
| 10/22/2021 | LA-323 | $0.00 | 10/13/2022 | LA-366 | $405,428.17 |
| 11/30/2021 | LA-324 | $148,214.83 | 10/13/2022 | LA-367 | $273,748.07 |
| 11/30/2021 | LA-325 | $378,780.84 | 10/13/2022 | LA-368 | $33,851.40 |
| 11/30/2021 | LA-326 | $195,014.79 | 11/30/2022 | LA-369 | $188,496.91 |
| 11/30/2021 | LA-327 | $43,576.38 | 11/30/2022 | LA-370 | $383,697.69 |
| 11/30/2021 | LA-328 | $100,016.00 | 11/30/2022 | LA-371 | $245,777.38 |
| 1/4/2022 | LA-329 | $149,270.58 | 11/30/2022 | LA-372 | $41,849.13 |
| 1/4/2022 | LA-330 | $370,908.72 | 12/6/2022 | LA-373 | $180,428.99 |
| 1/4/2022 | LA-331 | $190,119.69 | 12/6/2022 | LA-374 | $412,419.92 |
| 1/4/2022 | LA-332 | $43,676.28 | 12/6/2022 | LA-375 | $236,092.59 |
| 1/24/2022 | LA-333 | $158,271.96 | 12/6/2022 | LA-376 | $5,783.67 |
| 1/24/2022 | LA-334 | $386,035.17 | 12/28/2022 | LA-377 | $178,385.22 |
| 1/24/2022 | LA-335 | $204,105.69 | 12/28/2022 | LA-378 | $404,350.36 |
| 1/24/2022 | LA-336 | $45,294.66 | 12/28/2022 | LA-379 | $224,589.74 |
| 2/28/2022 | LA-337 | $160,512.52 | 12/28/2022 | LA-380 | $5,154.38 |
| 2/28/2022 | LA-338 | $479,010.61 | 1/18/2023 | LA-381 | $182,526.76 |
| 2/28/2022 | LA-339 | $195,400.40 | 1/18/2023 | LA-382 | $419,117.83 |
| 2/28/2022 | LA-340 | $32,507.46 | 1/18/2023 | LA-383 | $240,038.89 |
| 3/25/2022 | LA-341 | $152,823.02 | 1/18/2023 | LA-384 | $9,543.81 |

| 2/27/2023 | LA-385 | $182,267.13 |
| 2/27/2023 | LA-386 | $412,456.89 |
| 2/27/2023 | LA-387 | $234,766.63 |
| 2/27/2023 | LA-388 | $15,601.59 |
| 5/16/2023 | LA-393 | $207,222.29 |
| 5/16/2023 | LA-394 | $436,810.96 |
| 5/16/2023 | LA-395 | $270,644.73 |
| 5/2/2022 | LA-396 | $23,456.39 |
| | | **$32,026,022.61** |

| **FPS New England (Maine)** | | |
|---|---|---|
| **70RFP118DE1000001** | | |
| **Date** | **Invoice** | **Amount** |
| 9/13/2021 | ME-103 | $204,917.31 |
| 10/18/2021 | ME-104R | $192,335.45 |
| 11/16/2021 | ME-105 | $176,363.59 |
| 12/13/2021 | ME-106 | $181,775.75 |
| 1/19/2022 | ME-107 | $191,855.92 |
| 2/15/2022 | ME-108 | $181,579.52 |
| 3/21/2022 | ME-109 | $168,846.95 |
| 5/2/2022 | ME-110 | $236,521.78 |
| 5/19/2022 | ME-111 | $215,216.21 |
| 6/10/2022 | ME-112 | $212,229.08 |
| 7/31/2022 | ME-113 | $212,818.39 |
| 8/24/2022 | ME-114 | $207,050.13 |
| 9/26/2022 | ME-115 | $236,333.44 |
| 10/31/2022 | ME-116 | $223,284.82 |
| 12/18/2022 | ME-117 | $216,850.66 |
| 12/13/2022 | ME-118 | $210,475.12 |
| 1/18/2023 | ME-119 | $223,008.93 |
| 2/21/2023 | ME-120 | $208,738.31 |
| 3/29/2023 | ME-121 | $199,101.24 |
| 4/20/2023 | ME-122 | $245,517.48 |
| 5/15/2023 | ME-123 | $216,254.17 |
| | | **$4,361,074.25** |

| **FPS Southern Virginia** | | |
|---|---|---|
| **HSHQE3-14-D-00005** | | |
| **Date** | **Invoice** | **Amount** |
| 10/30/2017 | SVA-102 | $1,127,712.32 |
| 10/30/2017 | SVA-103 | $17,164.40 |
| 1/16/2018 | SVA-104 | $1,128,561.82 |
| 11/30/2017 | SVA-105 | $18,022.62 |
| 2/1/2018 | SVA-106 | $54,250.79 |
| 1/30/2018 | SVA-110 | $1,088,453.48 |
| 1/30/2018 | SVA-111 | $17,164.40 |
| 2/1/2018 | SVA-112 | $41,605.69 |
| | | **$3,492,935.52** |