**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **Todd Pattison,** | ) ) | CV No. TDC 21-3260 |
| | ) | |
| Plaintiffs, | ) ) | **CORRECTED COMPLAINT OF THE UNITED STATES OF AMERICA FOR:** |
| | ) | |
| **v.** | ) ) | **1. VIOLATIONS OF THE FALSE CLAIMS ACT  31 U.S.C. § 3729(a)(1)(A)** |
| **PATRONUS SYSTEMS, INC.,** | ) ) | **2. VIOLATIONS OF THE FALSE CLAIMS ACT  31 U.S.C. § 3729(a)(1)(B)** |
| **PATRONUS SYSTEMS PARTNERS, LLC, and MABEL RUTH O'QUINN,** | ) ) ) | **3. VIOLATIONS OF THE FALSE CLAIMS ACT  31 U.S.C. § 3729(a)(1)(C)** |
| Defendants. | ) ) | **4. VIOLATIONS OF THE ANTI-KICKBACK ACT  41 U.S.C. § 8706(a)(1)** |
| | | **5. VIOLATIONS OF THE ANTI-KICKBACK ACT  41 U.S.C. § 8706(a)(2)** |
| | | **6. PAYMENT BY MISTAKE** |
| | | **7. UNJUST ENRICHMENT** |

**JURY TRIAL DEMANDED**

**OVERVIEW**

1. This is an action brought by the United States to recover damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and under the Anti-Kickback Act, 41 U.S.C. § 8706, and to recover all remedies available under common law claims for payment under mistake of fact and unjust enrichment.

2. This action arises from a fraudulent scheme involving Defendant Patronus Systems, Inc. ("Patronus"), Defendant Patronus Systems Partners, LLC ("PSP"), their nominal owner, Defendant Mabel Ruth O'Quinn ("O'Quinn"), and five of the highest-ranking now-former executives of Paragon Systems, LLC ("Paragon"), a provider of protective security officers ("PSO") at federal buildings, to use Patronus as a sham small business to acquire Federal set-aside contracts for which substantially all work could be subcontracted to Paragon, which was itself not eligible for the small business set-aside contracts. The parties also conspired to award set-aside

contracts to Patronus in connection with contracts for which Paragon was the prime contractor. Patronus was controlled by four of Paragon's now-former executives (collectively "Paragon Executives") — its President ("Paragon President"), Vice President of Operations ("VP Ops"), Compliance Manager and Contracts Manager (collectively the "Paragon Managers"). The Paragon Managers were the adult sons of the Paragon President.

3.      The Paragon President, the VP Ops, and the Paragon Managers received kickbacks from Patronus totaling over $4.6 million, primarily disguised as purported consulting payments. The Patronus scheme is part of a larger fraudulent scheme which resulted in the payment of over $11 million in kickbacks and skimmed federal funds paid to the Paragon Executives by Patronus and three other ineligible Paragon subcontractors. Between approximately May and August 2023, the Paragon President and the Paragon Managers were terminated by Paragon. A fifth Paragon executive, a Vice President of Business Operations ("VP BD") previously retired in 2022.

4.      The Patronus scheme resulted in the submission of nearly 700 false claims by Patronus and Paragon, under both Patronus and Paragon contracts with the Federal Protective Services ("FPS"), a division of the United States Department of Homeland Security ("DHS") for protective security guard services at federal buildings across the United States. These false claims resulted in DHS' payments of over $106 million paid directly or indirectly to Patronus.

**JURISDICTION**

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331. The Defendants are doing and/or previously did business within this District.

**VENUE**

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C.§ 3732(a). All Defendants are doing and/or previously did business within this District.

- 2 -

## PARTIES

**The United States of America**

7.    The plaintiff is the United States of America. The United States brings this lawsuit on behalf of its agencies, DHS, and the Small Business Administration ("SBA"). The DHS contracts at issue in this action for protective security guard services at federal buildings, include, but are not limited to, five contracts on which Patronus served as the prime contractor and subcontracted work to Paragon[1] and seven contracts on which Patronus served as a subcontractor to Paragon[2]. These contracts were issued by at the DHS Headquarters located at 245 Murray Lane, SW, Washington, DC 20528-0075. The SBA awarded a Paycheck Protection Program ("PPP") loan to Patronus which is also at issue in this action.

8.    Relator Todd Pattison is a resident of Annapolis, Maryland. He is the Chief Executive Officer and President of CDA, Inc. d/b/a MaxSent, a company based in Annapolis, Maryland that provides protective security services for, *inter alia,* federal government buildings.

**The Defendants**

9.    Defendant Patronus Systems, Inc. ("Patronus") is a privately held corporation incorporated in Florida. It's principal place of business is 3000 N. Wickham Road, Suite 8, Melbourne, Florida. It is registered as a Service Disabled Veteran- and Woman-Owned Small Business and employs PSOs at various federal buildings under FPS contracts and subcontracts.

---

[1]    Contracts 70RFP119DE4000001, 70RFP320DE3000001, 70RFP418DE5000001, HSHQE3-15-R-00002, and HSHQWA-16-D-00002.

[2]    Contracts HSHQE4-13-D-00001, 70RFP420DE7000003, 70RFP118DE1000001, HSHQE1-13-D-00002, HSHQE4-12-D-00005, HSHQE4-17-D-00002.

Patronus's President and nominal sole owner is Mabel O'Quinn. Patronus is licensed by the State of Maryland as a Security Guard Provider, under License No, 22PLU-SG17414.

10.    Defendant Patronus Systems Partners, LLC ("PSP") was a Florida corporation incorporated in July 2018 and located at 3000 N. Wickham Road, Suite 8, Melbourne, Florida, as a joint venture between Paragon and Patronus. Ms. O'Quinn was the registered agent for PSP, and filed articles of dissolution for PSP with the Florida Secretary of State in November 2018.

11.    Defendant Mabel Ruth O'Quinn ("O'Quinn") is a resident of Florida whose business address is 3000 N. Wickham Road, Suite 8, Melbourne, Florida.

### The False Claims Act

12.    The False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, is the primary remedial statute designed to deter fraud upon the United States. Sections 3729(a)(1)(A), 3729(a)(1)(B), and 3729(a)(1)(C) of the FCA are relevant here.

13.    Section (a)(1) of the False Claims Act imposes civil liability, in pertinent part, upon any person, who in dealing with the Government, either "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" ... or "(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)[.]" 31 U.S.C. §§ 3729(a)(1)(A), (B), and (C).

14.    False Claims Act liability may be imposed where the United States was fraudulently induced to enter a contact where the Government was induced by, or relied upon, the fraudulent statement or omission when it awarded a contract or when it agreed to contract modifications.

15.    The False Claims Act defines "knowing" and "knowingly" to include actual

knowledge, deliberate ignorance, or reckless disregard and requires no proof of specific intent to defraud. *See* 31 U.S.C. § 3729(b)(1)(A), (B). The term "material," as used in the FCA, "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *See* 31 U.S.C. § 3729(b)(4).

16. As pertinent herein, the False Claims Act imposes liability of treble damages plus a civil penalty for each violation. The False Claims Act also imposes a penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Adjustment Act of 1990, 28 U.S.C. 2461 note; Pub. Law No. 104-410. *See* 31 U.S.C. 3729(a). Pursuant to the Bipartisan Budget Act of 2015, all civil statutory penalties, including those set forth in the FCA, are required to be adjusted annually for inflation. *See* Pub. Law. No. 114-74, § 701, 129 Stat. 584, 599. As a result, for any FCA violation occurring after November 2, 2015, the FCA imposes a penalty of not less than $5,000 and not more than $10,000, as adjusted by the Bipartisan Budget Act of 2015. *See* 28 C.F.R. § 85.5 (identifying civil statutory penalty amounts currently in effect, including Congressionally-mandated annual inflation adjustments). The current inflation-adjusted penalty for any FCA violation occurring after November 2, 2015, is not less than $13,946 and not more than $27,894 per claim. *See id.*

**The Anti-Kickback Act**

17. The Anti-Kickback Act (AKA), 41 U.S.C. § 8702, prohibits the payment, offer, or solicitation of a kickback from a federal contractor or a subcontractor. A kickback is defined broadly to include anything of value or compensation of any kind provided to a prime contractor or prime contractor employee to improperly obtain or reward favorable treatment in connection with a prime contract or a subcontract relating to a prime contract. 41 U.S.C. § 8701(a). The AKA does not require a quid-pro-quo agreement. The AKA also prohibits including the amount of a

kickback in the contract price charged by a subcontractor to a prime contractor or by a prime contractor to the government.  41 U.S.C. § 8702(3).

<u>**Small Business Set-Aside Contracts**</u>

18.    In creating the SBA, Congress sought to assist small businesses by ensuring that they receive a "fair proportion" of government contracts.  15 U.S.C. § 631(a).  Congress further established by statute certain government-wide goals for the percentage of federal contracts awarded to small businesses.  15 U.S.C. § 644(g).  Agencies have also created targeted sub-goals for certain categories of disadvantaged small businesses, including service-disabled veteran owned small businesses and woman-owned small businesses.

19.    A company must apply for and receive SBA approval to qualify as a woman-owned small business (WOSB), or service-disabled veteran owned small business (SDVOSB).  After being designated as such, the business may compete for the award of contracts that are set aside for eligible small businesses.

20.    To qualify as a small business, companies must meet defined eligibility criteria, including requirements concerning size, ownership, and operational control.  Regarding size, an organization must not exceed a specific threshold number of employees.  Notably, in assessing the size of an organization, businesses must consider any "affiliation" they have with other entities, and when a company is affiliated with other entities the employees of *all* affiliated businesses are aggregated to determine the size of the company.  *See* 13 C.F.R. § 121.105(4)(i).  The test for affiliation encompasses a variety of factors, and, in general, "entities are affiliates with each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both."  § 121.103(a).

21.    Regarding ownership and control, an enterprise cannot qualify as a small business

concern unless the person on whom the status of the business is based owns a majority of the company <u>and</u> exercises control over the day-to-day operations of the company, rather than merely being a figurehead owner in name only.  *See* 13 C.F.R. §§ 124.106, 125.13, and 127.102.

**Paycheck Protection Program**

22.    The PPP loan program was enacted to address the economic fallout from the COVID-19 pandemic by providing small businesses with low-interest rate loans guaranteed by SBA.  These loans could later be forgiven to the extent the proceeds were spent on payroll and certain other eligible businesses expenses.  PPP loans, like other SBA programs, were available only to "small businesses."  A company's own employees and revenue are considered together with the employees and revenue of any "affiliate" to determine whether it is a "small business."  Companies were considered "affiliates" if they shared common operational control.  13 C.F.R. § 121.301; 85 Fed. Reg. 20817 (Apr. 15, 2020) (Interim Final Rule regarding affiliation).

23.    Congress created the PPP under section 7(a) of the Small Business Act as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286 (Mar. 27, 2020).  The PPP, which is administered through the SBA, provided emergency relief to small businesses affected by the COVID-19 pandemic and was designed to cover businesses' actual gross payroll expenses to keep people employed during the COVID-19 pandemic.  *See* 15 U.S.C. § 636(a)(36).

24.    The SBA did not make PPP loans directly.  Rather, the CARES Act delegated authority to private lenders to make PPP loans pursuant to PPP requirements.

25.    The CARES Act provided for borrower loan forgiveness for PPP funds used for certain expenses.  *See* CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281, 297 (Mar. 27, 2020). To apply for PPP loan forgiveness, borrowers submitted loan forgiveness applications

through their lenders, and lenders then rendered a forgiveness decision to the borrower and the SBA. If a borrower received loan forgiveness, the SBA issued forgiveness payments to lenders. If a borrower's forgiveness application was denied or the borrower otherwise defaulted on the PPP loan, the lender could request that the SBA purchase the guaranty of the PPP loan. So long as lenders adhered to the program requirements, the SBA would guarantee the unforgiven or defaulted loan amounts. *See* 15 U.S.C. § 626(a)(2)(F); 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020); 86 Fed. Reg. 8283, 8294 (Feb. 5, 2021). To receive forgiveness or guaranty payments, lenders submitted claims and certifications to the SBA. The SBA then disbursed payments to lenders, which included the 1% interest due on the loan.

26. A PPP loan recipient cannot use PPP loan funds to pay its independent contractors because independent contractors are eligible for their own PPP loans.

**THE FRAUDULENT SCHEME**

27. The Paragon Executives entered into a scheme with O'Quinn, Patronus, and PSP to defraud the United States by (i) bidding on and submitting claims for payment on small business set-aside contracts awarded by DHS for which they were not eligible; (ii) submitting claims for ineligible subcontractor services on Paragon's prime contracts; and (iii) paying kickbacks to the Paragon Executives and otherwise skimming funds from federal contracts which were paid to the Paragon President. In reality, the Paragon Executives controlled Patronus and were surreptitiously paid over $4.4 million in kickbacks by Patronus. These kickbacks were disguised as consulting payments paid to certain of the Paragon Executives and shell companies that they controlled or to the spouse of one of the Paragon Executives. The Paragon Executives were assisted by some other Paragon executives and employees who provided services to Patronus either as part of a larger conspiracy or in return for payments from Patronus.

A.    **Patronus Corporate History**

28.    Patronus was incorporated in February 2010, by its initial Directors, O'Quinn and A.D., the spouse of the Paragon President.  In the Patronus articles of incorporation, A.D. used her maiden name and her home address where she resided with the Paragon President.  For several years, Patronus did not conduct any substantial business.  During this time, O'Quinn was a full-time employee of the United States Department of the Air Force.  In February 2011, A.D. resigned as a director of Patronus and ended her ownership interest in Patronus.  However, until at least 2023, Patronus compensated A.D.'s family members – the Paragon President (A.D.'s spouse) and the Paragon Managers (A.D.'s step-children) – as if A.D. and her family still had an ownership interest in Patronus.

29.    In or about December 2015, Paragon's President sent O'Quinn and O'Quinn's Spouse ("R.O."), a draft operating agreement between Patronus and MCKHU, Inc., a shell company incorporated by the Paragon President, A.D., and the Paragon President's adult daughter. The draft operating agreement identified MCKHU as a 40% owner of Patronus. From 2015 to at least 2023, Patronus' profits were distributed between O'Quinn and MCKHU in a 60/40 split as set forth in the draft operating agreement.

30.    The draft operating agreement allocated to O'Quinn the functions of human resources, security operations, and to act as Patronus' Treasurer.  It allocated to MCKHU the the bulk of Patronus' operations.

31    On or about May 7, 2016, R.O. sent Patronus' Bylaws, which had been signed by O'Quinn, to the Paragon President.  The language of the Patronus bylaws were substantially similar to the draft operating agreement and identified MCKHU as a 40% owner of Patronus.

32.    The Patronus bylaws similarly allocated to O'Quinn the functions of human

resources, security operations, and to act as Patronus' Treasurer.  The bylaws allocated to MCKHU

the bulk of Patronus' operations.  All of MCKHU's responsibilities to Patronus were carried out

by the Paragon Managers, not the MCKHU President, the adult daughter of the Paragon President

who had no involvement in the operations of Patronus.

33.     On June 2, 2015, O'Quinn falsely attested that Patronus was: (1) a small business;

(2) a veteran-owned small business; (3) a service-disabled veteran-owned small business; (4) a

disadvantaged small business; and (5) a woman-owned small business.  She certified that Patronus

was not owned or controlled by a larger entity or affiliate, thereby concealing *de facto* ownership

and operational control of Patronus that was exercised by the Paragon President and Paragon

Managers.  She reaffirmed this attestation to United States until at least 2023.

### 1.     The Patronus MCKHU/Frontline "Consulting Agreements"

34.     Patronus entered into purported "consulting agreements" with two shell

companies controlled by Paragon's President and the Paragon Managers, his adult sons, in order

to surreptitiously pay them at least 40% of Patronus' profits disguised as purported consulting

fees.  Additionally, these consulting agreements were one of the methods Patronus and O'Quinn

used to hide the Paragon's Executives' operational control and *de facto* ownership of Praetorian.

35.     MCKHU, Inc., a shell corporation, was incorporated in Ohio in February 2015 by

Paragon's President; his spouse, A.D.; and the Paragon President's adult daughter ("MCKHU

President").  MCKHU's business address was the Paragon President's residence.  The members

of MCKHU were the Paragon President's three adult children, including the Paragon Managers.

While the Paragon President was never the president of MCKHU, in 2015, he represented to

MCKHU's bank that he was the president of MCKHU and signed the account signature card as

MCKHU's President.  The Paragon President remained the sole signatory on the MCKHU bank

account until at least March 2022 and he personally endorsed checks paid to MCKHU by various Paragon subcontractors.

36.    In April 2015, Patronus signed a "consulting agreement" with MCKHU, a shell company controlled by Paragon's President and the Paragon Managers, to provide consulting services at $195 per hour.  All of the purported services provided to Patronus by MCKHU were provided by the Paragon Managers, largely from their offices at Paragon during normal business hours.  Under that subcontract, MCKHU submitted *pro forma* invoices to Patronus which were devoid of any details of the services provided.  In addition to the amounts that Patronus paid on a monthly basis to MCKHU, MCKHU also received substantial additional distribution payments from the profits of Patronus.

37.    From April 2015 to April 2019, Patronus paid MCKHU over nearly $1.5 million which, at $195 per hour, would equate to over 2,000 hours per year for those four years or 1,000 hours per year for each Paragon Manager, who were also working full time for Paragon and had a similar "consulting agreement" with Athena Services International, LLC ("ASI"), another sham subcontractor which was also controlled by the Paragon Executives and the  VP BD.

38.    In late 2018, a successful bid protest was filed against a Patronus-Paragon joint venture, which identified, *inter alia,* the involvement of A.D. in the incorporation of Patronus.  The Paragon President and the Paragon Managers expressed concern that their family address was available in publicly available Patronus corporate records and that their family name was included in publicly available MCKHU corporate records.  In September 2019, the Paragon President and Managers created three different Ohio LLC corporations to accept the payments from Patronus and two other Paragon subcontractors.  Frontline Solution, LLC ("Frontline") was created by the Paragon President and the Paragon Managers to accept the Patronus payments.   Frontline

transferred the Patronus funds to a fourth Ohio LLC corporation, Elite Capital Venture, LLC, which, in turn, distributed the funds to three additional Ohio LLC corporations which were named with initials that corresponded to the names of the Paragon President's adult daughter and the Paragon Managers.  The new LLC corporations' bank records show that the Paragon Manager and the President's adult daughter were signatories on their accounts.

39.      In January 2019, Patronus signed a consulting agreement with Frontline for $225 per hour, which was later increased to $250 per hour.  Frontline submitted monthly invoices to Patronus, all of which contained identical descriptions of the work performed by Frontline.

40.      From 2019 to mid-2022, Paragon paid Frontline over $2.5 million.  At $250 per hour, that represented 10,000 hours over the three and one-half year period, or over 2,900 hours per year, which was 1,450 hours for each of the two Paragon Managers.  During the same time period, the Paragon Managers were both full-time employees of Paragon, and had similar consulting arrangements, although not written agreements, with ASI and another Paragon subcontractor.  O'Quinn and Patronus were aware that the Paragon Managers were working for both Paragon and Patronus, and, upon information and belief, O'Quinn and Patronus knew that that Paragon Managers were simultaneously working for ASI.  During this time, the Paragon Managers were purportedly working the equivalent of four full-time jobs.  These hours demonstrate that Patronus' payments to Frontline were not for hours of *bona fide* consulting services paid at fair market value but, instead, distributions of Patronus' profits to the Paragon President and Managers.

### B.      The Paragon-Patronus Fraudulent Bids, Contracts and Claims for Payment

41.      The Paragon Executives assisted in the creation of at least three entities that purported to be women-, minority-, or veteran-owned small business subcontractors, including

Patronus, which they actually controlled through family members or friends.  Because these Paragon small business contractors were controlled by the Paragon Executives, they were affiliated with Paragon, and did not qualify for small business contractor status.

42.    On March 6, 2012, Paragon contacted R.O. stating that Paragon's President suggested that Paragon work with O'Quinn's business as a SDVOSB.  The next day, R.O. emailed her resume to Paragon's VP BD and President, noting that Patronus did not have the required licenses.  At all times relevant herein, R.O. was the Vice President of one of the largest labor unions for, *inter alia,* protective security guard personnel, including guards who worked for Paragon, and later Patronus and the other sham subcontractors.  The Paragon Executives knew R.O. from his leadership role at the labor union.  The United States is informed and believes, and on that basis alleges, that the Paragon President and R.O. had developed a personal friendship.

### 1.    <u>Patronus' Initial Subcontracts with Paragon</u>

43.    Beginning in 2012, the Paragon Executives, together with Paragon's VP BD, selected Paragon federal contracts on which Patronus would serve as a subcontractor.  At this point, Patronus was a start-up corporation with no experience or operations.  Patronus' only selling point to Paragon was its relationship with the Paragon President and Paragon Managers, and R.O.'s connection to the security guard labor union.  In 2014, Paragon's VP BD told another Paragon employee that the "main qualification" he looked for in subcontractors for the FPS contracts was "[m]alleability and our ability to focus their decisions."

44.    In April 2015, O'Quinn, Patronus and Paragon submitted an Application for a Mentor Protégé Agreement between Paragon and Patronus signed by O'Quinn and the Paragon President.  This application falsely claimed that Patronus was "a small service-disabled, woman owned firm[.]"  At the time of this email, O'Quinn, Patronus, and the Paragon Executives knew

that Patronus was controlled by the Paragon President, the Paragon Managers, and R.O.. For those

reason, Patronus was an affiliate of Paragon under applicable SBA rules and, thus, was ineligible.

Based on the false representations in the application, DHS approved the Paragon-Patronus Mentor

Protégé Agreement in or about September 2015.

45.    Paragon and Patronus' April 2015 application to DHS estimated that Paragon's in-

house assistance to Patronus over 3 years would be limited to a total of 1,010 hours of assistance

at an average of $57 per hour for a total worth of $57,000 for three years.

46.    The reality of the relationship between Paragon and Patronus was substantially

different from the representations made to DHS in the mentor protégé agreement. From September

2015 to September 2018, the time frame of the Paragon – Patronus DHS Mentor Protégé

Agreement, Patronus paid MCKHU for what would have been over 26,000 hours of work at $57

per hour or the equivalent of more than four full time employees over the three year period.

Moreover, the Mentor Protégé Agreement did not provide for Patronus paying Paragon for the

assistance. Therefore, the Paragon-Patronus Mentor Protégé Agreement provided no justification

for Patronus' massive payment to MCKHU and ultimately to the Paragon President, the Paragon

Managers, and their family members.

47.    In or about March 2014, Patronus became a subcontractor on Paragon's FPS North

Florida contract and its follow-on contract, until May 2023. In or about December 2015, Patronus

became a subcontractor on Paragon's FPS Alabama contract until about June 2018. In or about

August 2017, Patronus became a subcontractor on Paragon's FPS Southern Virginia contract, will

about March 2018. In or about October 2018, Patronus became a contractor on Paragon's FPS

New England contract until about December 2022. In or about October 2020, Patronus became a

subcontractor on Paragon's FPS Louisiana contract, until June 2023, when Paragon cancelled the

subcontract.

48.     In connection with these subcontracts, the Paragon Executives sought DHS'
approval for Patronus to serve as its subcontractor, falsely identifying Patronus as an eligible small
business subcontractor.  At all times relevant, Patronus was controlled by the Paragon Executives
and, thus, was not an eligible small business.

49.     When Patronus began invoicing Paragon, R.O. contacted Paragon's President
asking for the name of the Paragon employees to submit Patronus' invoices, the Paragon President
told R.O. to submit the invoices directly to him.  Given the size of Paragon and the hundreds of
subcontractors it had, it was unusual that the Paragon President handled the receipt of one small
subcontractor's invoices.  Later, the Paragon President told R.O. to coordinate with one of his adult
sons, Paragon's Contracts Manager, regarding the Patronus invoices.

50.     Under these subcontracts, Patronus and O'Quinn knowingly submitted at least 228
false invoices to Paragon, which, in turn, caused Paragon to submit false claims for payment to the
United States.  Both the Patronus invoices to Paragon and the Paragon claims for payment
submitted to the United States were false in that Patronus and O'Quinn knew that the Paragon
Executives controlled Patronus, making Patronus an affiliate of Paragon and an ineligible
subcontractor and that Patronus was paying kickbacks to the Paragon Executives.  Ultimately, the
United States paid over $205 million to Paragon on these Paragon contracts, of which over $11.87
million in federal funds was retained by Patronus:

        (a)     On or about March 18, 2014, Paragon and O'Quinn on behalf of Patronus
        signed a subcontract for the FPS North Florida contract.  On March 19, 2014, Paragon's
        VP BD sought approval of a subcontract between Paragon and Patronus for the FPS North
        Florida contract, claiming that Patronus was a woman-owned and a SDVOB company.

From April 2014 to June 2023, Patronus submitted 112 invoices to Paragon totaling over $4.7 million.  See Appendix B.

(b)     On or about March 4, 2015, Paragon and O'Quinn on behalf of Patronus signed a subcontract for the FPS Alabama contract.  From May 2015 to July 2018, Patronus submitted 43 invoices to Paragon totaling over $1.8 million.  See Appendix B

(c)     On May 18, 2018, Paragon's VP BD sought approval of a subcontract between Paragon and Patronus for the FPS Southern Virginia contract, claiming that Patronus was a woman-owned and a SDVOB company.  The services under the Southern Virginia subcontract were not provided by Patronus but by ASI, another ineligible subcontractor controlled by the Paragon Executives in order to create a work record for ASI.  From September 2017 to March 2018, Patronus submitted six invoices to Paragon totaling over $400,000.  *See* Appendix B.

(d)     On or about August 20, 2019, Paragon and O'Quinn on behalf of Patronus signed a subcontract for the FPS Louisiana contract. From September 2019 to June 2023, Patronus submitted 45 invoices to Paragon totaling over $2.2 million.  *See* Appendix B.

(e)     On or about August 11, 2021, Paragon and O'Quinn on behalf of Patronus signed a subcontract for the FPS New England contract.  On August 13, 2021, Paragon's VP BD sought approval of a subcontract between Paragon and Patronus for the FPS Louisiana contract, claiming that Patronus was a woman-owned and a SDVOB company. From August 2021 to June 2023, Patronus submitted 22 invoices to Paragon totaling over $2.6 million.  *See* Appendix B.

51.     Had the United States known of the affiliation and control between Patronus and Paragon and Patronus' payment of kickbacks to the Paragon Executives, the United States would

not have paid these claims.

### 2.    Patronus' Bids on Federal Set Aside Contracts

52.    Beginning in 2015, Patronus was the prime contractor on three small business set aside contracts where Paragon served as Patronus' subcontractor.  These contracts were Indefinite-Delivery Indefinite-Quantity (IDIQ) contracts for Armed Protective Security Officers in federal buildings in specific geographic regions.  All of the contracts were small business set aside contracts.  The prime contracts and the follow-on contracts at issue were: (a) FPS West Virginia from December 1, 2015 to November 30, 2020 and from December 1, 2020 to November 30, 2025; (b) FPS Eastern Washington and Idaho  from December 1, 2016 to March 31, 2022 and  from April 1, 2022 to March 31, 2027; and (c) FPS Kentucky from July 1, 2019 to June 30, 2024.

53.    The Patronus bids, including Patronus' pricing which hid the kickbacks paid to the Paragon Executives, were prepared by the Paragon Executives and signed by O'Quinn.

54.    In bidding on each of these set-aside contracts, Patronus and O'Quinn falsely represented that Patronus was a SDVOSB and a WOSB despite the fact that it was controlled by Paragon executives to whom it was paying millions in kickbacks.  The United States is informed and believes, and on that basis alleges that, following an internal investigation, Paragon withdrew as the subcontractor from these contracts in or about September 2023.

55.    Each of the Patronus prime contracts for West Virginia, Kentucky, and Eastern Washington and Idaho incorporated compliance with the Anti-Kickback Act, 41 U.S.C. § 8706, *et seq.,* into the terms of the contracts.  The Anti-Kickback Act probits the payment and receipt of payments in connection with federal contracts.

56.    In the Executive Summaries of its bids for the FSP West Virginia, FSP Eastern Washington and Idaho (EWAID), and FSP Kentucky, Patronus touted its relationship with

Paragon without disclosing Paragon's operational control of Patronus or that Patronus and O'Quinn were paying millions in kickbacks to the Paragon Executives through their shell companies, MCKHU and later Frontline.

57.    Patronus submitted its bid, signed by O'Quinn, on the initial FPS West Virginia contract on or about May 14, 2015.  The FPS West Virginia contract was awarded on or about September 30, 2015.  Patronus submitted its bid on the follow-on contract (contract no. 70RFP320DE3000001) on or about July 29, 2020 and that contract issued on or about August 3, 2020.  From January 2016 to May 2023, Patronus submitted 148 invoices totaling over $48.8 million to the United States.  *See* Appendix A.

58.    Patronus submitted its bid, signed by O'Quinn, on the FPS EWAID contract on or about January 26, 2016.  The FPS EWAID contract was awarded on or about April 8, 2016. Patronus submitted its bid on the follow-on contract (contract no. 79RFPW21RWA000007) on or about July 29, 2020 and the contract issued on or about August 3, 2020.  From January 2017 to May 2023, Patronus submitted 212 invoices totaling over $56.8 million to the United States.  *See* Appendix A.

59.    Patronus submitted its bid, signed by O'Quinn, on the FPS Kentucky contract on May 2, 2018.  The FPS contract was awarded on or about April 3, 2019.  From August 2019 to May 2023, Patronus submitted 48 invoices totaling over $22.9 million to the United States.  *See* Appendix A.

60.    Patronus and O'Quinn knowingly submitted over 400 false invoices to the United States under its prime contracts with DHS which caused the United States to pay Patronus over $128 million.  Patronus and O'Quinn knew that the Patronus invoices submitted to the United States were false in that the Paragon Executives controlled Patronus, making Patronus an affiliate

of Paragon and an ineligible subcontractor and that Patronus was paying kickbacks to the Paragon Executives.

61.     Had the United States known of the affiliation between Patronus and Paragon and the payment of kickbacks to the Paragon Executives, the United States would not have awarded the contracts to Patronus and would not have paid these claims.

        C.      **The Paragon Executives' Control of Patronus**

62.     From 2015 to at least late 2018, the Paragon President and Managers and R.O. controlled Patronus' finances and operations.  They routinely discussed Patronus' business without including O'Quinn who was then merely a figurehead.  During this period of time, R.O. and the Paragon Managers exchanged over 200 text messages which dealt solely with Patronus' business. Among the business discussions held among the Paragon President and Managers and O'Quinn's were Patronus' payments of distributions to MCKHU, Patronus' payments to ASI, another sham small business subcontractor, a substantial loan from MCKHU to Patronus, and Patronus' leasing of vehicles.

63.     O'Quinn was aware that R.O. should not be involved in Patronus' business.  In November 2015, O'Quinn emailed a Patronus employee telling her to use a revised version of a document:  "Use this document or change the author of the document on the one you use (had [R.O.'s] name)."  Similarly, R.O. also knew he was not supposed to be involved with Patronus' business.  On March 24, 2022, R.O. was deposed in an unrelated matter denied that he was involved in Patronus' business.

64.     Patronus, O'Quinn, and the Paragon Executives concealed the Paragon Executives' control of Patronus through the use of an anonymized email address which did not include the account holder's name.   In December 2015, R.O. created an anonymous email address --

accounting@patronus.usa – for the use of the Paragon Managers so that they could communicate with Patronus employees, Paragon employees, Government representatives, and third parties, such as vendors. without disclosing that two Paragon executives were operating and controlling Patronus.  Later, Patronus set up another similar email address for Paragon's Director of Payroll worked for Patronus as its payroll manager, at the request of Paragon's VP Ops.

65.     Not only did the Paragon President and Paragon Managers take steps to hide their involvement in the operations of Patronus, they made false statements about the extent of the involvement of R.O..  On November 9, 2018, after working closely on Patronus-related matters with R.O. for over three years, the Paragon President chastised Paragon's insurance broker for copying R.O. on emails about Patronus:  "Just so you know, [R.O.] has nothing to do with Patronus, please stop sending him things."  The United States is informed and believes that the Paragon President's email was prompted by the then-pending bid protest against Patronus.

66.     From the beginning of the scheme, the Paragon Executives took an active role in handling Patronus' financial records, including setting up Patronus' books, revising and reformatting Patronus' financial records that were submitted to DHS in connection with bids and to financial institutions, preparing income tax documents, preparing financial projections, and using the Paragon President's long-term Ohio-based accountant to prepare Patronus' tax returns. The Paragon President and Managers' control over Patronus' finances continued until at least August 2022, and during this time the Paragon Manager's regularly provided the Paragon President with updates on their work for Patronus.  Paragon and O'Quinn provided the Paragon Managers with log-in information and passwords for Paragon's bank accounts, allowing the Paragon Managers to access the accounts to pay Patronus bills.

67.     For example, from November 2016 to April 2021, Patronus had a financial shortfall

which made it unable to make payments to Paragon, which was serving as a subcontractor on set-aside contract awarded to Patronus.  The Paragon Managers suggested that O'Quinn withhold payment on a Paragon invoice, which was due in January 2017, until Patronus received its first payment on a new FPS contract, The United States is informed and believes that the cause of Patronus's financial shortfall was that from November 11, 2016 to April 30, 2017, it paid MCKHU $223,815 and $272,072 to O'Quinn.  These payments rendered Patronus unable to pay its bills as they came due.

68.    The Paragon Executives viewed themselves as owners and executives of Patronus. In early 2016, the Contracts Manager informed a third-party vendor that Patronus was his company, "a federal contractor of armed security guards with annual revenues of $7 million and about 100 employees" and identified both Patronus as Athena [ASI] by name.  Around the same time, the Contracts Manager also represented to another vendor that he was the CFO of Patronus.

### D.    Payments to the Paragon Executives

69.    From at least 2016 to 2023, Patronus paid over $4.6 million to the Paragon President, the Paragon Managers and, to a lesser extent, the  VP Ops.  These payments constituted kickbacks and demonstrate the control that these Paragon Executives exercised over Patronus.

### 1.    Payments to Shell Companies Owned and Control by the Paragon President and the Paragon Managers

70.    Between April 2016 and April 2023, when the Patronus, O'Quinn, the Paragon President, and the Paragon Managers were served with investigatory subpoenas, Patronus paid MCKHU and Frontline 50 payments over $4.6 million.  MCKHU received nearly $2.2 million, and Frontline received nearly $2.5 million.  These payments were disguised as "consulting payments" to these two shell companies, which, in turn, transferred the funds to the Paragon President, the Paragon Managers, and, to a lesser extent, other members of their families.  *See*

Appendix D.

71.    Each of these 50 payments constituted a kickback to the Paragon Executives.

### E.    Payments to Paragon's VP Operations through his Spouse

72.    Patronus also paid kickbacks to another Paragon Executive, Paragon's VP Ops, disguised as "consulting fees" paid to his spouse, R.B.  Initially, on January 1, 2016, R.B., using her maiden name, which she did not routinely use, emailed O'Quinn and Patronus an invoice for $11,000 for "WV Transition Management" and "December 2015 Oversight Management."  Later invoices to Patronus were submitted under the name Grigsby Consulting Services.  R.B. performed no work for Patronus and had no contact with Patronus other than the submission of monthly invoices from February 2016 to at least March 2023.  When Patronus received the initial invoice, R.O. asked Paragon's President if he concurred in the invoice.  Paragon's President responded, responded "How is our cash?" (emphasis added), apparently referring to Patronus' funds as "our cash."  R.O. provided Paragon's President information about Patronus' cash balances and later informed Paragon's President that he had "[p]aid that invoice."

73    After Patronus paid the initial invoice, Grigsby Consulting sent Patronus another invoice in February 2016 for $1,000.  O'Quinn objected to R.O. about paying for more consulting by Paragon's VP Ops: "Did U agree to have [Paragon's VP Ops] do more 'consulting'??? I do not agree."  Every Grigsby Consulting invoice to Patronus stated that R.B., not the VP Ops, was providing "Oversight Management Consulting Services" on the FPS West Virginia contract.  Despite O'Quinn's objections, Patronus paid Grigsby Consulting via nearly 90 checks to R.B. totaling over $87,000 for the next six years.  The payments to Grigsby Consulting and the VP Ops were controlled by Paragon's President, not O'Quinn.  If O'Quinn had actually controlled Patronus, she could have refused to pay any of the invoices for consulting services to Grigsby Consulting.

74.    In January 2016, R.B. provided a signed Independent Contractor Agreement to Patronus and O'Quinn, which listed specific purported duties for R.B., including reviewing time and attendance records and financials, serving as the chief advisor to the Wet Virginia contract manager, and advising on operational logistics.  R.B. lacked the experience and skills to perform these services for Patronus.

75.    In December 2020, O'Quinn again questioned the Paragon Managers why Patronus was continuing to pay consulting fees to Grigsby Consulting.  If O'Quinn had actually controlled Patronus, she could have cancelled this consulting arrangement without the approval of the Paragon Managers.  The Paragon Managers encouraged O'Quinn to discuss the matter with R.B. and the VP Ops, demonstrating that R.B. was not performing services for Patronus.  The VP Ops prepared a list of services that Grigsby Consulting purportedly provided to Patronus, which R.B. forwarded to O'Quinn and Patronus.  The only communications between the VP Ops and Patronus came through his Paragon email account and occurred during regular business hours when he was working in the Paragon offices.  Rather, Patronus was paying Patronus' VP Ops for work he performed at Paragon's offices during the normal course of Paragon's business.

76.    From January 2016 to April 2023, when the Patronus, O'Quinn, the Paragon President, and the Paragon Managers were served with investigatory subpoenas, Patronus paid 85 payments to the VP Ops totally $98,000.  These payments were disguised as "consulting payments" to R.B., using her maiden name, the VP Ops' Spouse, many of which were endorsed to the VP Ops.  *See* Appendix E.

77.    Each of these 85 payments constituted a kickback to the VP Ops.

**F.    <u>Paragon's Payroll Director was also Patronus' Payroll Director</u>**

78.    The Paragon Executives also exercised control over Patronus by having Paragon's

Payroll Director work as Patronus's Payroll Director from October 2016 until 2023.  The Payroll Director worked for Patronus at the request of Paragon's VP Ops and was paid over $112,000 by Patronus.

79.    In both her Paragon job and her Patronus job, the Payroll Director worked closely with the Paragon Managers and knew that they were working for Patronus as consultants.  The Payroll Director knew that the Paragon Managers used an anonymized Patronus email address -- accounting@Patronus.com.  The Payroll Director also used an anonymized Patronus email address – payroll@patronususa.com – to conduct her business on behalf of Patronus, often while at her desk at Paragon.

80.    The Payroll Director did not want other Paragon employees to know she was working as Patronus' Payroll Director.  The Payroll Director told Patronus employees not to send Patronus payroll emails to her Paragon email account or to her personal Gmail account.  Similarly, O'Quinn told employees of Patronus' payroll company, Valiant, not to use the Payroll Director's Paragon email address to communicate about her work at Patronus.

81.    The Payroll Director continued to work for Patronus until at least March 2023, interviewing candidates for employment and preparing payroll.  She performed her Patronus work from Paragon's offices during Paragon's regular business hours.

G.    **The Patronus – Paragon Failed Joint Venture**

82.    On June 11, 2018, FPS issued Request for Proposal (RFP) for protective security officers for certain federal buildings located in New Jersey.  Defendant PSP was incorporated on July 12, 2018 by O'Quinn to bid on the FPS New Jersey contract.  On August 6, 2018, PSP submitted a bid for the FSP New Jersey contract.  O'Quinn and the Paragon President signed the Joint Venture Agreement dated "July 17, 2018;" however, the document was backdated and, in

- 24 -

fact, it was signed three months later after a bid protest was filed against PSP.

83.    On October 16, 2018, a bid protest was submitted against PSP, alleging that Patronus was an affiliate of Paragon based on, *inter alia*, A.D's roles as a director of Patronus and the wife of the Paragon President.  The bid protest contained no allegations about the millions of dollars that Patronus was paying to the Paragon President and the Paragon Managers.

84.    On October 18, 2018, two days after the bid protest was filed, the VP BD sent O'Quinn the Paragon-PSP joint venture agreement.  On October 19, 2018, O'Quinn responded that she was just in the process of signing it.  Paragon and Patronus never prepared or signed a joint venture agreement until after the bid protest was filed against them.

85.    In Paragon and Patronus' opposition to the bid protest, Patronus and O'Quinn did not disclose the millions of dollars that Patronus paid to Paragon executives or the control of Patronus' business by the Paragon Executives.  Both O'Quinn and the Paragon President certified that the information in the bid protest response was accurate.  On November 3, 2018, PSP lost the bid protest nonetheless.  By then end of November, O'Quinn dissolved PSP.

86.    As a result of the bid protest, the Paragon Executives memorialized fewer communications with R.O. and memorialized a greater number of communications with O'Quinn herself.  O'Quinn continued to rely on the Paragon Managers to perform nearly all back office services for Patronus.

**H.    Patronus' PPP Fraud**

87.    In or about April 2020, O'Quinn and the Paragon Managers decided to seek a PPP loan for Patronus.  O'Quinn signed the application on or about April 6, 2020, and on May 4, 2020, Patronus received $1,828,713 in PPP funds.

88.    After the PPP loan was funded, Frontline, a shell company which funneled funds

to the Paragon President and the Paragon Managers, received:  (a) $189,225 on July 6, 2020; (b) $198,618 on August 18, 2020; (c) $193,950 on November 1, 2020; and (d) $189,000 on December 31, 2020.  PPP loan funds could not be use to pay third-party consultants such as Frontline purported to be.  All payments were made from the same account where Patronus deposited the PPP funds – Patronus Account No. X5524.

89.    In the same month when the PPP loan was funded, O'Quinn increased her own personal monthly distributions from $2,000 to $7,600 in June and July 2020.  In July 2020, Ms. O'Quinn again increased her monthly distributions to $40,0000 where they remained through 2021.  All payments were made from the same account where Patronus deposited the PPP funds – Patronus Account No. X5524.

90.    On February 19, 2021, Patronus applied for SBA loan forgiveness on its PPP loan. O'Quinn signed the PPP loan forgiveness application on behalf of Patronus.  In doing so, Patronus, through O'Quinn, expressly and impliedly certified that Patronus had complied with all applicable PPP rules relating to the use of PPP funds, including that at least 60% of the proceeds were used to pay Patronus employees.  On April 4, 2021, Patronus' PPP loan was forgiven in full.  Beginning that month, Frontline received additional payments: (a) $111,825 on April 7, 2021; and (b) $129,000 on May 6, 2021.  All payments were made from the same account where Patronus deposited the PPP funds – Patronus Account No. X5524.

91.    On December 6, 2021, the Paragon Managers informed O'Quinn that she had $844,078 in equity in Patronus than MCKHU/Frontline had taken due to the forgiveness of Patronus' PPP loan.  The Paragon Managers asked O'Quinn is she wanted to adjust her salary.  On December 6, 2021, O'Quinn forwarded the email to Paragon's President, who responded only to her on December 7, 2021: "oh my[.]  This is cash . . . [O'Quinn's mother-in-law and Paragon's

bookkeeper] did not say you have 800k on [the] books that is your[s] to take??"  On February 14, 2022, Patronus paid $300,035 to O'Quinn.

92.     On December 7, 2021, the Paragon Managers emailed O'Quinn asking "So how do we get our share of the equity, specifically the PPP?"  O'Quinn responded: "We decide at the end of each year how much can be pulled for each of us.  We leave enough money so we can still operate."  The Paragon Managers responded, "We are trying to spread things evenly rather than in big spikes.  We should have a call to go over.  I think there's a fundamental disconnection on the accounting for an owner versus vendor."  After that point, Patronus began paying Frontline approximately $66,000 per month instead of large payments at then end of each year.

### COUNT I
### VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)
### AGAINST ALL DEFENDANTS

93.     The United States re-alleges and incorporates by reference paragraphs 1 through 92 as though fully set forth herein.

94.     By virtue of the wrongful acts described herein, from at least 2014 through the present, all Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, presented, or caused to be presented, to the United States false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1 )(A) by Patronus, O'Quinn and/or Paragon.

95.     These claims were false in that:

(a)     Patronus and O'Quinn falsely described Patronus' small business status without disclosing that the Paragon Executives controlled Patronus and  that Patronus and O'Quinn were paying the Paragon Executives millions in kickbacks in violation of federal law, making Patronus an affiliate of Paragon and, thus ineligible to bid on the small business set-aside contracts;

(b)    The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives tainted all claims for payment submitted by Patronus on its small business set-aside contracts; and

(c)    The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives caused Paragon to submit false claims for payment under its contracts where Patronus served as a subcontractor

96.    Additionally, the conduct of O'Quinn and Patronus fraudulently induced the United States to enter into small business set-aside contracts with Patronus for which Patronus was ineligible due to the Paragon Executives' control of Patronus and Patronus' payment of kickbacks to the Paragon Executives,

97.    The United States relied on 411 fraudulent invoices and claims for payment submitted by Patronus and O'Quinn, in paying Patronus $128 million.  The United States relied on 352 fraudulent invoices and claims for payment submitted by Paragon, which Patronus and O'Quinn caused to be submitted, in paying Paragon, over $205 million of which $11.8 million was paid to Patronus.  Patronus submitted 228 false invoices to Paragon.

98.    From claims submitted as a prime contractor and as a subcontractor to Paragon, Patronus received a total of $140 million to which it was not legally entitled.  Patronus and O'Quinn submitted 228 invoices to Paragon as a subcontractor and 411 invoices submitted to the United States as a prime contractor, for a total of 639 false claims.

99.    The false representations, invoices, records, statements, reports, and certifications described herein were material to the United States' decision to pay Paragon and Patronus and had a natural tendency to influence and did influence those payment decisions.  Had the United States known of the false claims for payment, it would not have paid the invoices.

100.    The false representations, records, statements, reports, and certifications described herein were material to the United States' decision to enter into small business set-aside contracts with Patronus and had a natural tendency to influence and did influence those contracting decisions.  Had the United States known of the false representations, it would not have entered into the contracts or paid any of the invoices under the contracts.

101.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

102.    On or about April 14, 2020, Patronus and O'Quinn submitted an application for a PPP loan.  On May 4, 2020, Patronus received $1,828,713 in PPP funds.  On April 4, 2021, Patronus' PPP loan was forgiven based on false representation by Patronus and O'Quinn that the PPP funds were used for legitimate purposes.

103.    The bulk of Patronus' PPP loan was used to pay kickbacks to the Paragon Executives, and to pay substantial distributions to O'Quinn.  These were not legitimate uses for PPP funds.

104.    Patronus' application for PPP loan forgiveness was a false claim which resulted in a loss to SBA totaling more than $1,828,713.  Had SBA known the facts described above, the United States would not have paid, forgiven, or provided guarantees on the Patronus SBA loan.

105.    As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages in the amount of at least $140 million, plus the amount of the PPP loan ($1,828,713)  and is entitled to recover three times the amount by which it has been damaged, plus 639 civil money penalties as described in Paragraph 16 above, and other monetary relief as appropriate.

**COUNT II**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(B)**
**AGAINST ALL DEFENDANTS**

106.    The United States re-alleges and incorporates by reference paragraphs 1 through 925 as though fully set forth herein.

107.    By virtue of the wrongful acts described herein, from 2014 through the present, all Defendants, with actual knowledge, reckless disregard, or deliberate ignorance, made, used, and/or caused to be made or used, false records, statements, and certifications material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(b).  In particular, Defendants made, used, and caused to be made or used, false records, statements, and certifications in the invoices and accompanying documentation of Patronus and Paragon that were submitted to the United States. These false representations included O'Quinn and Patronus' false representations of Patronus' small business status and the failure to disclose the payment of kickbacks to the Paragon Executives.  The false representations also caused Paragon to make false statements to the United States concerning Patronus' small business status.

108.    The United States relied on these fraudulent records, statements, and certifications in paying Patronus and Paragon, which resulted in the payment of over $140 million to Patronus, to which it was not legally entitled.

109.    The false representations, records, statements, reports, and certifications described herein were material to United States' decision to provide pay Patronus and Paragon and had a natural tendency to influence and did influence those decisions.

110.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

111.    On or April 14 2020, Patronus and O'Quinn submitted an application for a PPP

loan.  On May 4, 2020, Patronus received $1,828,713 in PPP funds.  On April 4, 2021, Patronus'

PPP loan was forgiven by SBA.

112.    The bulk of Patronus' PPP loan was used to pay bogus consulting fees to Frontline,

which were kickbacks and to pay massive distributions to O'Quinn.  These were not legitimate

uses for PPP funds.

113.    Patronus' application for PPP loan forgiveness was a false claim which resulting in

a loss to SBA totaling more than $1,828,713.  Had SBA known the facts described above, the

United States would not have paid, forgiven, or provided guarantees on the Patronus SBA loan.

114.    As a result of the false records, statements, reports, and certifications, the United

States has suffered actual damages in the amount of at least $140 million, plus the amount of the

PPP loan ($1,828,713)  and is entitled to recover three times the amount by which it has been

damaged, plus 639 civil money penalties as described in Paragraph 16 above, and other monetary

relief as appropriate.

**COUNT III**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31 U.S.C. § 3729(a)(1)(C)**
**AGAINST ALL DEFENDANTS**

115.    The United States re-alleges and incorporates by reference paragraphs 1 through 92

as though fully set forth herein.

116.    All defendants participated in a conspiracy to get false and fraudulent claims paid

by the United States.  No later than April 15, 2015, O'Quinn and Patronus entered into a conspiracy

with the Paragon President and Paragon Managers, acting through their shell company, MCKHU,

for the Paragon Executives to control and operate Patronus and for Patronus to pay kickbacks from

Patronus' profits in return for Patronus being awarded Paragon subcontracts  These kickbacks were

disguised as consulting payments to MCKHU.  The conspiracy included the preparation and

submission of false bids and false claims to the United States by Patronus, O'Quinn, and the Paragon executives in connection with Patronus' prime contracts and causing Paragon to submit false claims to the United States in connection with Paragon's prime contracts where Patronus served as a subcontractor.   In January 2016, the conspiracy expanded when the Paragon President instructed Paragon and R.O. to pay additional kickbacks to the spouse of the Paragon Vice President Ops.  O'Quinn joined the conspiracy in early 2016 which she agreed that Patronus would make the payments, which were again disguised as kickback payments.

117.    These claims were false in that:

(a)    In bids to the United States, Patronus and O'Quinn falsely described Patronus' small business status without disclosing that the Paragon Executives controlled Patronus and without disclosing that Patronus and O'Quinn were paying the Paragon Executives millions in kickbacks in violation of federal law, making Patronus an affiliate of Paragon and, thus ineligible to bid on the small business set-aside contracts, including but not limited to FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts;

(b)    The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives tainted all claims for payment submitted by Patronus on its small business set-aside contracts, including but not limited to FPS Kentucky, FPS West Virginia, and FPS Eastern Washington & Idaho contracts; and

(c)    The control of Patronus by the Paragon Executives and the payment of kickbacks to the Paragon Executives caused Paragon to submit false claims for payment under its contracts where Patronus served as a subcontractor, including but not limited to Paragon's FPS North Florida, FPS New England, FPS Louisiana, and FPS Alabama

contracts.

118.    The United reasonably States relied on these fraudulent records, statements, and certifications in paying Patronus and Paragon, which resulted in the direct and indirect payment of over $140 million to which Patronus was not legally entitled.

119.    The false representations, records, statements, reports, and certifications described herein were material to United States' decision to provide pay Patronus and Paragon and had a natural tendency to influence and did influence those decisions.

120.    Payment of the false and fraudulent claims was a reasonable and foreseeable consequence of Defendants' conduct.

121.    On or about April 3, 2020, Patronus, O'Quinn and the Paragon Managers entered into an agreement to obtain a PPP loan to pay massive payments to O'Quinn and the Paragon Manager's shell company, Frontline.  On April 14, 2020, Patronus and O'Quinn submitted an application for a PPP loan.  On May 4, 2020, Patronus received $1,828,713 in PPP funds.  On April 4, 2021, Patronus' PPP loan was forgiven by SBA.

122.    The bulk of Patronus' PPP loan was used to pay bogus consulting fees to Frontline, which were kickbacks. and to pay massive distributions to O'Quinn.  These were not legitimate uses for PPP funds.

123.    Patronus' application for PPP loan forgiveness was a false claim which resulting in a loss to SBA totaling more than $1,828,713.  Had SBA known the facts described above, the United States would not have paid or forgiven the Patronus SBA loan.

124.    As a result of the false claims presented, and/or caused to be presented, the United States has suffered actual damages in the amount of at least $140 million, plus the amount of the PPP loan ($1,828,713)  and is entitled to recover three times the amount by which it has been

damaged, plus civil money penalties as described in Paragraph 16 above, and other monetary relief as appropriate.

**COUNT IV**
**VIOLATION OF THE ANTI-KICKBACK ACT**
**41 U.S.C. § 8706(a)(1)**
**AGAINST DEFENDANTS**
**MABEL O'QUINN AND PATRONUS SYSTEMS INC.**

125.    The United States re-alleges and incorporates by reference paragraphs 1 through 92 as though fully set forth herein.

126.    From at least January 2015 to August 2023, O'Quinn and Patronus knowingly paid at least 50 kickback payments totaling over $4.6 million to shell companies, including but not limited to MCKHU and/or Frontline, which were owned and/or controlled by the Paragon President and/or the Paragon Managers, and/or other members of their families, in return for receiving Paragon subcontracts and/or for Paragon's assistance in obtaining and performing set-aside contracts in Patronus' name.

127.    From at least January 2016 to August 2023, O'Quinn and Patronus knowingly paid at least 85 kickback payments totally approximately $89,000 to the spouse of the P Ops in return for receiving Paragon subcontracts and/or for Paragon's assistance in obtaining and performing set-aside contracts in Patronus' name.

128.    From at least January 2015 to August 2023, O'Quinn and Patronus knowingly included the amount of the kickbacks paid directly or indirectly to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops in both the contract prices that Patronus charged Paragon when Patronus served as Paragon's subcontractor and/or when in the contract prices Patronus, as a prime contractor, charged the Federal government.  O'Quinn signed all Patronus bids submitted to the United States for prime contracts.

- 34 -

129.    O'Quinn and Patronus acted knowingly when paying the kickbacks and including the amount of the kickbacks in Patronus' bids and contracts for prime contracts and in its subcontracts with Paragon.

130.    The Anti-Kickback Act was incorporated into Patronus' contracts and Anti-Kickback Act was incorporated into Paragon's contracts where Patronus served as a subcontractor.

131.    As a result of  O'Quinn and Patronus' knowing payment of 135 kickbacks to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops which totaled over $4.6 million, the United States is entitled to recover twice the amount of each kickbacks involved and a penalty of $27,894 for each occurrence.

## COUNT V
## VIOLATION OF THE ANTI-KICKBACK ACT
## 41 U.S.C. § 8706(a)(2)
## AGAINST DEFENDANTS
## MABEL O'QUINN AND PATRONUS SYSTEMS INC.

132.    The United States re-alleges and incorporates by reference paragraphs 1 through 92 as though fully set forth herein.

133.    From at least January 2015 to August 2023, O'Quinn and Patronus paid at least 50 kickback payments totaling over $4.6 million to shell companies, including but not limited to MCKHU and/or Frontline which were owned and/or controlled by the Paragon President and/or the Paragon Managers, and/or other members of their families in return for receiving Paragon subcontracts and/or for Paragon's assistance in obtaining and performing set-aside contracts in Patronus' name, including but not limited to Patronus' contracts.

134.    From at least January 2016 to August 2023, O'Quinn and Patronus paid at least 85 kickback payments totally approximately $89,000 to the spouse of the VP Ops in return for receiving Paragon subcontracts and/or for Paragon's assistance in obtaining and performing set-

aside contracts in Patronus' name.

135.    From at least January 2015 to August 2023, O'Quinn and Patronus included the amount of the kickbacks paid directly or indirectly to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops in both the contract prices that Patronus changed Paragon when Patronus served as Paragon's subcontractor and/or when in the contract prices Patronus, as a prime contractor, charged the federal government.  O'Quinn signed all Patronus bids submitted to the United States for prime contracts.

136.    The Anti-Kickback Act was incorporated into Patronus' prime contracts and into Paragon's prime contracts on which Patronus served as a subcontractor.

137.    As a result of  O'Quinn and Patronus' payment of 135 kickbacks to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops which totaled over $4.6 million, the United States is entitled to recover a penalty equal to the amount of each kickback.

**COUNT VI**
**PAYMENT BY MISTAKE**
**AGAINST DEFENDANT**
**PATRONUS SYSTEMS, INC.**

138.    The United States re-alleges and incorporates by reference paragraphs 1 through 92 as though fully set forth herein.

139.    This is a common law claim by the United States to recover payments made by the United States to Patronus based on a mistake of fact. This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

140.    By virtue of the wrongful acts described herein, from 2015 through the present, Patronus obtained and kept Federal funds to which it was not entitled that were paid based on a mistake of fact by the United States.  Specifically, the United States was unaware that:

(a)    Patronus was an affiliate of Paragon due to the control of Patronus by the

Paragon Executives which rendered all claims for payment to the United States by

Patronus as a prime contractor false and all claims for payment to Paragon by Patronus as

a subcontractor to Paragon false, which caused Paragon to submit false claims for

payment to the United States and to make false statements to the United States; and

(b)      Patronus and O'Quinn were paying kickbacks to the Paragon Executives,

including but not limited to the Paragon President, the Paragon Managers, and the VP

Ops, which rendered all claims for payment to the United States by Patronus as a prime

contractor false and all claims for payment to Paragon by Patronus as a subcontractor to

Paragon false, which caused Paragon to submit false claims for payment to the United

States and to make false statements to the United States; and

(c)      Patronus and O'Quinn received forgiveness of a PPP loan for $1,828,713

which was used to pay distributions and kickbacks to the Paragon President, the Paragon

Managers, and the Paragon Vice President Ops, which were not legitimate uses for PPP

loan funds.

141.    Based on the foregoing, the United States mistakenly paid over $141 million to

Patronus for tainted services and forgiven PPP loan funds, and the circumstances dictate that, in

equity and good conscience, the amount of these payments should be returned to the United

States.

142.    Had the United States known the facts described above, the United States would

not have paid such claims.

## COUNT VII
## UNJUST ENRICHMENT
## AGAINST ALL DEFENDANTS

143.    The United States re-alleges and incorporates by reference paragraphs 1 through 92

as though fully set forth herein.

144.    This is a claim by the United States for unjust enrichment under the common law arising from the unjust receipt of federal funds by Patronus and O'Quinn while engaged in the illegal conduct described herein.  This Court has jurisdiction to adjudicate this claim pursuant to 28 U.S.C. § 1345.

145.    By virtue of the wrongful acts described herein, from 2015 through the present, Defendants Patronus and O'Quinn directly or indirectly obtained federal funds by which they were unjustly enriched.  Specifically, the United States was unaware that:

(a)    Patronus was an affiliate of Paragon due to the control of Patronus by the Paragon Executives which rendered all claims for payment to the United States by Patronus as a prime contractor false and all claims for payment to Paragon by Patronus as a subcontractor to Paragon false, which caused Paragon to submit false claims for payment to the United States and to make false statements to the United States; and

(b)    Patronus and O'Quinn were paying kickbacks to the Paragon Executives, including but not limited to the Paragon President, the Paragon Managers, and the VP Ops, which rendered all claims for payment to the United States by Patronus as a prime contractor false and all claims for payment to Paragon by Patronus as a subcontractor to Paragon false, which caused Paragon to submit false claims for payment to the United States and to make false statements to the United States; and

(c)    Patronus and O'Quinn received forgiveness of a PPP loan for $1,828,713 which was used to pay distributions and kickbacks to the Paragon President, the Paragon Managers, and the Paragon Vice President Ops, which were not legitimate uses for PPP loan funds.  Had SBA known the facts described above, the United States would not have

- 38 -

paid, forgiven, or provided guaranties on such claims.

146.    Based on the foregoing, Patronus and O'Quinn have been unjustly enriched, and the circumstances dictate that, in equity and good conscience, the money should be returned to the United States.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor and against Defendants, jointly and severally, as follows:

1.    On Counts I - III, under the False Claims Act, 31 U.S.C. 3729 et seq., against all Defendants for treble the amount of the United States' actual damages, plus civil penalties as are allowable by law for each false claim or record;

2.    On Count IV, under the Anti-Kickback Act, 41 U.S.C. § 8706(a)(1), against all Defendants for double the amount of the kickbacks paid, plus civil penalties as are allowable by law for reach kickback payment;

3.    On Count V, under the Anti-Kickback Act, 41 U.S.C. § 8706(a)(2), against all Defendants for civil penalties in the amount of the kickbacks paid as are allowable by law for reach kickback payment;

4.    On Count VI for payment by mistake against Patronus, for the amount paid to Patronus by the United States plus interest;

5.    On Count VII for unjust enrichment against all Defendants for the amounts by which the Defendants were unjustly enriched, plus interest;

6.    For all costs of this civil action; and

7.    For such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

Respectfully submitted,

Dated: November 5, 2024

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

EREK L. BARRON
United States Attorney
District of Maryland

By: _____
SARAH MARQUARDT (No. 17294)
Assistant United States Attorneys
36 S. Charles Street, 4th Floor |
Baltimore, MD 21201
Telephone (410) 209-4801
Email:  SMarquardt@usa.doj.gov

JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
ALICIA J. BENTLEY
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-9854
Email:  Alicia.Bentley@usdoj.gov

Attorneys for the United States of America

**APPENDIX A -- PARAGON PRIME CONTRACT INVOICES**

| FPS Kentucky | | |
|---|---|---|
| **70RFP119DE4000001** | | |
| **Date** | **Invoice No.** | **Amount** |
| 8/14/2019 | KY-001 | $550,915.29 |
| 9/11/2019 | KY-002 | $546,204.11 |
| 10/17/2019 | KY-003 | $494,396.47 |
| 11/14/2019 | KY-004 | $536,518.94 |
| 12/27/2019 | KY-005 | $462,222.90 |
| 1/13/2020 | KY-006 | $494,589.12 |
| 2/12/2020 | KY-007 | $518,163.14 |
| 4/1/2020 | KY-008 | $484,213.17 |
| 4/20/2020 | KY-009 | $505,939.59 |
| 5/15/2020 | KY-010 | $414,556.99 |
| 6/16/2020 | KY-011 | $399,597.07 |
| 7/21/2020 | KY-012 | $414,507.10 |
| 8/21/2020 | KY-013 | $424,777.83 |
| 9/19/2020 | KY-014 | $403,483.25 |
| 10/26/2020 | KY-015 | $404,893.23 |
| 10/20/2020 | KY-016 | $25,237.99 |
| 11/13/2020 | KY-017 | $409,118.16 |
| 12/11/2020 | KY-018 | $363,881.10 |
| 1/13/2021 | KY-019 | $388,985.52 |
| 2/12/2021 | KY-020 | $358,459.20 |
| 3/9/2021 | KY-021 | $325,917.57 |
| 4/15/2021 | KY-022 | $433,066.59 |
| 5/12/2021 | KY-023 | $416,054.10 |
| 6/19/2021 | KY-024 | $408,238.38 |
| 7/14/2021 | KY-025 | $456,268.23 |
| 8/21/2021 | KY-026 | $460,703.42 |
| 10/4/2021 | KY-027 | $493,311.21 |
| 9/14/2021 | KY-028 | $11,220.25 |
| 10/13/2021 | KY-029 | $464,132.07 |
| 11/16/2021 | KY-030 | $484,236.79 |
| 12/10/2021 | KY-031 | $468,359.16 |
| 1/18/2022 | KY-032 | $499,904.18 |
| 1/20/2022 | KY-033 | $44,516.36 |
| 2/28/2022 | KY-034 | $466,003.81 |
| 3/4/2022 | KY-035 | $196,526.00 |
| 4/6/2022 | KY-036R | $435,236.91 |
| 3/5/2022 | KY-037 | $71,699.30 |
| 4/27/2022 | KY-038 | $552,510.69 |
| 5/16/2022 | KY-039 | $567,284.29 |
| 6/17/2022 | KY-040 | $567,116.07 |

| | | |
|---|---|---|
| 7/13/2022 | KY-041 | $566,327.43 |
| 8/19/2022 | KY-042 | $571,772.31 |
| 9/21/2022 | KY-043 | $646,410.17 |
| 9/22/2022 | KY-044 | $24,680.19 |
| 10/17/2022 | KY-045 | $591,255.37 |
| 11/11/2022 | KY-046 | $569,494.39 |
| 12/12/2022 | KY-047 | $561,156.94 |
| 1/12/2023 | KY-048 | $581,591.22 |
| 2/11/2023 | KY-049 | $575,752.80 |
| 3/10/2023 | KY-050 | $548,684.02 |
| 4/13/2023 | KY-051 | $658,153.24 |
| 5/11/2023 | KY-052 | $582,730.15 |
| | | **$22,900,973.78** |

# APPENDIX A -- PARAGON PRIME CONTRACT INVOICES

| FPS EWAID | | |
|---|---|---|
| **HSHQWA-16-D-00002** | | |
| **Date** | **Invoice No.** | **Amount** |
| 1/11/2017 | EWAID-001 | $576,503.41 |
| 1/12/2017 | EWAID-002 | $121,342.99 |
| 1/12/2017 | EWAID-003 | $14,674.95 |
| 2/8/2017 | EWAID-004 | $567,820.07 |
| 2/8/2017 | EWAID-005 | $113,951.59 |
| 2/8/2017 | EWAID-006 | $24,351.59 |
| 3/8/2017 | EWAID-007 | $522,564.91 |
| 3/8/2017 | EWAID-008 | $109,458.63 |
| 3/8/2017 | EWAID-009 | $24,455.43 |
| 4/10/2017 | EWAID-010 | $596,002.75 |
| 4/10/2017 | EWAID-011 | $136,877.04 |
| 4/10/2017 | EWAID-012 | $29,608.29 |
| 4/11/2017 | EWAID-013 | $7,434.35 |
| 4/11/2017 | EWAID-014 | $3,458.45 |
| 5/9/2017 | EWAID-015 | $573,954.12 |
| 5/9/2017 | EWAID-016 | $119,175.40 |
| 5/9/2017 | EWAID-017 | $22,831.72 |
| 5/11/2017 | EWAID-018 | $166.60 |
| 5/17/2017 | EWAID-019 | $71,498.09 |
| 5/17/2017 | EWAID-020 | $2,941.26 |
| 6/7/2017 | EWAID-021 | $606,226.39 |
| 6/7/2017 | EWAID-022 | $130,828.34 |
| 6/7/2017 | EWAID-023 | $33,906.45 |
| 7/17/2017 | EWAID-024 | $592,693.75 |
| 7/17/2017 | EWAID-025 | $131,251.23 |
| 7/17/2017 | EWAID-026 | $28,831.19 |
| 8/8/2018 | EWAID-027 | $585,688.05 |
| 8/8/2018 | EWAID-028 | $119,153.87 |
| 8/8/2018 | EWAID-029 | $27,364.12 |
| 9/7/2017 | EWAID-030 | $615,209.71 |
| 9/7/2017 | EWAID-031 | $136,787.33 |
| 9/7/2017 | EWAID-032 | $29,188.48 |
| 10/10/2017 | EWAID-033 | $575,829.21 |
| 10/10/2017 | EWAID-034 | $119,162.58 |
| 10/10/2017 | EWAID-035 | $25,607.96 |
| 11/8/2017 | EWAID-036 | $596,828.89 |
| 11/8/2017 | EWAID-037 | $125,497.32 |
| 11/8/2017 | EWAID-038 | $24,451.02 |
| 12/8/2017 | EWAID-039 | $574,714.31 |
| 12/8/2017 | EWAID-040 | $116,244.87 |
| 12/8/2017 | EWAID-041 | $17,758.01 |
| 1/11/2018 | EWAID-042 | $588,427.22 |
| 1/11/2018 | EWAID-043 | $119,585.48 |
| 1/11/2018 | EWAID-044 | $19,589.52 |
| 2/9/2018 | EWAID-045 | $598,323.64 |
| 2/9/2018 | EWAID-046 | $125,228.20 |
| 2/9/2018 | EWAID-047 | $24,720.14 |
| 2/13/2018 | EWAID-048 | $615.12 |
| 2/13/2018 | EWAID-049 | $1,742.84 |
| 3/8/2018 | EWAID-050 | $539,848.80 |
| 3/8/2018 | EWAID-051 | $113,592.18 |
| 3/8/2018 | EWAID-052 | $29,931.00 |
| 3/8/2018 | EWAID-053 | $5,644.72 |
| 4/6/2018 | EWAID-054 | $608,199.91 |
| 4/6/2018 | EWAID-055 | $132,109.84 |
| 4/6/2018 | EWAID-056 | $26,945.33 |
| 5/8/2018 | EWAID-057 | $586,234.99 |
| 5/8/2018 | EWAID-058 | $125,561.39 |
| 5/8/2018 | EWAID-059 | $24,895.96 |
| 6/8/2018 | EWAID-060 | $603,855.62 |
| 6/8/2018 | EWAID-061 | $131,674.13 |
| 6/8/2018 | EWAID-062 | $22,533.90 |
| 7/8/2018 | EWAID-063 | $585,748.02 |
| 7/8/2018 | EWAID-064 | $125,997.10 |
| 7/8/2018 | EWAID-065 | $24,230.60 |
| 8/8/2018 | EWAID-066 | $598,966.44 |
| 8/8/2018 | EWAID-067 | $126,455.62 |
| 8/8/2018 | EWAID-068 | $21,545.60 |
| 9/11/2018 | EWAID-069 | $618,084.88 |
| 9/11/2018 | EWAID-070 | $137,761.26 |
| 9/11/2018 | EWAID-071 | $26,259.99 |
| 10/12/2018 | EWAID-072 | $575,183.53 |
| 10/12/2018 | EWAID-073 | $112,661.80 |
| 10/12/2018 | EWAID-074 | $17,379.70 |
| 11/9/2018 | EWAID-075 | $612,201.36 |
| 11/9/2018 | EWAID-076 | $130,287.00 |
| 11/9/2018 | EWAID-077 | $34,747.26 |
| 12/11/2018 | EWAID-078 | $579,858.42 |
| 12/11/2018 | EWAID-079 | $116,503.84 |
| 12/11/2018 | EWAID-080 | $30,697.62 |
| 1/14/2019 | EWAID-081 | $576,159.96 |
| 1/14/2019 | EWAID-082 | $107,280.53 |
| 1/14/2019 | EWAID-083 | $24,696.60 |

**APPENDIX A -- PARAGON PRIME CONTRACT INVOICES**

| | | | | | |
|---|---|---|---|---|---|
| 2/11/2019 | EWAID-084 | $592,683.54 | 3/12/2020 | EWAID-127 | $564,018.19 |
| 2/11/2019 | EWAID-085 | $124,568.87 | 3/12/2020 | EWAID-128 | $159,529.06 |
| 2/11/2019 | EWAID-086 | $27,785.84 | 3/12/2020 | EWAID-129 | $8,728.43 |
| 3/5/2019 | EWAID-087 | $126,726.24 | 4/10/2020 | EWAID-130 | $591,772.94 |
| 3/5/2019 | EWAID-088 | $544,052.79 | 4/10/2020 | EWAID-131 | $150,817.85 |
| 3/5/2019 | EWAID-089 | $112,943.29 | 5/10/2020 | EWAID-132 | $549,537.51 |
| 3/11/2019 | EWAID-090 | $26,442.63 | 5/10/2020 | EWAID-133 | $96,976.74 |
| 4/18/2019 | EWAID-091 | $607,887.10 | 6/12/2020 | EWAID-134 | $537,036.87 |
| 4/18/2019 | EWAID-092 | $125,037.80 | 6/12/2020 | EWAID-135 | $85,912.19 |
| 4/18/2019 | EWAID-093 | $34,147.41 | 7/9/2020 | EWAID-136 | $552,001.88 |
| 5/8/2019 | EWAID-094 | $609,802.91 | 7/9/2020 | EWAID-137 | $86,398.40 |
| 5/8/2019 | EWAID-095 | $131,091.65 | 8/11/2020 | EWAID-138 | $565,641.71 |
| 5/8/2019 | EWAID-096 | $30,359.87 | 8/11/2020 | EWAID-139 | $89,837.66 |
| 6/8/2019 | EWAID-097 | $621,936.82 | 9/9/2020 | EWAID-140 | $559,394.46 |
| 6/8/2019 | EWAID-098 | $130,599.84 | 9/9/2020 | EWAID-141 | $85,212.88 |
| 6/8/2019 | EWAID-099 | $20,670.02 | 10/9/2020 | EWAID-142 | $549,090.12 |
| 7/9/2019 | EWAID-100 | $590,156.50 | 10/9/2020 | EWAID-143 | $86,011.72 |
| 7/9/2019 | EWAID-101 | $119,003.75 | 11/11/2020 | EWAID-144 | $541,209.34 |
| 7/9/2019 | EWAID-102 | $18,716.48 | 11/11/2020 | EWAID-145 | $84,822.06 |
| 7/30/2019 | EWAID-103 | $2,593.86 | 12/9/2020 | EWAID-146 | $508,358.57 |
| 7/30/2019 | EWAID-104 | $8,074.03 | 12/9/2020 | EWAID-147 | $74,960.25 |
| 8/7/2019 | EWAID-105 | $621,963.10 | 1/14/2021 | EWAID-148 | $551,959.17 |
| 8/7/2019 | EWAID-106 | $130,617.13 | 1/14/2021 | EWAID-149 | $90,103.91 |
| 8/7/2019 | EWAID-107 | $19,025.71 | 2/12/2021 | EWAID-150 | $538,267.21 |
| 9/9/2019 | EWAID-108 | $621,129.92 | 2/12/2021 | EWAID-151 | $73,076.45 |
| 9/9/2019 | EWAID-109 | $131,091.65 | 6/2/2021 | EWAID-152 | $172,496.52 |
| 9/9/2019 | EWAID-110 | $19,458.03 | 2/22/2021 | EWAID-153 | $24,804.86 |
| 10/8/2019 | EWAID-111 | $153,128.54 | 5/23/2021 | EWAID-154 | $30,956.00 |
| 10/8/2019 | EWAID-112 | $24,711.45 | 3/16/2021 | EWAID-155 | $506,894.54 |
| 10/8/2019 | EWAID-113 | $5,153.89 | 3/16/2021 | EWAID-156 | $82,963.00 |
| 10/9/2019 | EWAID-114 | $586,460.99 | 4/10/2021 | EWAID-157 | $596,966.96 |
| 10/9/2019 | EWAID-115 | $156,013.16 | 4/10/2021 | EWAID-158 | $101,042.63 |
| 10/9/2019 | EWAID-116 | $6,979.66 | 4/12/2021 | EWAID-159 | $571,241.34 |
| 11/14/2019 | EWAID-117 | $626,468.87 | 5/11/2021 | EWAID-160 | $571,241.34 |
| 11/14/2019 | EWAID-118 | $176,155.14 | 5/11/2021 | EWAID-161 | $96,995.04 |
| 12/9/2019 | EWAID-119 | $594,935.87 | 6/11/2021 | EWAID-162 | $571,575.11 |
| 12/9/2019 | EWAID-120 | $145,918.78 | 6/11/2021 | EWAID-163 | $90,833.87 |
| 1/7/2020 | EWAID-121 | $587,311.16 | 6/25/2021 | EWAID-164 | $10,961.28 |
| 1/7/2020 | EWAID-122 | $156,794.83 | 7/13/2021 | EWAID-165 | $567,483.42 |
| 2/11/2020 | EWAID-123 | $595,995.85 | 7/13/2021 | EWAID-166 | $96,332.96 |
| 2/11/2020 | EWAID-124 | $164,953.17 | 8/10/2021 | EWAID-167 | $578,196.89 |
| 2/14/2020 | EWAID-125 | $625.32 | 8/10/2021 | EWAID-168 | $96,479.31 |
| 2/14/2020 | EWAID-126 | $130.28 | 9/16/2021 | EWAID-169 | $601,444.71 |

**APPENDIX A -- PARAGON PRIME CONTRACT INVOICES**

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/16/2021 | EWAID-170 | $106,482.15 | | | | $56,877,160.68 |
| 10/14/2021 | EWAID-171 | $598,720.73 | | | | |
| 10/14/2021 | EWAID-172 | $106,710.70 | | | | |
| 11/15/2021 | EWAID-173 | $598,890.76 | | | | |
| 11/15/2021 | EWAID-174 | $101,234.08 | | | | |
| 12/10/2021 | EWAID-175 | $586,273.68 | | | | |
| 12/10/2021 | EWAID-176 | $98,151.00 | | | | |
| 1/14/2022 | EWAID-177 | $605,559.71 | | | | |
| 1/14/2022 | EWAID-178 | $108,076.00 | | | | |
| 2/10/2022 | EWAID-179 | $592,401.86 | | | | |
| 2/10/2022 | EWAID-180 | $101,099.79 | | | | |
| 3/8/2022 | EWAID-181 | $547,644.87 | | | | |
| 3/8/2022 | EWAID-182 | $97,644.02 | | | | |
| 4/11/2022 | EWAID-183 | $627,122.24 | | | | |
| 4/11/2022 | EWAID-184R | $121,984.04 | | | | |
| 5/12/2022 | EWAID-185 | $598,209.71 | | | | |
| 5/12/2022 | EWAID-186 | $164,275.31 | | | | |
| 6/10/2022 | EWAID-187 | $608,803.47 | | | | |
| 6/10/2022 | EWAID-188 | $168,347.32 | | | | |
| 7/13/2022 | EWAID-189 | $596,472.14 | | | | |
| 7/13/2022 | EWAID-190 | $168,333.23 | | | | |
| 8/17/2022 | EWAID-191 | $600,932.80 | | | | |
| 8/17/2022 | EWAID-192 | $158,319.74 | | | | |
| 3/29/2023 | EWAID-193 | $63,678.65 | | | | |
| 3/28/2023 | EWAID-194 | $12,204.59 | | | | |
| 9/13/2022 | EWAID-195 | $635,876.08 | | | | |
| 9/13/2022 | EWAID-196 | $184,264.51 | | | | |
| 10/13/2022 | EWAID-197 | $599,106.97 | | | | |
| 10/13/2022 | EWAID-198 | $168,568.25 | | | | |
| 11/14/2022 | EWAID-199 | $616,389.53 | | | | |
| 11/14/2022 | EWAID-200 | $153,788.26 | | | | |
| 12/13/2022 | EWAID-201 | $603,812.53 | | | | |
| 12/13/2022 | EWAID-202 | $151,496.80 | | | | |
| 1/11/2023 | EWAID-203 | $622,480.95 | | | | |
| 1/11/2023 | EWAID-204 | $165,914.25 | | | | |
| 2/11/2023 | EWAID-205 | $619,173.35 | | | | |
| 2/11/2023 | EWAID-206 | $162,175.90 | | | | |
| 3/8/2023 | EWAID-207 | $569,158.74 | | | | |
| 3/8/2023 | EWAID-208 | $156,103.11 | | | | |
| 4/11/2023 | EWAID-209 | $652,689.84 | | | | |
| 4/11/2023 | EWAID-210 | $184,114.03 | | | | |
| 5/9/2023 | EWAID-211 | $599,655.46 | | | | |
| 5/9/2023 | EWAID-212 | $150,668.66 | | | | |

**APPENDIX A -- PARAGON PRIME CONTRACT INVOICES**

| Date | Invoice No. | Amount |
|---|---|---|
| **FPS WEST VIRGINIA** | | |
| **HSHQE3-15-D-00002** | | |
| **Date** | **Invoice No.** | **Amount** |
| 1/12/2016 | WV-001 | $580,900.83 |
| 2/9/2016 | WV-002 | $523,896.76 |
| 3/7/2016 | WV-003 | $535,907.69 |
| 4/13/2016 | WV-004 | $597,870.01 |
| 5/8/2016 | WV-005 | $559,266.83 |
| 6/9/2016 | WV-006 | $562,794.20 |
| 7/13/2016 | WV-007 | $575,902.98 |
| 8/16/2016 | WV-008 | $550,497.27 |
| 8/16/2016 | WV-009 | $8,037.10 |
| 9/9/2016 | WV-010 | $600,252.86 |
| 10/7/2016 | WV-011 | $568,992.06 |
| 10/10/2016 | WV-012 | $39,107.38 |
| 10/10/2016 | WV-013 | $1,028.76 |
| 10/1/2016 | WV-014 | $31,946.64 |
| 11/9/2016 | WV-015 | $84.00 |
| 11/14/2016 | WV-016 | $541,138.50 |
| 12/8/2016 | WV-017 | $528,031.14 |
| 1/5/2017 | WV-018 | $2,520.00 |
| 1/5/2017 | WV-019 | $23,300.34 |
| 1/5/2017 | WV-020 | $19,315.80 |
| 1/8/2017 | WV-021 | $536,571.19 |
| 1/8/2017 | WV-022 | $10,792.09 |
| 2/13/2017 | WV-023 | $522,137.48 |
| 2/13/2017 | WV-024 | $10,802.23 |
| 3/9/2017 | WV-025 | $487,242.87 |
| 3/9/2017 | WV-026 | $14,404.86 |
| 4/11/2017 | WV-027 | $570,167.05 |
| 4/11/2017 | WV-028 | $24,758.22 |
| 5/1/2017 | WV-029 | $283.64 |
| 5/1/2017 | WV-030 | $1,324.19 |
| 5/1/2017 | WV-031 | $8,450.04 |
| 5/10/2017 | WV-032 | $516,324.48 |
| 5/10/2017 | WV-033 | $24,008.10 |
| 6/8/2017 | WV-034 | $554,111.00 |
| 6/8/2017 | WV-035 | $17,648.08 |
| 7/18/2017 | WV-036 | $532,361.89 |
| 7/18/2017 | WV-037 | $16,460.44 |
| 8/7/2017 | WV-038 | $497,312.09 |
| 8/7/2017 | WV-039 | $18,928.51 |
| 9/13/2017 | WV-040 | $550,403.42 |
| 9/13/2017 | WV-041 | $35,791.02 |
| 9/15/2017 | WV-042 | $39,997.29 |
| 10/13/2017 | WV-043 | $511,860.58 |
| 10/13/2017 | WV-044 | $37,045.20 |
| 10/24/2017 | WV-045 | $112,362.26 |
| 11/14/2017 | WV-046 | $532,758.11 |
| 11/15/2017 | WV-047 | $19,355.80 |
| 12/22/2017 | WV-048 | $497,214.60 |
| 12/22/2017 | WV-049 | $21,198.62 |
| 1/19/2018 | WV-050 | $510,764.30 |
| 1/19/2018 | WV-051 | $18,120.80 |
| 2/21/2018 | WV-052 | $528,048.85 |
| 2/21/2018 | WV-053 | $21,380.80 |
| 3/16/2018 | WV-054 | $478,148.33 |
| 3/16/2018 | WV-055 | $15,598.70 |
| 4/16/2018 | WV-056 | $545,971.00 |
| 4/16/2018 | WV-057 | $15,069.78 |
| 5/16/2018 | WV-058 | $523,757.71 |
| 5/16/2018 | WV-059 | $15,099.70 |
| 6/21/2018 | WV-060 | $545,159.05 |
| 6/21/2018 | WV-061 | $14,655.08 |
| 7/18/2018 | WV-062 | $530,771.89 |
| 7/18/2018 | WV-063 | $190,650.99 |
| 7/18/2018 | WV-064 | $23,428.96 |
| 8/8/2018 | WV-065 | $55,832.89 |
| 8/11/2018 | WV-066 | $540,596.94 |
| 8/11/2018 | WV-067 | $13,049.20 |
| 9/17/2018 | WV-068 | $591,370.76 |
| 9/17/2018 | WV-069 | $18,482.28 |
| 10/3/2018 | WV-070 | $3,286.25 |
| 10/22/2018 | WV-071 | $519,076.90 |
| 10/22/2018 | WV-072 | $13,431.11 |
| 11/13/2018 | WV-073 | $574,911.17 |
| 11/13/2018 | WV-074 | $16,272.38 |
| 12/13/2018 | WV-075 | $522,082.86 |
| 12/13/2018 | WV-076 | $12,446.36 |
| 1/15/2019 | WV-077 | $497,876.43 |
| 1/15/2019 | WV-078 | $10,364.07 |
| 2/12/2019 | WV-079 | $536,263.03 |
| 2/12/2019 | WV-080 | $16,531.93 |
| 3/12/2019 | WV-081 | $500,154.97 |
| 3/12/2019 | WV-082 | $15,216.91 |
| 4/11/2019 | WV-083 | $552,634.71 |

## APPENDIX A -- PARAGON PRIME CONTRACT INVOICES

| | | | | | | |
|---|---|---|---|---|---|---|
| 4/11/2019 | WV-084 | $18,297.87 | 10/19/2021 | WV-127 | $522,536.05 |
| 5/16/2019 | WV-085 | $562,275.20 | 12/2/2021 | WV-128 | $516,495.53 |
| 5/16/2019 | WV-086 | $15,557.12 | 1/20/2022 | WV-129 | $499,128.26 |
| 6/12/2019 | WV-087 | $566,295.76 | 1/25/2022 | WV-130 | $510,864.45 |
| 6/12/2019 | WV-088 | $17,894.03 | 2/23/2022 | WV-131 | $491,251.49 |
| 7/15/2019 | WV-089 | $525,520.31 | 3/18/2022 | WV-132 | $480,326.03 |
| 7/15/2019 | WV-090 | $11,791.92 | 4/13/2022 | WV-133 | $551,630.06 |
| 8/7/2019 | WV-091 | $578,435.26 | 5/20/2022 | WV-134 | $533,754.29 |
| 8/7/2019 | WV-092 | $11,374.79 | 6/30/2022 | WV-135 | $51,841.60 |
| 9/17/2019 | WV-093 | $75,257.63 | 6/30/2022 | WV-136 | $540,060.22 |
| 9/17/2019 | WV-094 | $579,889.08 | 8/4/2022 | WV-137 | $527,062.00 |
| 9/17/2019 | WV-095 | $13,796.48 | 8/15/2022 | WV-138 | $532,726.53 |
| 10/15/2019 | WV-096 | $537,084.36 | 9/13/2022 | WV-139 | $621,729.11 |
| 10/15/2019 | WV-097 | $12,415.50 | 10/27/2022 | WV-140 | $581,022.96 |
| 11/14/2019 | WV-098 | $579,380.24 | 11/23/2022 | WV-141 | $573,015.94 |
| 11/18/2019 | WV-099 | $13,717.33 | 12/23/2022 | WV-142 | $560,632.51 |
| 12/26/2019 | WV-100 | $520,134.16 | 1/25/2023 | WV-143 | $577,573.05 |
| 12/26/2019 | WV-101 | $12,866.40 | 2/24/2023 | WV-144 | $570,532.21 |
| 1/15/2020 | WV-102 | $550,815.76 | 3/27/2023 | WV-145 | $531,340.19 |
| 3/2/2020 | WV-103 | $570,230.31 | 5/2/2023 | WV-146 | $620,432.50 |
| 3/12/2020 | WV-104 | $527,710.37 | 5/25/2023 | WV-147 | $567,962.10 |
| 4/23/2020 | WV-105 | $558,442.85 | | | **$48,827,227.65** |
| 5/14/2020 | WV-106 | $456,082.95 | | | |
| 6/15/2020 | WV-107 | $445,395.73 | | | |
| 7/15/2020 | WV-108 | $461,682.43 | | | |
| 8/13/2020 | WV-109 | $469,557.19 | | | |
| 9/23/2020 | WV-110 | $466,923.83 | | | |
| 10/15/2020 | WV-111 | $468,613.58 | | | |
| 11/16/2020 | WV-112 | $480,379.87 | | | |
| 12/16/2020 | WV-113 | $437,005.36 | | | |
| 1/21/2021 | WV-114 | $483,993.95 | | | |
| 2/18/2021 | WV-115 | $466,326.54 | | | |
| 3/11/2021 | WV-116 | $450,833.67 | | | |
| 4/12/2021 | WV-117 | $530,704.67 | | | |
| 4/23/2021 | WV-118 | $122,393.38 | | | |
| 9/9/2021 | WV-119 | $22,574.70 | | | |
| 5/23/2021 | WV-120 | $521,625.57 | | | |
| 6/15/2021 | WV-121 | $499,688.73 | | | |
| 8/3/2021 | WV-122 | $511,068.70 | | | |
| 8/19/2021 | WV-123 | $518,561.52 | | | |
| 9/20/2021 | WV-124 | $546,749.38 | | | |
| 9/27/2021 | WV-125 | $81,769.16 | | | |
| 10/4/2021 | WV-126 | $4,823.34 | | | |

APPENDIX B – PATRONUS SUBCONTRACT INVOICES

| FPS Alabama | | |
|---|---|---|
| **HSHQE4-13-D-00001** | **HSHQE4-17-D-00002** | |
| **Date** | **Invoice** | **Amount** |
| 5/18/2015 | A001 | $10,965.84 |
| 5/20/2015 | A002 | $28,023.76 |
| 6/11/2015 | A003 | $43,480.86 |
| 6/15/2015 | A004 | $41,119.68 |
| 7/22/2015 | A005 | $43,474.48 |
| 7/22/2015 | A006 | $43,474.48 |
| 7/23/2015 | A007 | $43,657.96 |
| 9/2/2015 | A008 | $45,636.39 |
| 10/12/2015 | A009 | $46,142.80 |
| 10/15/2015 | A010 | $43,947.07 |
| 12/30/2015 | A011 | $45,497.76 |
| 1/9/2016 | A012 | $43,871.15 |
| 1/10/2016 | A013 | $45,730.29 |
| 5/9/2016 | A014 | $45,120.73 |
| 5/10/2016 | A015 | $42,505.88 |
| 5/11/2016 | A026 | $45,976.05 |
| 7/20/2016 | A017 | $45,710.46 |
| 7/20/2016 | A018 | $48,399.92 |
| 7/20/2016 | A019 | $46,999.44 |
| 10/24/2016 | A020 | $50,456.17 |
| 10/24/2016 | A021 | $49,380.58 |
| 10/24/2016 | A022 | $49,686.11 |
| 11/21/2016 | A023 | $47,990.66 |
| 12/1/2016 | A024 | $44,311.52 |
| 1/1/2017 | A025 | $49,426.57 |
| 3/15/2017 | A026 | $46,512.51 |
| 4/1/2017 | A027 | $48,895.24 |
| 5/1/2017 | A028 | $47,838.21 |
| 6/1/2017 | A029 | $48,119.23 |
| 7/1/2017 | A030 | $48,959.22 |
| 8/1/2017 | A031 | $47,282.24 |
| 9/1/2017 | A032 | $49,277.00 |
| 10/1/2017 | A033 | $48,411.46 |
| 11/1/2017 | A034 | $48,076.68 |
| 12/1/2017 | A035 | $49,598.07 |
| 1/1/2018 | A036 | $43,783.94 |
| 2/1/2018 | A037 | $47,929.48 |
| 3/1/2018 | A038 | $45,894.61 |
| 4/1/2018 | A039 | $49,824.78 |
| 5/1/2018 | A040 | $48,286.92 |

| | | |
|---|---|---|
| 6/1/2018 | A041 | $1,538.62 |
| 7/1/2018 | A042 | $1,608.55 |
| 7/23/2018 | A043 | $6,667.29 |
| | | **$1,819,490.66** |

APPENDIX B – PATRONUS SUBCONTRACT INVOICES

| **FPS North Florida** | | |
|---|---|---|
| **HSHQE4-12-D-00005** | | |
| **Date** | **Invoice** | **Amount** |
| 4/15/2014 | F001 | $30,283.20 |
| 4/17/2014 | F002 | $33,311.82 |
| 6/9/2014 | F003 | $32,056.48 |
| 7/10/2014 | F004 | $27,715.99 |
| 8/31/2014 | F005 | $32,029.63 |
| 9/4/2014 | F006 | $31,364.30 |
| 10/5/2014 | F007A | $30,254.22 |
| 10/15/2014 | F008 | $25,430.32 |
| 12/23/2014 | F009 | $35,802.05 |
| 1/6/2015 | F010 | $32,185.65 |
| 1/15/2015 | F011A | $30,887.99 |
| 3/2/2015 | F012 | $30,255.71 |
| 3/31/2015 | F013A | $37,117.45 |
| 4/14/2015 | F014A | $35,640.21 |
| 5/18/2015 | F015 | $39,512.02 |
| 5/22/2015 | F016 | $43,354.22 |
| 6/15/2015 | F017 | $34,928.59 |
| 7/23/2015 | F018 | $36,157.36 |
| 9/2/2015 | F019 | $34,643.22 |
| 10/28/2015 | F020 | $34,771.56 |
| 10/28/2015 | F021 | $31,145.49 |
| 1/6/2016 | F022 | $27,023.80 |
| 1/10/2016 | F023 | $24,677.57 |
| 1/10/2016 | F024 | $30,014.67 |
| 5/15/2016 | F025 | $25,118.09 |
| 5/16/2016 | F026 | $29,657.75 |
| 5/17/2016 | F027 | $36,426.48 |
| 7/18/2016 | F028 | $38,937.79 |
| 7/19/2016 | F029 | $35,208.83 |
| 7/20/2016 | F30 | $41,840.68 |
| 10/24/2016 | F031 | $34,492.44 |
| 10/24/2016 | F032 | $38,537.61 |
| 10/24/2016 | F033 | $40,346.72 |
| 11/21/2016 | F034 | $35,962.90 |
| 12/1/2016 | F035 | $37,406.53 |
| 1/1/2017 | F036 | $43,710.01 |
| 3/15/2017 | F037 | $38,935.23 |
| 4/1/2017 | F038 | $41,963.99 |
| 5/1/2017 | F039 | $42,031.40 |
| 6/1/2017 | F040 | $40,197.85 |
| 7/1/2017 | F041 | $43,694.44 |
| 8/1/2017 | F042 | $40,610.91 |
| 9/1/2017 | F043 | $40,656.64 |
| 10/1/2017 | F044 | $37,442.45 |
| 11/1/2017 | F045 | $27,302.96 |
| 12/1/2017 | F046 | $39,428.88 |
| 1/1/2018 | F047 | $34,226.92 |
| 2/1/2018 | F048 | $40,919.64 |
| 3/1/2018 | F049 | $36,983.88 |
| 4/1/2018 | F050 | $3,247.74 |
| 5/1/2018 | F051 | $40,614.00 |
| 6/1/2018 | F052 | $44,171.84 |
| 7/1/2018 | F053 | $43,286.09 |
| 7/23/2018 | F054 | $38,376.22 |
| 8/20/2018 | F055 | $42,450.36 |
| 9/20/2018 | F056 | $39,744.13 |
| 10/22/2018 | F057 | $33,325.71 |
| 11/15/2018 | F058 | $45,406.80 |
| 12/20/2018 | F059 | $59,333.24 |
| 1/22/2019 | F060 | $37,878.93 |
| 2/20/2019 | F061 | $41,525.52 |
| 3/20/2019 | F062 | $51,741.99 |
| 4/22/2019 | F063 | $48,423.90 |
| 5/21/2019 | F064 | $48,436.60 |
| 6/21/2019 | F065 | $50,234.44 |
| 7/19/2019 | F066 | $46,642.15 |
| 8/19/2019 | F067 | $51,837.46 |
| 9/20/2019 | F068 | $39,745.71 |
| 10/22/2019 | F069 | $43,389.20 |
| 11/21/2019 | F070 | $49,721.61 |
| 12/10/2019 | F071 | $49,283.20 |
| 1/29/2020 | F072 | $48,168.91 |
| 2/21/2020 | F073 | $54,096.38 |
| 3/20/2020 | F074 | $42,970.59 |
| 4/22/2020 | F075 | $40,696.78 |
| 5/20/2020 | F076 | $29,008.60 |
| 6/25/2020 | F077 | $28,004.48 |
| 7/21/2020 | F078 | $27,745.84 |
| 8/21/2020 | F079 | $30,325.86 |
| 9/23/2020 | F080 | $33,071.58 |
| 10/22/2020 | F081 | $36,774.50 |
| 11/20/2020 | F082 | $34,485.32 |
| 12/21/2020 | F083 | $27,946.62 |

APPENDIX B – PATRONUS SUBCONTRACT INVOICES

| | | |
|---|---|---|
| 1/20/2021 | F084 | $36,971.29 |
| 2/20/2021 | F085 | $34,220.07 |
| 3/20/2021 | F086 | $33,056.52 |
| 4/21/2021 | F087 | $34,911.24 |
| 5/21/2021 | F088 | $30,313.08 |
| 6/21/2021 | F089 | $38,355.60 |
| 7/20/2021 | F090 | $37,926.30 |
| 8/20/2021 | F091 | $38,699.54 |
| 9/20/2021 | F092 | $39,185.64 |
| 10/21/2021 | F093 | $39,974.22 |
| 11/21/2021 | F094 | $43,456.80 |
| 12/20/2021 | F095 | $41,491.04 |
| 1/20/2022 | F096 | $48,169.20 |
| 2/23/2022 | F097 | $39,846.67 |
| 3/20/2022 | F098 | $51,623.05 |
| 4/21/2022 | F099 | $52,899.72 |
| 5/20/2022 | F100 | $56,442.72 |
| 6/21/2022 | F101 | $80,931.65 |
| 7/24/2022 | F102 | $71,290.68 |
| 8/22/2022 | F103 | $59,626.90 |
| 9/24/2022 | F104 | $69,613.80 |
| 10/20/2022 | F105 | $76,051.29 |
| 11/22/2022 | F106 | $79,370.47 |
| 12/21/2022 | F107 | $71,060.22 |
| 1/20/2023 | F108 | $80,369.85 |
| 2/20/2023 | F109 | $87,519.78 |
| 3/20/2023 | F110 | $86,358.09 |
| 4/20/2023 | F111 | $87,512.61 |
| 6/5/2023 | F112 | $80,790.71 |
| | | **$4,732,755.59** |

APPENDIX B – PATRONUS SUBCONTRACT INVOICES

| FPS Louisiana | | |
|---|---|---|
| **HSHQC7-15-D-00001** | | |
| **Date** | **Invoice** | **Amount** |
| 9/20/2019 | L001 | $69,834.84 |
| 10/22/2019 | L002 | $49,208.16 |
| 11/21/2019 | L003 | $49,208.16 |
| 12/20/2019 | L004 | $1,675.33 |
| 1/29/2020 | L005 | $48,111.56 |
| 2/21/2020 | L006 | $51,600.44 |
| 3/20/2020 | L007 | $53,474.19 |
| 4/22/2020 | L008 | $51,435.09 |
| 5/20/2020 | L009 | $45,074.41 |
| 6/25/2020 | L010 | $47,815.69 |
| 7/21/2020 | L011 | $48,262.24 |
| 8/21/2020 | L012 | $50,301.58 |
| 9/23/2020 | L013 | $45,230.13 |
| 10/22/2020 | L014 | $52,843.00 |
| 11/20/2020 | L015 | $49,867.13 |
| 12/21/2020 | L016 | $47,587.83 |
| 1/20/2021 | L017 | $47,734.28 |
| 2/20/2021 | L018 | $45,057.43 |
| 3/20/2021 | L019 | $42,915.95 |
| 4/21/2021 | L020 | $40,826.28 |
| 5/21/2021 | L021 | $44,003.96 |
| 6/21/2021 | L022 | $46,292.24 |
| 7/20/2021 | L023 | $55,531.69 |
| 8/20/2021 | L024 | $58,060.90 |
| 9/20/2021 | L025 | $49,723.65 |
| 10/21/2021 | L026 | $57,769.91 |
| 11/22/2021 | L027 | $45,515.06 |
| 12/20/2021 | L028 | $43,947.15 |
| 1/20/2022 | L029 | $50,735.51 |
| 2/23/2022 | L030 | $47,673.03 |
| 3/23/2022 | L031 | $56,378.85 |
| 4/21/2022 | L032 | $58,359.93 |
| 5/20/2022 | L033 | $50,562.85 |
| 6/21/2022 | L034 | $54,615.88 |
| 7/25/2022 | L035 | $56,560.60 |
| 8/22/2022 | L036 | $62,031.28 |
| 9/21/2022 | L037 | $63,460.77 |
| 10/20/2022 | L038 | $63,146.71 |
| 11/22/2022 | L039 | $62,583.63 |
| 12/21/2022 | L040 | $53,409.91 |

| | | |
|---|---|---|
| 1/20/2023 | L041 | $57,516.83 |
| 2/20/2023 | L042 | $53,473.07 |
| 3/20/2023 | L043 | $57,882.96 |
| 4/20/2023 | L044 | $54,595.50 |
| 6/5/2023 | L045 | $48,201.79 |
| | | **$2,290,097.38** |

APPENDIX B – PATRONUS SUBCONTRACT INVOICES

| FPS New England (Maine) | | |
|---|---|---|
| **70RFP118DE1000001** | | |
| **Date** | **Invoice** | **Amount** |
| 8/20/2021 | ME001 | $120,927.40 |
| 9/20/2021 | ME002 | $120,927.40 |
| 10/21/2021 | ME003 | $126,973.33 |
| 11/22/2021 | ME004 | $96,096.67 |
| 12/20/2021 | ME005 | $92,592.22 |
| 1/20/2022 | ME006 | $112,738.36 |
| 2/23/2022 | ME007 | $114,474.87 |
| 3/23/2022 | ME008 | $110,754.33 |
| 4/21/2022 | ME009 | $118,701.20 |
| 5/20/2022 | ME010 | $110,317.30 |
| 6/21/2022 | ME011 | $124,728.41 |
| 7/24/2022 | ME012 | $108,650.74 |
| 8/22/2022 | ME013 | $114,007.41 |
| 9/21/2022 | ME014 | $124,950.34 |
| 10/20/2022 | ME015 | $127,551.07 |
| 11/22/2022 | ME016 | $125,774.21 |
| 12/21/2022 | ME017 | $119,921.79 |
| 1/20/2023 | ME018 | $145,396.48 |
| 2/20/2023 | ME019 | $123,756.81 |
| 3/20/2023 | ME020 | $132,451.11 |
| 4/20/2023 | ME021 | $138,265.46 |
| 6/5/2023 | ME022 | $125,451.64 |
| | | **$2,635,408.55** |

| FPS Southern Virginia | | |
|---|---|---|
| **HSHQE3-14-D-00005** | | |
| **Date** | **Invoice** | **Amount** |
| 9/1/2017 | SVA001 | $138,993.60 |
| 11/1/2017 | SVA002 | $48,846.47 |
| 11/1/2017 | SVA003 | $46,426.96 |
| 12/1/2007 | SVA004 | $63,453.60 |
| 2/15/2018 | SVA005 | $46,907.67 |
| 2/15/2018 | SVA006 | $57,101.17 |
| | | **$401,729.47** |

APPENDIX C – PARAGON INVOICES – PARAGON PRIME CONTRACTS WITH PATRONUS
SUBCONTRACT

| FPS Alabama | | |
|---|---|---|
| **HSHQE4-13-D-00001** | | |
| **Date** | **Invoice** | **Amount** |
| 6/16/2015 | AL-069 | $589,535.56 |
| 7/16/2015 | AL-070 | $600,192.36 |
| 9/15/2015 | AL-071 | $600,109.32 |
| 8/18/2015 | AL-072 | $594,724.80 |
| 9/14/2015 | AL-073 | $582,214.06 |
| 10/15/2015 | AL-074 | $598,555.83 |
| 11/16/2015 | AL-077 | $603,317.87 |
| 1/4/2016 | AL-078 | $599,762.63 |
| 1/15/2016 | AL-079 | $615,759.16 |
| 2/17/2016 | AL-080 | $575,229.11 |
| 3/10/2016 | AL-081 | $582,712.81 |
| 4/8/2016 | AL-082 | $653,915.25 |
| 5/16/2016 | AL-083 | $610,425.07 |
| 6/22/2016 | AL-084 | $616,142.74 |
| 7/28/2016 | AL-085 | $626,985.56 |
| 8/11/2016 | AL-086 | $595,561.60 |
| 9/19/2016 | AL-087 | $657,106.03 |
| 12/2/2016 | AL-088 | $617,049.82 |
| 1/12/2017 | AL-089 | $657,311.90 |
| 1/12/2017 | AL-090 | $654,556.22 |
| 1/19/2017 | AL-091 | $690,623.32 |
| 3/23/2017 | AL-092R | $674,000.92 |
| 3/20/2017 | AL-093 | $642,548.66 |
| 4/17/2017 | AL-094 | $752,157.44 |
| 5/15/2017 | AL-095 | $673,274.99 |
| 6/22/2017 | AL-096 | $745,238.90 |
| 8/8/2017 | AL-097R | $736,610.19 |
| 8/29/2017 | AL-098 | $700,422.51 |
| 10/11/2017 | AL-099 | $773,512.71 |
| 11/2/2017 | AL-100 | $803,794.04 |
| 1/8/2018 | AL-101 | $803,787.12 |
| 2/9/2018 | AL-102 | $684,366.84 |
| 2/1/2018 | AL-103 | $684,291.63 |
| 3/1/2018 | AL-104 | $684,231.41 |
| 3/22/2018 | AL-105 | $653,833.00 |
| 4/19/2018 | AL-106 | $742,967.14 |
| 5/29/2018 | AL-107 | $716,044.07 |
| 6/27/2018 | AL-108 | $750,429.49 |
| 7/11/2018 | AL-109 | $723,658.02 |
| | | **$25,866,960.10** |

APPENDIX C – PARAGON INVOICES – PARAGON PRIME CONTRACTS WITH PATRONUS SUBCONTRACT

| FPS North Florida HSHQE4-12-D-00005 / HSHQE4-17-D-00002 | | |
|---|---|---|
| **Date** | **Invoice** | **Amount** |
| 6/24/2014 | NFL-019 | $1,099,201.70 |
| 7/16/2014 | NFL-020 | $1,094,195.12 |
| 8/18/2014 | NFL-021 | $1,140,257.12 |
| 9/19/2014 | NFL-023 | $1,145,476.51 |
| 10/21/2014 | NFL-025 | $1,135,067.67 |
| 11/24/2014 | NFL-026 | $1,182,822.40 |
| 1/15/2015 | NFL-027 | $1,020,218.93 |
| 2/10/2015 | NFL-028 | $1,149,249.54 |
| 3/11/2015 | NFL-029 | $1,112,846.80 |
| 3/26/2015 | NFL-031 | $1,042,861.91 |
| 5/1/2015 | NFL-032 | $1,193,687.23 |
| 5/28/2015 | NFL-033 | $1,192,116.52 |
| 6/26/2015 | NFL-034 | $1,140,316.80 |
| 7/31/2015 | NFL-036 | $1,231,910.77 |
| 8/26/2015 | NFL-038 | $1,268,852.85 |
| 9/28/2015 | NFL-039 | $1,226,720.62 |
| 10/19/2015 | NFL-040 | $1,216,511.05 |
| 11/20/2015 | NFL-041 | $1,229,146.32 |
| 12/16/2015 | NFL-042 | $1,126,678.81 |
| 2/3/2016 | NFL-043 | $1,257,353.53 |
| 2/25/2016 | NFL-045 | $1,160,138.43 |
| 2/21/2016 | NFL-046 | $1,169,202.80 |
| 4/20/2016 | NFL-047 | $1,316,427.99 |
| 5/23/2016 | NFL-050 | $1,264,103.57 |
| 6/24/2016 | NFL-051 | $1,268,057.19 |
| 8/1/2016 | NFL-052 | $1,328,768.19 |
| 8/26/2018 | NFL-053 | $1,246,636.37 |
| 9/23/2016 | NFL-054 | $1,385,406.95 |
| 11/7/2016 | NFL-055 | $1,269,928.91 |
| 12/6/2016 | NFL-056 | $1,235,475.36 |
| 1/9/2017 | NFL-057 | $1,276,823.29 |
| 2/3/2017 | NFL-058 | $1,329,852.05 |
| 3/8/2018 | NFL-059 | $1,304,302.24 |
| 4/3/2017 | NFL-060 | $1,214,087.29 |
| 5/1/2017 | NFL-061 | $1,384,600.78 |
| 5/30/2017 | NFL-062 | $1,234,372.82 |
| 6/23/2017 | NFL-063 | $1,329,267.89 |
| 7/25/2017 | NFL-064 | $1,320,146.01 |
| 8/24/2017 | NFL-065 | $1,122,177.82 |
| 10/4/2017 | NFL-066 | $1,410,132.83 |
| 11/29/2017 | NFL-067 | $1,017,443.40 |
| 3/13/2018 | NFL-069R | $1,238,147.10 |
| 3/13/2018 | NFL-070 | $1,278,184.57 |
| 3/29/2018 | NFL-071 | $1,330,272.66 |
| 3/29/2018 | NFL-072 | $1,220,530.34 |
| 5/16/2018 | NFL-073 | $1,415,858.53 |
| 6/6/2018 | NFL-074 | $1,355,724.33 |
| 6/26/2018 | NFL-075 | $1,403,008.72 |
| 7/27/2018 | NFL-076 | $1,341,781.50 |
| 8/15/2018 | NFL-077 | $1,358,296.14 |
| 10/1/2018 | NFL-078 | $1,468,623.54 |
| 10/25/2018 | NFL-079 | $1,254,214.54 |
| 11/30/2018 | NFL-080 | $1,396,987.64 |
| 12/7/2018 | NFL-081 | $618,824.17 |
| 12/27/2018 | NFL-082 | $1,323,024.54 |
| 1/31/2019 | NFL-083 | $1,173,611.28 |
| 2/21/2019 | NFL-084 | $1,291,691.95 |
| 3/14/2019 | NFL-085 | $1,260,393.23 |
| 5/31/2019 | NFL-086 | $1,368,212.74 |
| 6/11/2019 | NFL-087 | $1,389,250.91 |
| 6/19/2019 | NFL-088 | $1,414,760.85 |
| 7/25/2019 | NFL-089 | $1,319,410.85 |
| 10/4/2019 | NFL-090 | $1,417,277.43 |
| 9/23/2019 | NFL-091 | $1,373,987.38 |
| 11/22/2019 | NFL-092 | $1,321,216.73 |
| 1/16/2020 | NFL-093 | $1,484,452.19 |
| 12/30/2019 | NFL-094 | $1,321,055.76 |
| 1/30/2020 | NFL-095 | $1,347,961.06 |
| 2/28/2020 | NFL-096 | $1,431,314.10 |
| 3/31/2020 | NFL-097 | $1,315,936.04 |
| 4/30/2020 | NFL-098 | $1,366,578.00 |
| 6/2/2020 | NFL-099 | $1,117,900.80 |
| 6/18/2020 | NFL-100 | $1,102,976.56 |
| 7/23/2020 | NFL-101 | $1,221,887.88 |
| 9/17/2020 | NFL-102 | $1,246,148.40 |
| 9/29/2020 | NFL-103 | $1,227,943.23 |
| 10/26/2020 | NFL-104 | $1,191,754.95 |
| 11/27/2020 | NFL-105 | $1,288,845.64 |
| 1/8/2021 | NFL-106 | $1,219,246.07 |
| 2/10/2021 | NFL-107 | $1,229,407.99 |

APPENDIX C – PARAGON INVOICES – PARAGON PRIME CONTRACTS WITH PATRONUS SUBCONTRACT

| | | |
|---|---|---|
| 3/15/2021 | NFL-108 | $1,132,096.97 |
| 4/6/2021 | NFL-109 | $1,156,127.54 |
| 5/10/2021 | NFL-110 | $1,351,087.85 |
| 5/25/2021 | NFL-111 | $1,293,373.78 |
| 6/30/2021 | NFL-112 | $1,229,398.45 |
| 7/29/2021 | NFL-113 | $1,314,795.49 |
| 8/31/2021 | NFL-114 | $1,320,196.84 |
| 11/5/2021 | NFL-115 | $1,433,262.60 |
| 10/29/2021 | NFL-116 | $1,383,531.73 |
| 11/23/2021 | NFL-117 | $1,426,401.90 |
| 1/18/2022 | NFL-118 | $1,394,979.30 |
| 1/28/2022 | NFL-119 | $1,476,016.64 |
| 2/25/2022 | NFL-120 | $1,437,844.48 |
| 3/22/2022 | NFL-121 | $1,365,031.68 |
| 5/27/2022 | NFL-122 | $1,628,179.52 |
| 6/17/2022 | NFL-123 | $1,603,657.28 |
| 8/8/2022 | NFL-124 | $1,595,880.00 |
| 8/1/2022 | NFL-125 | $1,582,993.93 |
| 10/11/2022 | NFL-126 | $1,558,392.32 |
| 10/11/2022 | NFL-127 | $1,727,349.76 |
| 11/14/2022 | NFL-128 | $1,439,074.56 |
| 11/30/2022 | NFL-129 | $1,544,116.86 |
| 12/30/2022 | NFL-130 | $1,498,891.31 |
| 2/16/2023 | NFL-131 | $1,646,433.00 |
| 2/27/2023 | NFL-132 | $1,623,095.40 |
| 3/24/2023 | NFL-133 | $1,497,992.40 |
| 4/19/2023 | NFL-134 | $1,768,425.00 |
| | | **$139,668,171.31** |

| FPS Louisiana | | |
|---|---|---|
| **HSHQC7-15-D-00001** | | |
| **Date** | **Invoice** | **Amount** |
| 12/18/2019 | LA-216 | $112,817.72 |
| 12/18/2019 | LA-217 | $370,017.40 |
| 12/18/2019 | LA-218 | $26,545.60 |
| 12/18/2019 | LA-219 | $218,328.52 |
| 12/18/2019 | LA-220 | $33,542.90 |
| 1/21/2020 | LA-221 | $123,880.87 |
| 1/21/2020 | LA-222 | $389,116.76 |
| 1/21/2020 | LA-223 | $27,712.91 |
| 1/21/2020 | LA-224 | $236,131.35 |
| 1/21/2020 | LA-225 | $31,010.84 |
| 2/13/2020 | LA-226 | $129,000.25 |
| 2/13/2020 | LA-227 | $392,485.79 |
| 2/13/2020 | LA-228 | $29,316.57 |
| 2/13/2020 | LA-229 | $253,707.08 |
| 2/13/2020 | LA-230 | $33,337.32 |
| 3/25/2020 | LA-231 | $112,870.14 |
| 3/25/2020 | LA-232 | $359,358.94 |
| 3/25/2020 | LA-233 | $26,069.01 |
| 3/25/2020 | LA-234 | $226,451.26 |
| 3/25/2020 | LA-235 | $38,503.83 |
| 5/1/2020 | LA-236 | $125,356.95 |
| 5/1/2020 | LA-237 | $399,596.05 |
| 5/1/2020 | LA-238 | $19,664.92 |
| 5/1/2020 | LA-239 | $218,488.16 |
| 5/1/2020 | LA-240 | $29,003.31 |
| 6/1/2020 | LA-241 | $73,743.45 |
| 6/1/2020 | LA-242 | $382,693.97 |
| 6/1/2020 | LA-243 | $0.00 |
| 6/1/2020 | LA-244 | $101,442.91 |
| 6/1/2020 | LA-245 | $7,150.88 |
| 6/30/2020 | LA-246 | $67,354.38 |
| 6/30/2020 | LA-247 | $382,553.34 |
| 6/30/2020 | LA-248 | $0.00 |
| 6/30/2020 | LA-249 | $96,323.54 |
| 6/30/2020 | LA-250 | $9,283.95 |
| 7/29/2020 | LA-251 | $98,168.98 |
| 7/29/2020 | LA-252 | $391,388.79 |
| 7/29/2020 | LA-253 | $0.00 |
| 7/29/2020 | LA-254 | $105,309.24 |
| 7/29/2020 | LA-255 | $18,852.32 |
| 8/21/2020 | LA-256 | $108,807.14 |
| 8/21/2020 | LA-257 | $401,556.44 |
| 8/21/2020 | LA-258 | $7,008.66 |
| 8/21/2020 | LA-259 | $106,369.27 |
| 8/21/2020 | LA-260 | $8,857.34 |
| 9/29/2020 | LA-261 | $98,582.70 |
| 9/29/2020 | LA-262 | $397,755.69 |
| 9/29/2020 | LA-263 | $22,797.95 |
| 9/29/2020 | LA-264 | $102,325.30 |
| 9/29/2020 | LA-265 | $7,994.88 |
| 11/3/2020 | LA-266 | $102,132.41 |
| 11/3/2020 | LA-267R | $388,917.60 |
| 11/3/2020 | LA-268 | $28,127.82 |
| 11/3/2020 | LA-269 | $105,599.04 |
| 11/3/2020 | LA-270 | $9,077.62 |
| 11/3/2020 | LA-271 | $731,756.88 |
| 12/11/2020 | LA-272 | $101,700.99 |
| 12/11/2020 | LA-273 | $392,088.24 |
| 12/11/2020 | LA-274 | $100,382.01 |
| 12/11/2020 | LA-275 | $39,429.14 |
| 12/11/2020 | LA-276 | $678,155.36 |
| 1/6/2021 | LA-277 | $103,893.81 |
| 1/6/2021 | LA-278 | $378,349.35 |
| 1/6/2021 | LA-279 | $98,447.65 |
| 1/6/2021 | LA-280 | $37,038.87 |
| 1/6/2021 | LA-281 | $528,086.71 |
| 2/3/2021 | LA-282 | $113,673.15 |
| 2/3/2021 | LA-283 | $401,464.33 |
| 2/3/2021 | LA-284 | $107,884.48 |
| 2/3/2021 | LA-285 | $35,583.92 |
| 2/26/2021 | LA-286 | $102,948.10 |
| 2/26/2021 | LA-287 | $385,998.23 |
| 2/26/2021 | LA-288 | $97,519.83 |
| 2/26/2021 | LA-289 | $31,676.34 |
| 3/23/2021 | LA-290 | $104,548.55 |
| 3/23/2021 | LA-291 | $347,223.82 |
| 3/23/2021 | LA-292 | $88,776.42 |
| 3/23/2021 | LA-293 | $28,683.30 |
| 4/27/2021 | LA-294 | $133,782.64 |
| 4/27/2021 | LA-295 | $416,219.62 |
| 4/27/2021 | LA-296R | $131,049.38 |
| 4/27/2021 | LA-297 | $53,542.18 |
| 5/27/2021 | LA-298 | $128,129.13 |

APPENDIX C – PARAGON INVOICES – PARAGON PRIME CONTRACTS WITH PATRONUS
SUBCONTRACT

| 5/27/2021 | LA-299 | $401,077.75 | 3/25/2022 | LA-342 | $349,150.50 |
|---|---|---|---|---|---|
| 5/27/2021 | LA-300 | $126,638.35 | 3/25/2022 | LA-343 | $192,044.56 |
| 5/27/2021 | LA-301 | $31,260.64 | 3/25/2022 | LA-344 | $29,670.30 |
| 6/24/2021 | LA-302 | $123,036.80 | 4/29/2022 | LA-345 | $184,585.23 |
| 6/24/2021 | LA-303 | $394,499.30 | 4/29/2022 | LA-346 | $393,964.64 |
| 6/24/2021 | LA-304 | $122,485.97 | 4/29/2022 | LA-347 | $229,710.06 |
| 6/24/2021 | LA-305 | $42,942.81 | 4/29/2022 | LA-348 | $33,026.94 |
| 7/27/2021 | LA-306 | $149,340.21 | 6/8/2022 | LA-349 | $173,439.18 |
| 7/27/2021 | LA-307 | $401,836.40 | 6/8/2022 | LA-350 | $380,519.10 |
| 7/27/2021 | LA-308 | $192,676.88 | 6/8/2022 | LA-351 | $225,394.38 |
| 7/27/2021 | LA-309 | $43,149.66 | 6/8/2022 | LA-352 | $26,493.48 |
| 9/3/2021 | LA-310 | $149,586.30 | 7/11/2022 | LA-353 | $181,384.43 |
| 9/3/2021 | LA-311 | $401,836.40 | 7/11/2022 | LA-354 | $386,273.34 |
| 9/3/2021 | LA-312 | $218,048.73 | 7/11/2022 | LA-355 | $231,025.54 |
| 9/3/2021 | LA-313 | $43,149.66 | 7/11/2022 | LA-356 | $22,307.67 |
| 9/30/2021 | LA-314 | $153,019.16 | 9/29/2022 | LA-357 | $179,979.44 |
| 9/30/2021 | LA-315 | $387,349.26 | 9/29/2022 | LA-358 | $378,680.94 |
| 9/30/2021 | LA-316 | $214,230.98 | 9/29/2022 | LA-359 | $233,606.16 |
| 9/30/2021 | LA-317 | $42,068.84 | 9/29/2022 | LA-360R | $24,023.91 |
| 9/30/2021 | LA-318 | $3,304.10 | 9/13/2022 | LA-361 | $180,734.54 |
| 10/22/2021 | LA-319 | $102,961.81 | 9/13/2022 | LA-362 | $384,756.19 |
| 10/22/2021 | LA-320 | $370,097.71 | 9/13/2022 | LA-363 | $226,812.96 |
| 10/22/2021 | LA-321 | $194,210.34 | 9/13/2022 | LA-364 | $43,496.46 |
| 10/22/2021 | LA-322 | $42,692.39 | 10/13/2022 | LA-365 | $204,872.60 |
| 10/22/2021 | LA-323 | $0.00 | 10/13/2022 | LA-366 | $405,428.17 |
| 11/30/2021 | LA-324 | $148,214.83 | 10/13/2022 | LA-367 | $273,748.07 |
| 11/30/2021 | LA-325 | $378,780.84 | 10/13/2022 | LA-368 | $33,851.40 |
| 11/30/2021 | LA-326 | $195,014.79 | 11/30/2022 | LA-369 | $188,496.91 |
| 11/30/2021 | LA-327 | $43,576.38 | 11/30/2022 | LA-370 | $383,697.69 |
| 11/30/2021 | LA-328 | $100,016.00 | 11/30/2022 | LA-371 | $245,777.38 |
| 1/4/2022 | LA-329 | $149,270.58 | 11/30/2022 | LA-372 | $41,849.13 |
| 1/4/2022 | LA-330 | $370,908.72 | 12/6/2022 | LA-373 | $180,428.99 |
| 1/4/2022 | LA-331 | $190,119.69 | 12/6/2022 | LA-374 | $412,419.92 |
| 1/4/2022 | LA-332 | $43,676.28 | 12/6/2022 | LA-375 | $236,092.59 |
| 1/24/2022 | LA-333 | $158,271.96 | 12/6/2022 | LA-376 | $5,783.67 |
| 1/24/2022 | LA-334 | $386,035.17 | 12/28/2022 | LA-377 | $178,385.22 |
| 1/24/2022 | LA-335 | $204,105.69 | 12/28/2022 | LA-378 | $404,350.36 |
| 1/24/2022 | LA-336 | $45,294.66 | 12/28/2022 | LA-379 | $224,589.74 |
| 2/28/2022 | LA-337 | $160,512.52 | 12/28/2022 | LA-380 | $5,154.38 |
| 2/28/2022 | LA-338 | $479,010.61 | 1/18/2023 | LA-381 | $182,526.76 |
| 2/28/2022 | LA-339 | $195,400.40 | 1/18/2023 | LA-382 | $419,117.83 |
| 2/28/2022 | LA-340 | $32,507.46 | 1/18/2023 | LA-383 | $240,038.89 |
| 3/25/2022 | LA-341 | $152,823.02 | 1/18/2023 | LA-384 | $9,543.81 |

APPENDIX C – PARAGON INVOICES – PARAGON PRIME CONTRACTS WITH PATRONUS
SUBCONTRACT

| | | |
|---|---|---|
| 2/27/2023 | LA-385 | $182,267.13 |
| 2/27/2023 | LA-386 | $412,456.89 |
| 2/27/2023 | LA-387 | $234,766.63 |
| 2/27/2023 | LA-388 | $15,601.59 |
| 5/16/2023 | LA-393 | $207,222.29 |
| 5/16/2023 | LA-394 | $436,810.96 |
| 5/16/2023 | LA-395 | $270,644.73 |
| 5/2/2022 | LA-396 | $23,456.39 |
| | | **$32,026,022.61** |

APPENDIX C – PARAGON INVOICES – PARAGON PRIME CONTRACTS WITH PATRONUS
SUBCONTRACT

| **FPS New England (Maine)** | | |
|---|---|---|
| **70RFP118DE1000001** | | |
| **Date** | **Invoice** | **Amount** |
| 9/13/2021 | ME-103 | $204,917.31 |
| 10/18/2021 | ME-104R | $192,335.45 |
| 11/16/2021 | ME-105 | $176,363.59 |
| 12/13/2021 | ME-106 | $181,775.75 |
| 1/19/2022 | ME-107 | $191,855.92 |
| 2/15/2022 | ME-108 | $181,579.52 |
| 3/21/2022 | ME-109 | $168,846.95 |
| 5/2/2022 | ME-110 | $236,521.78 |
| 5/19/2022 | ME-111 | $215,216.21 |
| 6/10/2022 | ME-112 | $212,229.08 |
| 7/31/2022 | ME-113 | $212,818.39 |
| 8/24/2022 | ME-114 | $207,050.13 |
| 9/26/2022 | ME-115 | $236,333.44 |
| 10/31/2022 | ME-116 | $223,284.82 |
| 12/18/2022 | ME-117 | $216,850.66 |
| 12/13/2022 | ME-118 | $210,475.12 |
| 1/18/2023 | ME-119 | $223,008.93 |
| 2/21/2023 | ME-120 | $208,738.31 |
| 3/29/2023 | ME-121 | $199,101.24 |
| 4/20/2023 | ME-122 | $245,517.48 |
| 5/15/2023 | ME-123 | $216,254.17 |
| | | **$4,361,074.25** |


| **FPS Southern Virginia** | | |
|---|---|---|
| **HSHQE3-14-D-00005** | | |
| **Date** | **Invoice** | **Amount** |
| 10/30/2017 | SVA-102 | $1,127,712.32 |
| 10/30/2017 | SVA-103 | $17,164.40 |
| 1/16/2018 | SVA-104 | $1,128,561.82 |
| 11/30/2017 | SVA-105 | $18,022.62 |
| 2/1/2018 | SVA-106 | $54,250.79 |
| 1/30/2018 | SVA-110 | $1,088,453.48 |
| 1/30/2018 | SVA-111 | $17,164.40 |
| 2/1/2018 | SVA-112 | $41,605.69 |
| | | **$3,492,935.52** |

APPENDIX D – MCKHU PAYMENTS

| Date | Payor | Payee | Amount |
|---|---|---|---|
| 4/12/2016 | Patronus | MCKHU Inc. | $18,500.00 |
| 7/12/2016 | Patronus | MCKHU Inc. | $22,500.00 |
| 1/23/2017 | Patronus | MCKHU Inc. | $90,000.00 |
| 3/9/2017 | Patronus | MCKHU Inc. | $101,520.55 |
| 3/17/2017 | Patronus | MCKHU Inc. | $32,295.00 |
| 4/5/2017 | Patronus | MCKHU Inc. | $230,000.00 |
| 5/1/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 5/16/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 6/8/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 7/21/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 8/11/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 9/15/2017 | Patronus | MCKHU Inc. | $10,745.00 |
| 10/5/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 11/3/2017 | Patronus | MCKHU Inc. | $10,765.00 |
| 11/24/2017 | Patronus | MCKHU Inc. | $198,720.00 |
| 3/7/2018 | Patronus | MCKHU Inc. | $415,000.00 |
| 3/29/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 4/27/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 5/14/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 5/16/2018 | Patronus | MCKHU Inc. | $10,765.00 |
| 6/11/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 7/11/2018 | Patronus | MCKHU Inc. | $41,000.00 |
| 8/22/2018 | Patronus | MCKHU Inc. | $108,000.00 |
| 10/1/2018 | Patronus | MCKHU Inc. | $108,000.00 |
| 12/3/2018 | Patronus | MCKHU Inc. | $200,000.00 |
| 4/5/2019 | Patronus | MCKHU Inc. | $361,345.00 |
| 12/30/2019 | Patronus | Frontline Source | $498,543.75 |
| 7/7/2020 | Patronus | Frontline Source | $189,225.00 |
| 8/19/2020 | Patronus | Frontline Source | $198,618.75 |
| 12/22/2020 | Patronus | Frontline Source | $193,950.00 |
| 3/4/2021 | Patronus | Frontline Source | $189,000.00 |
| 4/7/2021 | Patronus | Frontline Source | $111,825.00 |
| 5/6/2021 | Patronus | Frontline Source | $129,600.00 |
| 6/3/2021 | Patronus | Frontline Source | $63,900.00 |
| 7/1/2021 | Patronus | Frontline Source | $62,775.00 |
| 8/2/2021 | Patronus | Frontline Source | $69,300.00 |
| 9/2/2021 | Patronus | Frontline Source | $67,275.00 |
| 10/1/2021 | Patronus | Frontline Source | $67,500.00 |
| 11/5/2021 | Patronus | Frontline Source | $69,750.00 |
| 12/3/2021 | Patronus | Frontline Source | $69,975.00 |
| 3/17/2022 | Patronus | Frontline Source | $59,625.00 |
| 6/13/2022 | Patronus | Frontline Source | $58,750.00 |

APPENDIX D – MCKHU PAYMENTS

| 9/13/2022 | Patronus | Frontline Source | $49,500.00 |
|---|---|---|---|
| 10/11/2022 | Patronus | Frontline Source | $48,750.00 |
| 11/9/2022 | Patronus | Frontline Source | $47,250.00 |
| 12/20/2022 | Patronus | Frontline Source | $46,750.00 |
| 1/6/2023 | Patronus | Frontline Source | $45,500.00 |
| 2/27/2023 | Patronus | Frontline Source | $46,000.00 |
| 3/17/2023 | Patronus | Frontline Source | $42,500.00 |
| 4/3/2023 | Patronus | Frontline Source | $41,750.00 |
| | | | **$4,655,358.05** |

APPENDIX E – GRIGSBY CONSULTING PAYMENTS

| Date | Payor | Payor/Payee | Amount |
|---|---|---|---|
| 2/10/2016 | Patronus Systems | Grigsby Consulting | $11,000.00 |
| 3/21/2016 | Patronus Systems | Grigsby Consulting | $2,000.00 |
| 4/4/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/3/2016 | Patronus Systems | Grigsby Consulting | $2,000.00 |
| 7/12/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/5/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/2/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/3/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/1/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/5/2016 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/6/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/2/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/3/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/3/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/1/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/1/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/15/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/2/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/4/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/5/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/3/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/4/2017 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/3/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/3/2018 | Patronus Systems | Grigsby Consulting | $2,000.00 |
| 10/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/2/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/5/2018 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/3/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/5/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/4/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/2/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/4/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/3/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/1/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/1/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/5/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/4/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |

APPENDIX E – GRIGSBY CONSULTING PAYMENTS

| | | | |
|---|---|---|---|
| 11/11/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/2/2019 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/6/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/1/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/8/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/4/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/5/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/2/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/3/2020 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/6/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/3/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/3/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/4/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/5/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/2/2021 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/5/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/3/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/3/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/1/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 5/4/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 6/6/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 7/5/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 8/4/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 9/6/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 10/7/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 11/11/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 12/5/2022 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 1/26/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 2/6/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 3/2/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| 4/4/2023 | Patronus Systems | Grigsby Consulting | $1,000.00 |
| | | | $98,000.00 |